

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KIM KAUFMAN and GLENN KAUFMAN,

                                        Plaintiffs,

                -against-

UNITEDHEALTH GROUP INC.,
UNITEDHEALTHCARE, UNITED HEALTHCARE
INSURANCE COMPANY OF NEW YORK,
UNITEDHEALTHCARE OF NEW YORK, INC.,
OXFORD HEALTH PLANS LLC and OXFORD
HEALTH PLANS (NY), INC.,

                                        Defendants.

---

08 Civ.

COMPLAINT

JURY TRIAL DEMANDED

ECF Case

Plaintiffs Kim Kaufman and Glenn Kaufman, by and through their undersigned

counsel, upon personal knowledge as to their actions and upon information and belief as to the

actions of others, allege against UnitedHealth Group Inc., UnitedHealthcare, United HealthCare

Insurance Company of New York, UnitedHealthcare of New York, Inc. ("United"), Oxford

Health Plans LLC and Oxford Health Plans (NY), Inc. ("Oxford"), as well as their relevant

affiliates and subsidiaries (collectively, the "Defendants"), as follows:

## NATURE OF THE ACTION

1.      This is an ERISA action seeking reimbursement for covered benefits in

accordance with the terms of the relevant insurance policies and New York law, as well as

declaratory relief that Plaintiffs are entitled to future benefits.

2.      Between February 16, 2006, and February 18, 2008, Mrs. Kaufman

underwent numerous painful, medically-necessary procedures related to her cleft palate

condition--a congenital deformity causing significant functional impairment. Despite the fact that such procedures (a) were plainly covered by Plaintiffs' policies and (b) <u>must</u> be covered by Plaintiffs' policies pursuant to New York law, the defendant insurers have--upon patently false grounds--improperly denied Plaintiffs' claims for benefits related to these covered procedures for over thirty months.

3.    Moreover, Defendants have acted in bad faith and have deliberately engaged in unnecessary tactics of delay and obfuscation. Indeed, despite Defendants' explicit and unequivocal agreement in March 2007 to cover the great bulk of Plaintiffs' claims--after a stunning rebuke of Defendants' course of conduct by an independent, third-party review agency and extraordinary efforts by Plaintiffs--not a dollar of the approved coverage has been paid by Defendants for <u>more than thirteen months</u>.

4.    Defendants' actions have caused unnecessary emotional distress and suffering by Mrs. Kaufman. Defendants' conduct is intentionally designed to force Plaintiffs to abandon their effort to obtain proper coverage.

5.    Because of Defendants' improper refusal to provide coverage that is mandated by their policies and by New York law--and because of Defendants' ongoing delay in providing reimbursement that they have already agreed to pay--Plaintiffs respectfully submit that this Court should award: (a) all outstanding costs associated with all procedures related to Mrs. Kaufman's condition, as well as costs incidental to such reimbursement; (b) declaratory relief ordering that all costs associated with future procedures related to Mrs. Kaufman's congenital condition are covered benefits; and (c) a declaration that Defendants, in bad faith, wrongfully denied Plaintiffs' claims for benefits and intentionally engaged in tactics of delay and obfuscation.

2

## THE PARTIES

6.    Kim Kaufman and Glenn Kaufmann are residents of the State of New York.  At all relevant times, Mrs. Kaufman has been the wife of Glenn Kaufman, an employee of American Securities Capital Partners, LLC ("ASCP"), a firm based in New York, New York.

7.    Since at least 2004, Kim and Glenn Kaufman have been enrolled in a health benefit plan provided and administered by United and/or Oxford to employees of ASCP and their families.

8.    UnitedHealth Group Inc., a diversified healthcare conglomerate, is the parent corporation of UnitedHealthcare and Oxford Health Plans LLC.

9.    UnitedHealthcare, an operating division of UnitedHealth Group Inc., provides consumer-oriented health benefit plans and services for individuals and small and mid-sized employers.

10.    Upon information and belief, UnitedHealthcare provides health benefit plans in New York by or through United HealthCare Insurance Company of New York or its affiliates and operates in New York as UnitedHealthcare of New York, Inc.

11.    UnitedHealthcare, through United Healthcare Insurance Company of New York, UnitedHealthcare of New York, Inc., and/or its affiliates and subsidiaries, was the health benefit plan provider to ASCP from January 1, 2004, to February 28, 2006. UnitedHealthcare has again been the health benefit plan provider to ASCP from January 1, 2007, to the present.

12.    Defendant Oxford Health Plans LLC, a subsidiary of UnitedHealth Group Inc. and/or UnitedHealthcare, is a provider of employee health benefit plans to various companies and organizations.

3

13.     Upon information and belief, Oxford Health Plans LLC provides health benefit plans in New York by or through Oxford Health Plans (NY), Inc., or its affiliates and subsidiaries.

14.     Oxford Health Plans LLC, through Oxford Health Plans (NY), Inc., and/or its affiliates and subsidiaries, was the health benefit plan provider to ASCP from March 1, 2006, to December 31, 2006.

## JURISDICTION AND VENUE

15.     This action arises under 29 U.S.C. §§ 1001 et. seq. (the Employee Retirement Income Security Act ("ERISA")) and 29 U.S.C. § 1132 (ERISA section 502).

16.     The Court has jurisdiction over the subject matter of this action based upon 29 U.S.C. § 1132.  Section 1132(a)(1)(B) provides that a civil action may be brought by a plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan".

17.     Section 1132(a)(3)(B)(i) provides that a plan participant or beneficiary may bring an action "to obtain other appropriate equitable relief to redress" violations of ERISA or the relevant plan.

18.     Section 1132(e)(1) provides that the district courts of the United States have jurisdiction over civil actions brought under Section 1132(a)(1)(B) by a plan participant or beneficiary.

19.     Venue is properly laid in the Southern District of New York. Section 1132(e)(2) provides that, for actions brought in a district court of the United States, an action may be brought "in the district where the plan is administered, where the breach took

4

place, or where a defendant resides or may be found".

20.    The Court has jurisdiction over Defendants pursuant to

Section 1132(d)(1), which provides that "an employee benefit plan may sue or be sued under this

subchapter as an entity". Jurisdiction is also proper under Rule 4(K)(1)(A) of the Federal Rules

of Civil Procedure, since both Oxford and United have sufficient contacts with the State of

New York.

## FACTS

21.    Over the course of the relevant period, Defendants have provided an

"employee benefit plan" to ASCP, which is subject to the provisions of ERISA.

22.    An "employee benefit plan" is covered by ERISA if it is established or

maintained "by any employer engaged in commerce or in any industry or activity affecting

commerce". 29 U.S.C. § 1003(a)(1).

23.    Under ERISA, the term "employee benefit plan" encompasses any

"employee welfare benefit plan". 29 U.S.C. § 1002(3). ERISA defines an "employee welfare

benefit plan" as "any plan, fund, or program which was heretofore or is hereafter established or

maintained by an employer or by an employee organization, or by both, to the extent that such

plan, fund, or program was established or is maintained for the purpose of providing its

participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical,

surgical, or hospital care or benefits . . . .". 29 U.S.C. § 1002(1).

24.    Glenn Kaufman was a participant in an employee welfare benefit plan

provided by Defendants--through ASCP--at all relevant times.

25.    Kim Kaufman was a participant and/or beneficiary of an employee welfare

benefit plan provided by Defendants--through ASCP--at all relevant times.

5

**Kim Kaufman's Condition**

26.     Since shortly after birth (and throughout her childhood years), Mrs. Kaufman has undergone numerous surgical procedures to correct a severe cleft palate and lip.

27.     Cleft palate is a congenital deformity caused by abnormal facial development during gestation. The condition leads to significant functional impairment, and the surgical procedures involved in correcting cleft palate are painful and extensive.

28.     In more than ten surgeries on Mrs. Kaufman through age nineteen, various doctors worked to remedy her cleft palate condition.

29.     One of the severe problems associated with Mrs. Kaufman's cleft palate was a large area at the forward roof of Mrs. Kaufman's mouth that was without any bone. As a result, there were no teeth in the area. To rectify the problem, doctors inserted a "Maryland Bridge"--affixing teeth in the area of the cleft palate where there is no bone using the abutting teeth as anchors.

30.     The procedures undergone by Mrs. Kaufman, including the use of the Maryland Bridge, were the best available treatment options at the time and were performed by surgeons at the forefront of their profession.

**The Procedures at Issue**

31.     In or around 2004, the Maryland Bridge reached the end of its period of effectiveness and began to fail.

32.     As a result, the effects of Mrs. Kaufman's cleft palate condition resurfaced and her quality of life deteriorated significantly. Mrs. Kaufman suffered from various medical problems, severe pain, loss of two natural teeth (the anchors of the Bridge) and significant functional impairment (inability to masticate or drink without pain, difficulty speaking, etc.).

6

33.    Given the deteriorated condition of Mrs. Kaufman's mouth (e.g., the loss of teeth), a replacement bridge was not a viable remedial option.

34.    Consequently, a course of treatment permanently to repair the cleft and manage Mrs. Kaufman's congenital condition was decided upon by an expert team of dentists and surgeons who are highly specialized in cleft palate reconstruction. The team was led by Dr. Court Cutting and included Dr. Lawrence Brecht and Dr. Burton Langer.

35.    It was determined that an iliac bone graft to the alveolar cleft--which involves the transfer of bone from the hip to the palate--was the best option permanently to correct Mrs. Kaufman's condition and provide her with acceptable quality of life. That procedure had not been available at the time of Mrs. Kaufman's previous surgeries.

36.    As a necessary and integral part of the course of treatment--directly related to the primary bone graft surgery--Mrs. Kaufman was to undergo several procedures both before and after the bone graft.

37.    The following are the primary procedures in Mrs. Kaufman's course of treatment to remedy and manage her congential condition, but do not represent an exhaustive list:

(a)    On February 16, 2006, a tissue grafting procedure was performed by Dr. Langer.

(b)    On May 11, 2006, Dr. Langer successfully performed a procedure consisting of: (i) certain connective tissue grafting; and (ii) removal of an implant.

7

(c)    On July 20, 2006, Mrs. Kaufman underwent the primary alveolar bone grafting procedure performed by Dr. Cutting to reconstruct the palate. Dr. Brecht served in an advisory role during the procedure.

(d)    On December 11, 2006, Dr. Langer surgically inserted implants for teeth five, six and seven into the bone graft now in place in the palate. Dr. Brecht produced replacement teeth and subsequently performed procedures to put such teeth in place.

38.    During and since the period of those procedures, Mrs. Kaufman has undergone a substantial number of other procedures directly related to her cleft palate condition.

**Defendants' Wrongful Denial of Plaintiffs' Claims**

39.    The Kaufmans' Oxford policy--as an explicit exception to the policy's non-coverage of dental services--specifically provided coverage for "[o]ral surgical procedures required for the correction of a non-dental physiological condition which has resulted in a severe functional impairment". (Ex. A (Section V(2)(F)(2)).)

40.    The Kaufmans' United policy provides for "dental services for care and treatment necessary due to congenital disease or Congenital Anomaly". (Ex. B (Dental Services Amendment to the ASCP policy provided by United HealthCare Insurance Co. of New York).) (Exs. A and B are, collectively, "the Policies".)

41.    Further, the New York Administrative Code, Title 11, Chapter III, Subchapter A, Part 52, prohibits an insurance policy from limiting or excluding coverage for "dental care or treatment necessary due to congenital disease or anomaly". (Ex. C (Section 52.16(c)(9)).)

42.    From the beginning, Plaintiffs have made extraordinary efforts to comply with onerous administrative hurdles imposed by Oxford and United in order to obtain

8

reimbursement for covered benefits. This includes submission of pre-authorizations; providing letters, signed statements and other information from doctors performing the various procedures; and providing detailed invoices, billing statements and other materials demanded by Defendants.

43.    Indeed, Defendants' repeated refusal to provide reimbursement for covered benefits has come in the face of an overwhelming effort by Mrs. Kaufman and her doctors to explain the nature and necessity of the procedures she has undergone.

44.    Plaintiffs provide the following examples--as a way of contrasting their extraordinary efforts with the bad faith of Defendants.

**i.    The May 11 Procedure**

45.    On May 5, 2006, Plaintiffs sought pre-authorization from Oxford for the May 11, 2006, procedure, providing necessary information and codes. (See Ex. D.)

46.    After the May 11 procedure, Dr. Langer spoke at length with Dr. Jonathan Zucker (the Medical Director at Oxford initially responsible for reviewing Plaintiffs' claims) and explained in detail that the work being done was directly related to the medical treatment of Mrs. Kaufman's cleft palate and was not dental or cosmetic in nature. Upon information and belief, Dr. Zucker is a dentist with no cleft palate experience.

47.    On May 15, 2006, Oxford sent a Letter of Determination denying Plaintiffs' claim related to the May 11 procedure solely because certain documentation had not been received. (Ex. E; see Ex. D.)

48.    On or about May 18, 2006, in response to Oxford's request, Dr. Langer sent a letter of medical necessity--along with other detailed information about the procedures--to Oxford. (See Ex. F.)

49.    On May 24, 2006, Elizabeth Britt (the Oxford Claims Project Manager

handling Plaintiffs' claim) notified Plaintiffs that substantial additional medical records, including those related to treatment more than twenty years earlier, would need to be provided by May 27--less than three days later and on the Saturday of Memorial Day weekend--or the May 11 claims would automatically be denied. (See Ex. G.)

50.    Despite the outrageous deadline imposed by Oxford, through extraordinary efforts Plaintiffs were able to compile the requested information and provide it to Oxford by May 27.

51.    On June 7, 2006--despite the plain language of the Oxford policy; despite Dr. Langer's explanation; despite Plaintiffs' remarkable efforts to supply paperwork; and in direct violation of applicable New York law--Oxford denied Plaintiffs' May 11, 2006, claim, stating that "[d]ental treatment including removal of teeth and services needed to prepare the mouth for the replacement of teeth are not covered benefits". (Ex. H.) That was patently wrong and in violation of the law.

52.    Oxford's denial was based, at least in part, upon the determination of Dr. David Behrman, a maxillofacial surgeon. However, upon information and belief, Dr. Behrman--like Dr. Zucker and in stark contrast to each of Mrs. Kaufman's doctors--has no experience with the specialized area of cleft palates, nor any bone-grafting experience relating to cleft palate deformities.

53.    On or about June 19, 2006, in accordance with their rights under the Oxford policy, Plaintiffs appealed Oxford's denial of coverage in a letter sent by J. Peat & Associates (an employee benefit specialist). (See Ex. I.) The letter explained why Plaintiffs' claims should be covered and requested expedited review for the July 20, 2006, bone graft surgery to be performed by Dr. Cutting. The letter also explained that future procedures to be

performed by Drs. Langer and Brecht were integral to the bone graft and the overall course of treatment for Mrs. Kaufman's cleft palate condition. (See Ex. I.)

54.     On or about June 20, 2006, Dr. Cutting and Dr. Brecht submitted letters (through Mrs. Kaufman) explaining in detail the procedures at issue, the medical necessity of the procedures and why they should be covered. (Ex. J.)

55.     On June 26, 2006, Oxford received an appeal from Dr. Brecht in support of Plaintiffs' claim. (See Ex. D, at 2.)

56.     On July 3, 2006, Oxford again improperly denied the claim. Oxford asserted--inconsistently with the undisputed facts--that denial was appropriate because "removal of teeth and the preparation of the mouth for the replacement of teeth is not a covered benefit". (Ex. K; see Ex. D.)

57.     On or about July 21, 2006, in accordance with their rights under the Oxford policy, Plaintiffs submitted an appeal through J. Peat & Associates. (See Ex. L.) That appeal--like the June 19 letter (Ex. I)--discussed pre-certification coverage for the July 20, 2006, bone graft, as well as the subsequent implant procedures by Drs. Langer and Brecht.

58.     On or about July 19, 2006, Plaintiffs submitted a formal complaint against Oxford to the New York State Insurance Department. (Ex. M.)

59.     On or about September 22, 2006, Plaintiffs appealed Oxford's denial of their claim. (See Ex. N.)

60.     Shortly thereafter, Plaintiffs (through J. Peat & Associates) informed Oxford that additional, vital information in support of the claim was forthcoming. (See Ex. O.)

61.     Oxford ignored Plaintiffs' request and proceeded to review the claim without the additional information. (See Ex. O.)

11

62.    On October 16, 2006, Oxford issued a final determination denying benefits related to the May 11 procedure and referring to the procedure as a "dental service". (Ex. P.)

### ii.    The July 20 Procedure

63.    Plaintiffs requested pre-authorization review of the July 20, 2006, bone graft.  (See Ex. Q; see also Ex. I.)

64.    Oxford agreed to provide coverage for this procedure on June 20, 2006. (Ex. Q.)

65.    Accordingly, Plaintiffs and the relevant doctors submitted claims for reimbursement of covered claims.

66.    However, Oxford actually paid only a small portion of the total costs relating to the procedure.

67.    On or about August 28, 2006, and October 6, 2006, Dr. Cutting sent Oxford letters explaining the relevant costs and requesting full reimbursement.  (Ex. R.)

68.    On October 16, 2006, Oxford asserted that the services provided by Dr. Brecht on July 20, 2006--which were integral to the bone graft performed that day--"[were] not authorized by Oxford" and that "Oxford paid the claim in error".  Oxford then stated that it would seek to "recoup the payment".  (Ex. P.)

69.    On or about October 20, 2006, Plaintiffs again appealed Oxford's decision to not reimburse in full all costs associated with the bone graft.  (Ex. S.)

70.    On or about October 22, 2006, Dr. Brecht again provided an explanation of Mrs. Kaufman's condition and an explanation of why all associated procedures were medically necessary as part of her overall congenital cleft palate care.  (Ex. T.)

12

71.    On November 6, 2006, Oxford again wrongly denied Plaintiffs' claim for full reimbursement with respect to the bone graft. (Ex. U.)

**iii.    The December 11 Procedure**

72.    On August 15, 2006, Oxford improperly denied Plaintiffs' claim for pre-certification of the implantation procedure to be performed by Dr. Langer.  Oxford wrongly stated that "[d]ental treatment including replacement of teeth is not a covered benefit"--despite the fact that such procedures were clearly related to Mrs. Kaufman's cleft palate condition and integral to her course of treatment. (Ex. V.)

73.    On August 22, 2006, in accordance with their rights under the Oxford policy, Plaintiffs appealed Oxford's denial of her claim. (Ex. W.)

74.    On September 5, 2006, Oxford again improperly denied the claim.  Oxford asserted--inconsistently with the undisputed facts--that denial was appropriate because Mrs. Kaufman's "<u>dental problem does not appear to be related to a failure of her cleft palate repair</u>, as the defect remains well closed". (Ex. X, emphasis added.)  That was patently (and demonstrably) false.

75.    Incredibly, Oxford further stated that "the request for management of a failing dental implant is <u>no different from any other failing dental implant</u>"; and that "<u>medical necessity has not been demonstrated</u>". (Ex. X, emphases added.)

76.    On or about September 22, 2006, J. Peat & Associates sent Oxford a letter reiterating that the yet to be performed procedures such as the surgical insertion of implants were necessary to complete reconstruction of the cleft and were covered by the Oxford policy and New York law. (Ex. N; <u>see also</u> Exs. I, L.)

77.    Oxford's "final position" letter of October 16, 2006, once again

incorrectly asserted that the implantation of teeth and related procedures were merely "dental services" that were not covered. (Ex. P.)

78.    With respect to many of the procedures at issue, Plaintiffs have exhausted all available administrative remedies.

79.    Moreover, it is absolutely clear that past and future attempts by Plaintiffs to submit paperwork, comply with Defendants' onerous demands and pursue further administrative remedies were--and continue to be--utterly futile.

80.    Indeed, Defendants have deliberately made the administrative process so inordinately difficult--e.g., requiring excessive amounts of paperwork, making redundant requests, imposing unnecessarily short time frames, failing to provide phone numbers, addresses and email addresses, etc.--that it has been and continues to be virtually impossible for Plaintiffs fully to comply with the administrative demands imposed by Defendants. That, in itself, has caused great pain to Mrs. Kaufman and further demonstrates Defendants' intentional bad faith.

**External Review of Plaintiffs' Claims for Benefits**

81.    As part of the administrative appeals process, on or around November 10, 2006, Plaintiffs submitted the disputed claims--as they related to past and future coverage of Mrs. Kaufman's condition--to IPRO. IPRO is an independent, third-party reviewer of medical claims hired by the State of New York to adjudicate disputes of this nature.

82.    Plaintiffs submitted all relevant documentation and a wealth of supporting letters from her physicians--which were, of course, previously provided or available to Defendants previously. (See Ex. Y.)

83.    Defendants submitted materials in support of their position. (See Ex. Y.)

84.    On December 6, 2006, IPRO determined that Oxford was plainly wrong, stating that "reconstruction of the cleft and restoration of those congenitally absent teeth are

under the umbrella of New York State regulation". (Ex. Y, at 5.)

85.    IPRO specifically found that the following procedures were "medically necessary" and must be covered:  (a) removal of the infected implant; (b) the connective tissue graft; (c) reconstruction of the cleft palate; (d) temporization after surgical reconstruction; (e) placement of dental implant for tooth number seven; and (f) fixed prosthetics for tooth number seven.  (Ex. Y, at 5.)

86.    IPRO concluded that only replacement of teeth numbers five and six was not covered.  Plaintiffs disagree with this aspect of IPRO's determination.

87.    In its findings, IPRO specifically noted that Oxford's decision to cover a portion of the bone graft suggested that Oxford itself deemed the procedures to be "medically necessary".  (Ex. Y, at 4.)

**Oxford's Astonishing Delay and Obfuscation**

88.    Despite IPRO's independent determination that almost all of Plaintiffs' claims are covered, Oxford delayed for more than three months before agreeing to reimburse Plaintiffs for the procedures.

89.    That was despite an email from Defendants on January 2, 2007, which stated that Oxford had received IPRO's final decision and would "abide by the determination made by IPRO".  (Ex. Z.)

90.    Finally on March 7, 2007, Oxford officially informed the Kaufmans that Oxford would provide coverage in accordance with IPRO's determinations.  (Ex. AA.)

91.    However, in direct contravention of its January 2, 2007, and March 7, 2007, assurances--and despite Plaintiffs' extraordinary efforts to provide additional requested paperwork--Oxford has still failed, through the date of this Complaint, to provide reimbursement for the covered procedures.

92.    On October 5, 2007, Plaintiffs notified Defendants, through counsel, that they were demanding prompt reimbursement for all procedures for which they had requested coverage, as well as for all costs associated with securing reimbursement. (Ex. BB.) The letter further stated that failure to provide full reimbursement (with documentation supporting calculation of such reimbursement) by October 22, 2007, would result in commencement of legal proceedings.

93.    Defendants failed to respond to the October 5, 2007, letter in any fashion.

94.    Defendants' failure to provide the required benefits--and their continuing wrongful denial of benefits--demonstrates bad faith, a willingness to attempt to avoid their own commitments, a willingness to ignore the official determination of a state-sanctioned adjudicator, a disregard of their own policies and the laws of the State of New York and a remarkable indifference to Plaintiffs' rights and Mrs. Kaufman's well-being.

95.    Adding to the insulting nature of Defendants' conduct, while refusing to comply with the law as well as their own policies and assurances (or even respond to Plaintiffs' letter), Oxford contacted Dr. Brecht seeking recoupment of payments made relating to the July 20, 2006, procedure because, according to Oxford, those payments were "paid incorrectly". (See Ex. CC.) Oxford even threatened to offset future payments to Dr. Brecht and noted that it had retained a collection agency to pursue the matter.

96.    Thus, Oxford has not only failed to reimburse Plaintiffs for covered benefits that it agreed (twice) to pay, but also it has begun to bully Mrs. Kaufman's doctors in an effort improperly to recoup certain of the payments that Oxford was required to make. There can be no clearer demonstration of Defendants' bad faith.

## FIRST CAUSE OF ACTION (IMPROPER DENIAL OF BENEFITS)

97.     Plaintiffs reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 96 of this Complaint.

98.     Plaintiffs are participants and/or beneficiaries of an "employee benefit plan" provided by Defendants.

99.     That "employee benefit plan" is subject to ERISA.

100.     On February 16, 2006, Mrs. Kaufman underwent a medically necessary procedure to fix a congenital condition causing significant impairment of function.

101.     On May 11, 2006, Mrs. Kaufman underwent a medically necessary procedure to fix a congenital condition causing significant impairment of function.

102.     On July 20, 2006, Mrs. Kaufman underwent a medically necessary procedure to fix a congenital condition causing significant impairment of function.

103.     On December 11, 2006, Mrs. Kaufman underwent a medically necessary procedure to fix a congenital condition causing significant impairment of function.

104.     Between February 16, 2006, and the date of this Complaint, Mrs. Kaufman underwent several other medically necessary procedures to fix a congenital condition causing significant impairment of function.

105.     Under the terms of the Policies, Plaintiffs are entitled to reimbursement of all costs associated with those medically necessary procedures, including associated care—e.g., the cost of anesthesiologists, certain CT scans, appointments with doctors before and after the relevant procedures, etc.  Such costs comprise those that Defendants agreed to cover on January 2, 2007, and March 7, 2007 (in accordance with IPRO's December 6, 2006, determination), as well as the remainder of costs associated with the procedures.

106.     Under New York law, Plaintiffs are entitled to reimbursement of all costs

17

associated with the above-described medically necessary procedures. Such costs comprise those that Defendants agreed to cover on January 2, 2007, and March 7, 2007 (in accordance with IPRO's December 6, 2006, determination), as well as the remainder of costs associated with the procedures.

107.    Due to Defendants' improper denial of benefits, obfuscation and overt delay tactics, Plaintiffs are entitled to recover additional costs associated with securing reimbursement for the above-described procedures, including but not limited to interest, attorney's fees and additional costs that would have been reimbursed if the procedures in question had been included in calculating individual and family annual deductibles. Such incidental costs are recoverable under 29 U.S.C. § 1132(a)(1)(B) and as "appropriate equitable relief" (29 U.S.C. § 1132(a)(3)). Plaintiffs are entitled to attorney's fees and costs under 29 U.S.C. § 1132(g)(1).

108.    Further, because of the complexity and circumstances surrounding reimbursement of Plaintiffs' covered benefits--in addition to Defendants' needless obfuscation--Plaintiffs are entitled to an accounting of all costs and reimbursements, with full documentation.

## SECOND CAUSE OF ACTION (DECLARATORY RELIEF)

109.    Plaintiffs reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 108 of this Complaint.

110.    Under the terms of the Policies, Plaintiffs are entitled to reimbursement of all costs associated with medically necessary procedures.

111.    Under New York law, Plaintiffs are entitled to reimbursement of all costs associated with medically necessary procedures.

112.    Under ERISA, Plaintiffs are entitled to "clarify [their] rights to future

benefits under the terms of the plan". 29 U.S.C. § 1132(a)(1)(B).

113.    Due to Defendants' past course of conduct--including improper denial of
benefits, obfuscation and overt delay tactics--Plaintiffs are entitled to declaratory relief
establishing their right to reimbursement for all costs associated with future procedures related to
Mrs. Kaufman's congenital condition.

## THIRD CAUSE OF ACTION (DECLARATORY RELIEF)

114.    Plaintiffs reallege and incorporate by reference herein the allegations
contained in Paragraphs 1 through 113 of this Complaint.

115.    Under ERISA, Plaintiffs are entitled "to obtain other appropriate equitable
relief to redress" violations of ERISA or the relevant plan.  29 U.S.C. § 1132(a)(3)(B)(i).

116.    Due to Defendants' past course of conduct, Plaintiffs are entitled to a
declaration that Defendants:  (a) have wrongfully denied Plaintiffs' claims for benefits;
(b) intentionally acted in bad faith; and (c) intentionally engaged in tactics of delay and
obfuscation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of a judgment in their favor and against Defendants:

(a)     Awarding Plaintiffs reimbursement of all costs associated with the February 16, 2006, May 11, 2006, July 20, 2006, and December 11, 2006, procedures (as well as related procedures) that Defendants have already agreed to pay;

(b)     Awarding Plaintiffs reimbursement of all additional costs associated with the February 16, 2006, May 11, 2006, July 20, 2006, and December 11, 2006, procedures that Defendants have not agreed to pay;

(c)     Awarding Plaintiffs reimbursement of all additional costs associated with all other procedures performed related to Mrs. Kaufman's cleft palate condition;

(d)     Awarding Plaintiffs reimbursement for additional costs associated with securing reimbursement for Mrs. Kaufman's covered procedures, including but not limited to interest, attorney's fees and costs and payments that would be reimbursable if the procedures in question had brought individual and family covered benefits to and above annual deductibles;

(e)     Awarding Plaintiffs declaratory relief providing that all costs associated with future procedures related to Mrs. Kaufman's congenital condition are covered benefits;

(f)     Awarding Plaintiffs declaratory relief providing that Defendants:  (a) have wrongfully denied Plaintiffs' claims for benefits; (b) intentionally acted in bad faith; and (c) intentionally engaged in tactics of delay and obfuscation; and

(g)    Awarding Plaintiffs such other and further relief as this Court may deem just and proper, including prejudgment interest and the costs and disbursements of this action.

June 13, 2008

CRAVATH, SWAINE & MOORE LLP

by _____

Max R. Shulman
A member of the Firm

825 Eighth Avenue
New York, NY 10019
(212) 474-1000
mshulman@cravath.com

*Attorneys for Plaintiffs*

21

# EXHIBIT A







**OXFORD**

**HEALTH PLANS®**

*A UnitedHealthcare Company*

Dear Oxford Member,

Welcome, and thank you for selecting Oxford Health Plans.

At Oxford, your satisfaction is important to us, and we strive to help make your healthcare experience a positive one. As an Oxford Member, you have access to a series of programs and resources to help you along your road to health:

- A robust network of hospitals and providers from a local health plan with over 20 years of experience. If your employer's plan offers out-of-area coverage, you also have in-network national access outside of Oxford's tri-state service area through the UnitedHealthcare Choice Plus network.
- Our *Healthy Bonus*® program, which consists of special offers and discounts that help you stay healthy and manage special conditions. Members can save on services such as weight loss programs, fitness equipment and publications.
- Our web site, *www.oxfordhealth.com*, which allows you to conduct business (e.g., request an ID card, update or correct any personal information, etc.) and access health information at your convenience.
- Healthcare guidance 24 hours a day, seven days a week, from Oxford's registered nurses through *Oxford On-Call*®
- *Healthy Mind Healthy Body*® magazine, your source for health information on prevention, nutrition, and exercise, as well as important benefit and coverage information.

The following information is enclosed: your new Summary of Benefits, Certificate of Coverage and other important plan information. If you have questions about your coverage, or want to learn more about Oxford's programs and resources, please log on to *www.oxfordhealth.com* or call Customer Service at the number on your Oxford ID card.

Wishing you the best of health.

Sincerely,

Kevin R Hill

Kevin Hill
Chief Executive Officer, Northeast Region

Enclosures

MS-05-1293                                                                          In-Area Welcome Letter (10.05)

| Important Information |
| --- |

### *Reconstructive Breast Surgery Law*

The Women's Health and Cancer Rights Act of 1998 has amended existing federal law (ERISA and the Public Health Service Act) effective October 21, 1998, to require health insurance carriers of group and individual commercial policies that cover mastectomies to cover reconstructive surgery or related services following a mastectomy. We are pleased to announce that Oxford Health Plans already offers this benefit to its commercial Members in New York, New Jersey and Connecticut.

Essentially, the Act guarantees coverage to any member who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with that mastectomy. The health insurance company that issues the policy is now required to provide coverage for:

  a. reconstruction of the breast on which the mastectomy has been performed;
  b. surgery and reconstruction of the other breast to produce a symmetrical appearance; and
  c. prostheses and physical complications for all stages of mastectomy, including lymphedemas.

If you have any additional questions about this benefit, please read the enclosed Certificate of Coverage.

MS-99-028

OXFORD HEALTH INSURANCE, INC.

FREEDOM DIRECT PLAN

SUMMARY OF BENEFITS

American Securities Capital Partners, LLC, ASCP Management LLC

**PLEASE REVIEW THE MAXIMUMS AND LIMITATIONS (pages 8, 9 & 10)**

| Covered Services | In-Network | Out-of-Network |
|---|---|---|
| **Primary and Preventive Care** | | |
| | **Physician Office and Home Visits** | **Physician Office and Home Visits** |
| | Preventive Care (children) is Covered at No Charge. Preventive Care (adults) is covered subject to No Charge. | Adult Primary Care is Covered subject to Deductible and 30% Coinsurance. |
| | | Adult Preventive Care is Not Covered. |
| | However, for adults related radiological tests (including mammograms) and most procedures (e.g. colonoscopy) will be Covered subject to Deductible and the Primary Care Coinsurance listed below. | Primary and Preventive Care for Children is Covered subject to Deductible and 30% Coinsurance. |
| | Primary Care is Covered subject to a Copayment of $15 per visit. | **Some procedures require Precertification. Please see your Certificate.** |
| | Two well-woman examinations and two Pap tests per Calendar Year are Covered at No Charge. | Well-woman examinations are Covered in-network only. |
| | Preventive Screening Mammograms performed in accordance with the well-woman schedule in your certificate are covered at 100%. All other mammograms will be Covered subject to Deductible and 10% Coinsurance. | |
| Inpatient Hospital Visits | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance. |
| Diabetes Education and Self Management | Covered subject to a Copayment of $15 per visit. | Covered subject to Deductible and 30% Coinsurance. |

OXFORD HEALTH INSURANCE, INC.

| Covered Services Primary and Preventive Care (cont.) | In-Network | Out-of-Network |
|---|---|---|
| Diabetic Supplies | Covered subject to a Copayment of $15 per 30-day supply of each item. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required before the purchase of an insulin pump.** |
| **Specialty Care** | | |
| Physician Office and Home Visits | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance.<br>**Some procedures require precertification. Please see your certificate** |
| Inpatient Hospital Visits | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance. |
| Obstetrical Services (including prenatal and postnatal) | Covered subject to a Copayment of $15 per initial visit.<br>Inpatient hospital services are Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| Elective Termination of Pregnancy | No Charge. | Covered subject to Deductible and 30% Coinsurance. |
| Basic and Comprehensive Infertility Services | | |
| Outpatient | Covered subject to Deductible and 10% Coinsurance.<br>**Advanced Services are Not Covered.** | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.**<br>**Advanced Services are Not Covered.** |
| Inpatient | Covered subject to Deductible and 10% Coinsurance.<br>**Advanced Services are Not Covered.** | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.**<br>**Advanced Services are Not Covered.** |

OXFORD HEALTH INSURANCE, INC.

| Covered Services<br>**Speciality Care (cont.)** | **In-Network** | **Out-of-Network** |
|---|---|---|
| Basic & Comprehensive Infertility<br>Services (cont.) | | |
| Office Visits | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance. |
| | **Advanced Services are Not Covered.** | **Precertification is required.**<br>**Advanced Services are Not Covered.** |
| Allergy Testing and Treatment | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance. |
| Short-Term Rehabilitative Services<br>(Physical, Speech, and Occupational) | | |
| Outpatient | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance. |
| Inpatient | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| Oral Surgery | | |
| Office Visit | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| Outpatient | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| Inpatient | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |

OXFORD HEALTH INSURANCE, INC.

| Covered Services<br>Speciality Care (cont.) | In-Network | Out-of-Network |
|---|---|---|
| Laboratory Procedures and X-ray Examinations | No Charge. | Covered subject to Deductible and 30% Coinsurance. |
| Facility Based Radiology Services | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required for PET Scans, MRAs, MRIs, Bone Density Studies, Nuclear Medicine, CAT Scans and Surgical Endoscopic Procedures.** |
| Diagnostic Mammography | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance. |
| Prosthetic Devices | Surgery and Internal Devices are Covered subject to Deductible and 10% Coinsurance. | Surgery and Internal Devices are Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| | External Devices are Covered subject to Deductible and 10% Coinsurance. | External Devices are Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required before purchase.** |
| Durable Medical Equipment | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required on items that cost $500 or more.** |
| Medical Supplies | **No In-Network Benefit** | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |

OXFORD HEALTH INSURANCE,INC.

| Covered Services<br>Speciality Care (cont.) | In-Network | Out-of-Network |
|---|---|---|
| Transplants | Transplants performed at Our approved facilities are Covered subject to Deductible and 10% Coinsurance.<br><br>Transplants performed at other Network facilities are Covered on an Out-of-Network basis. | Covered subject to Deductible and 30% Coinsurance.<br><br>**Precertification is required.** |
| Home Health Care | Covered subject to 10% Coinsurance. Not subject to Deductible. | Covered subject to 25% Coinsurance. Not subject to Deductible.<br><br>**Precertification is required.** |
| Chiropractic Services | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance. |
| Second Opinions | At your request, Covered subject to Deductible and 10% Coinsurance.<br>At Our request, No Charge. | Covered subject to Deductible and 30% Coinsurance. |

**Hospital and Other Facility Based Services**

| | | |
|---|---|---|
| Inpatient Hospital Services | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| Outpatient Hospital Services and Ambulatory Surgical Center Services | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |
| Skilled Nursing Facility Services | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance.<br>**Precertification is required.** |

OXFORD HEALTH INSURANCE INC.

| Covered Services | In-Network | Out-of-Network |
|---|---|---|
| **Hospital and Other Facility Based Services (cont.)** | | |
| Hospice Services | | |
|     Outpatient | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance. **Precertification is required.** |
|     Inpatient | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance. **Precertification is required.** |
|     Home Health Care | Covered subject to 10% Coinsurance. Not subject to Deductible. | Covered subject to 25% Coinsurance. Not subject to Deductible. **Precertification is required.** |
|     Skilled Nursing Facility Services | Covered subject to Deductible and 10% Coinsurance. | Covered subject to Deductible and 30% Coinsurance. **Precertification is required.** |
| **Alcohol and Substance Abuse Services** | | |
| Outpatient Alcohol and Substance Abuse Rehabilitation | Covered subject to a Copayment of $25 per visit. | Covered subject to Deductible and 30% Coinsurance. **Precertification is required.** |
| **Medical Emergency and Urgent Care Services** | | |
| Emergency Room Services | Covered subject to a Copayment of $100 per visit. | When proper notice is given, Covered on an In-Network basis. When proper notice is **not** given, Medical Emergency Admissions are Covered as described in the Certificate subject to Deductible and 50% Coinsurance. |
| Urgent Care Facility Services | When proper notice is given the services of Network and Non-Network Providers are Covered subject to a Copayment of $25 per visit. | When proper notice is **not** given, Covered subject to Deductible and 30% Coinsurance. |
| Ambulance Services | Covered subject to Deductible and 10% Coinsurance. | Covered on an In-Network basis. |

OXFORD HEALTH INSURANCE,INC.

| Covered Services | In-Network | Out-of-Network |
|---|---|---|
| **Supplemental Coverage** | | |
| Outpatient Prescription Drugs | Subject to a separate deductible of $50. The Deductible is waived for Generics.<br>Tier 1: A Copayment of $10 per Prescription and refill.<br>Tier 2: A Copayment of $25 per Prescription and refill.<br>Tier 3: A Copayment of $50 per Prescription and refill.<br>**All Copayments listed above apply to a 30-day supply of each prescribed drug.**<br>Mail Order Drugs: Copayments are the same as listed above except that you must pay two Copayments for a 90-day supply. | Not Covered |

OXFORD HEALTH INSURANCE,INC.

| Covered Services<br>Supplemental Coverage (cont.) | In-Network | Out-of-Network |
|---|---|---|
| Outpatient Mental Health Services | Covered subject to a Copayment of 50% per visit. | Covered subject to a Copayment of 50% per visit.<br><br>**Precertification is required.** |
| Inpatient Mental Health Services | Covered subject to Deductible and 10% Coinsurance. | **Not Covered** |
| Inpatient Substance Abuse Rehabilitation and Detoxification | Covered subject to Deductible and 10% Coinsurance. | **Not Covered** |

## MAXIMUMS AND LIMITATIONS

**Unless otherwise indicated, the following maximums and limitations apply to both the In-Network and Out-of-Network Benefits combined.**

**Important.** Coverage In-Network does not duplicate coverage Out-of-Network. **Benefits are not cumulative.** Benefits received In-Network reduce the amount of benefits available Out-of-Network. Benefits received Out-of-Network reduce the amount of benefits available In-Network.

**All reimbursements for Out-of-Network benefits are subject to UCR at the 70th percentile of HIAA.**

| | |
|---|---|
| Total Out-of-Network Benefits | $1,000,000 per Member per Lifetime. |
| Preventive Care for Adults | Unlimited |
| Preventive Care for Children | Out-of-Network benefit is limited to $300 |
| Diabetic Supplies | Diabetic supplies will only be supplied in amounts consistent with the Member's treatment plan as developed by the Member's Physician. Only basic models of Blood glucose monitors are Covered unless the Member has special needs relating to poor vision or blindness. |

## MAXIMUMS AND LIMITATIONS (cont.)

| | |
|---|---|
| Elective Termination of Pregnancy | We Cover one procedure per Member per Calendar Year. We pay a maximum benefit of $350 per procedure. |
| Short-Term Rehabilitation Therapy Services (Physical, Speech, Occupational) | |

| | |
|---|---|
| Outpatient | 60 visits per condition, per lifetime |
| Inpatient | One consecutive 60-day period per condition, per lifetime. |
| Durable Medical Equipment | We will pay a maximum benefit of $1,500 per Member, per Calendar Year. |
| Transplants | **In-Network coverage is available only at Network facilities  <u>specifically approved and designated by Us</u> to perform these procedures.** Transplants performed at any other Network facility will be eligible for coverage only at the Out-of-Network level of coverage. |
| Home Health Services | 40 visits per Calendar Year |
| Skilled Nursing Facility Services | 200 days per Calendar Year |
| Hospice Services | 210 days per Calendar Year (combined inpatient and outpatient) |
| Bereavement Counseling for Member's Family | 5 sessions either before or after the death of the Member |
| Outpatient Alcohol and Substance Abuse Rehabilitation | 60 visits per Calendar Year.  Up to 20 of these visits may be used by the Member's family. |

### Supplemental Coverage Information

| | |
|---|---|
| Outpatient Mental Health Services | 30 visits per Calendar Year |
| Inpatient Mental Health Services | 30 days per Calendar Year |

OXFORD HEALTH INSURANCE, INC.

**Supplemental Coverage Information (cont.)**

| | |
|---|---|
| Inpatient Alcohol and Substance Abuse Rehabilitation | 30 days per Calendar Year |
| Detoxification | 7 days per Calendar Year |
| Exercise Facility Reimbursement | Within one 6-month period We will reimburse you $200. We will reimburse your spouse $100 per 6-month period. You must complete 50 visits within the 6-month period. |

## FAILURE TO PRECERTIFY

If you fail to obtain a required Precertification for an Out-of-Network benefit, you will be subject to a reduction in benefits.  You must pay 50% of the costs for such service or supply.

## DEDUCTIBLES

The applicable Deductibles for this Plan are:

In Network          Individual- $500
                    Family - A maximum of 2 times the Individual Deductible.

Out-of-Network      Individual- $1,000
                    Family - A maximum of 2 times the Individual Deductible.

## OUT-OF-POCKET MAXIMUM

In Network

The maximum amount you must pay in any Calendar Year for In-Network Covered Services is $1,500 for an individual and 2 times per family

Remember, only Copayments, Deductibles and Coinsurance paid for In-Network Covered Services contribute to your In-Network, Out-of-Pocket Maximum.  Deductible and Coinsurance for Out-of-Network benefits, amounts in excess of the UCR, amounts paid for non-Covered Services, and any amounts paid as a penalty do not count toward the In-Network, Out-of-Pocket Maximum.

## OUT-OF-POCKET MAXIMUM (cont.)

Out-of-Network

The maximum amount you must pay in any Calendar Year for Out-of-Network Covered Services is $4,000 for an individual and 2 times per family.

Remember, only Out-of-Network Coinsurance and the amounts paid to meet your Out-of-Network Deductible count toward the Out-of-Network, Out-of-Pocket Maximum. Copayments and/or Deductible and Coinsurance for In-Network benefits, amounts in excess of the UCR, amounts paid for non-Covered Services, and any amounts paid as a penalty do not count toward the Out-of-Network, Out-of-Pocket Maximum.

Coinsurance paid for any Covered Service obtained under a Supplemental Coverage (excluding State mandated offers) will not be applied toward the Out-of-Pocket Maximums. Therefore, amounts paid for: outpatient prescription drugs will not be applied toward either Out-of-Pocket Maximum.

## ELIGIBILITY LIMITS

The limiting ages for dependents (as defined in the Certificate) are: under the age of 19 and between the ages of 19 and 25 for a full-time student. Coverage ends at the end of the Calendar Year.

## EFFECTIVE DATES OF COVERAGE

**Initial Enrollment** (During the initial Group Open Enrollment Period). Coverage is effective on the effective date of the Agreement.

**Newly Eligible Employee** (Application within 31 days of becoming eligible). Coverage is effective on the date the employee became eligible.

**Newly Eligible Dependents** (Application within 31 days of becoming eligible). Coverage is effective on the date the dependent became eligible. Coverage is effective at birth for newborns and newly born adopted children subject to enrollment requirements as described in the Certificate.

**Group Open Enrollment Period.** Coverage will be effective the renewal date of Agreement.

**IMPORTANT:** this document is not a contract. It is only a summary of your coverage under FREEDOM DIRECT PLAN. Please read your Certificate for a full description of your Covered Services, exclusions and other terms and conditions of coverage.



## National Medical Support Notices

The New York State Insurance Department has issued guidance as to how health insurance policyholders and health insurance companies/ health maintenance organizations need to respond when they receive a "National Medical Support Notice" issued by the New York State Division of Child Support Enforcement. These notices require that a non-custodial parent provide health insurance for a dependent child. In some cases the non-custodial parents may not have elected coverage for themselves and may need to be enrolled in order to provide the coverage required pursuant to the National Medical Support Notice.

Any party that fails to comply with the court order becomes responsible for any healthcare costs incurred as a result of the non-compliance. Even when the non-custodial parent refuses to sign a required enrollment form, the policyholder and the insurer must take necessary steps to enroll the child even if it means enrolling the non-custodial parent against his/her will.

Thank you for your assistance in helping us to process these enrollments in compliance with the Insurance Department's directive.

NY-05-610



# OXFORD HEALTH PLANS (NY), INC.

Freedom Plan Direct

Certificate of Coverage
&
Member Handbook

Cover Sheet

Group:

Effective Date of Certificate:

Monthly Rates:

## CERTIFICATE OF COVERAGE ("Certificate")
### for
## OXFORD HEALTH INSURANCE, INC. ("Oxford")

Please read this entire Certificate carefully, including your Summary of Benefits which contains information specific to your Group. These documents, and any attached riders, describe your rights and obligations and those of Oxford.

Under this Certificate, you engage Oxford to make arrangements through which medical and hospital services will be delivered in accordance with the terms and conditions of this Certificate and in reliance upon the statements you made in your application for coverage. Oxford agrees with the Group to provide the Covered Services set forth in this Certificate, as may be amended from time to time by Oxford or the Group's Board of Directors or similar body. **Please note:**

- This Certificate and any riders, schedules or attachments have been delivered in consideration of the Group's timely payment of Premiums.

- No services are Covered under this Certificate in the absence of current payment of Premiums, subject to a 30-day Grace Period and the terms and conditions of the Certificate.

- No services are Covered under this Certificate unless your coverage is in force at the time you receive services.

- In some instances a medical procedure may not be Covered or may require Precertification. It is your responsibility to understand the terms and conditions in this Certificate.

- This Certificate replaces any older Certificate issued to you which provided coverage under the Plan.

- This Certificate is not in lieu of and does not affect any requirements for coverage by Workers' Compensation Insurance.

**This Certificate is governed by the laws of the State of New York.**

**Please Note:** Unless otherwise expressly indicated in this Certificate, coverage will cease upon the termination of this Certificate. Benefit changes are effective on the renewal date of this Certificate. Benefits do not vest.

# Important Telephone Numbers and Addresses

| | |
|---|---|
| Member Services | Medical Emergencies and Urgent Care |
| 1-800-444-6222 | **Medical Management Coordinator** |
| Oxford Health Insurance, Inc.<br>48 Monroe Turnpike<br>Trumbul, CT. 06611 | **1-800 444-6222**<br><br>**1-800 201-4911   After 5:00 p.m.** |
| Claims<br>Oxford Health Insurance, Inc.<br>P.O. Box 7082<br>Bridgeport, CT 06601-7082 | Complaints, Grievances and<br>Utilization Review Appeals<br>**1-800 444-6222**<br>**1-800 201-4911   After 5:00 p.m** |

**Member Service and claims representatives are available Monday through Friday, 8 a.m. to 6 p.m.**

To expedite service, please have your Member Identification Card with you when you call.

For claims questions, please have your Member Identification Card, date of service, and a copy of all bills, correspondence, or any other related materials from your provider available when you call.

---

**Suggestions, comments and grievances should be sent to:**

**Correspondence Department**
P.O. Box 7081
Bridgeport, CT 06601-7081

**Grievance Review Board**
48 Monroe Turnpike
Trumbull, CT 06611

**Secretary, Grievance Review Board**
48 Monroe Turnpike
Trumbull, CT 06611

**Clinical Appeals**
48 Munroe Turnpike
Trumbull. CT 06611

**Attention:**
If you need assistance and would prefer to speak in a language other than English, please call 1-800. When the Member Service Representative answers your call please say "Spanish Please"(or the language you require). The Customer Service Representative will place your call on hold. **Do not hang-up!** Soon, the Member Service Representative will come back on the line with a translator. With the help of the translator, the Member Service Representative will be able to answer your questions.

## SPANISH

Si necesita ayuda y prefiere información en Español por favor llame al 800-444-6222.

Cuando nuestro representante conteste la llamada diga "Spanish, Please" o pida el lenguaje que usted necesite. Nuestro representante pondrá su llamada en espera, no cuelgue el telefono. Nuestro representante regresará a la línea muy pronto y tendrá a su disposición un traductor. Con la ayuda de el traductor, nuestro representante podrá contestar sus preguntas.

## CHINESE

如果您需要協助，或者您想與華語客戶服務代表洽詢，請致電：1-888-201-4133
當客戶服務代表接聽電話時，請說明："Chinese, Please."（您可要求說其它語言）。客戶服務代表會請您稍候，不要收線！客戶服務代表會儘快邀請翻譯員參與對話。在翻譯員的協助下，客戶服務代表便可回答您的問題。

## RUSSIAN

Если Вам необходима помощь, и Вы хотели бы получить ее по-русски, пожалуйста, позвоните по телефону 888-201-4133. Когда Вам ответит представитель Бюро Обслуживания, скажите: "Russian, please." Вас попросят подождать. Не вешайте трубку! Через некоторое время представитель снова появится на линии с переводчиком. С помощью переводчика наш представитель сможет ответить на все Ваши вопросы.

# TABLE OF CONTENTS

**Important Telephone Numbers and Addresses** ..................................................... 3

**Getting Started** ........................................................................................... 7

More Information About Oxford Health Plans ............................................ 7

## Section I. How the Plan Works

Introduction ....................................................................................... 8
Network Providers ............................................................................... 8
Precertification .................................................................................. 8
Second Opinions ................................................................................ 8
Medical Emergencies ........................................................................... 8
Urgent Care ...................................................................................... 8
Diagnostic Testing and Laboratory Services .............................................. 9

## Section II. Selecting Your PCP

Selecting Your PCP ............................................................................. 9
Primary Provider of OB/GYN Care ......................................................... 9
Network Specialists as PCPs ................................................................ 9
Changing Your PCP ............................................................................ 10

## Section III. Provider Participation and Transitional Care

Provider Participation ......................................................................... 10
Transitional Care .............................................................................. 10
Patient Provider Relationship ................................................................ 10
Provider Reimbursement and Quality Assurance ....................................... 10

## Section IV. Who Can Join?

Eligibility ........................................................................................ 11
Applying For Coverage ........................................................................ 11
Effective Date Of Coverage .................................................................. 12
Increase or Reduction in Benefits .......................................................... 12
Notice of Change in Status ................................................................... 12

## Section V. Covered Services

Primary and Preventive Care ................................................................ 13
Specialty Care .................................................................................. 14
Hospital and Other Facility-Based Services .............................................. 17
Hospice .......................................................................................... 17
Alcoholism and Substance Abuse Services ............................................... 18
Medical Emergencies .......................................................................... 18
Urgent Care ..................................................................................... 18
Ambulance Services ........................................................................... 19
Reimbursement and Copayments ........................................................... 19

## Section VI. Exclusions and Limitations .............................................. 19

## Section VII. How Will the Plan Handle Any Questions or Problems?

Grievance Procedure .......................................................................... 22
Complaints and Grievances .................................................................. 22

Written Appeals ........................................................................................ 22
Hearing .................................................................................................... 22
Expedited Grievance Procedure ............................................................... 23
Utilization Review Appeal.......................................................................... 23
Expedited Utilization Review Appeal ......................................................... 24
External Appeal......................................................................................... 24

## Section VIII. Termination of Coverage

How Your Coverage May Terminate ........................................................... 25
Effective Date of Termination.................................................................... 26
Reinstatement .......................................................................................... 26

## Section IX. What Happens If I Lose Coverage?

Termination or Loss of Eligibility: Coverage Options................................. 26
Cobra ....................................................................................................... 26
State of New York Continuation ................................................................ 28
Extended Benefits .................................................................................... 29
Conversion Privilege ................................................................................ 29
Other Available Coverage:
Leave of Absence or Lay-off ..................................................................... 30
Family and Medical Leave Act .................................................................. 30

## Section X. What Happens If a Provider Bills Me?

Filing a Claim ........................................................................................... 30
Payment Options ...................................................................................... 30
Limitations................................................................................................ 31
If You Receive a Bill From a Network Provider .......................................... 31
Claim Information...................................................................................... 31
Physical Examination ............................................................................... 31

## Section XI. Other Important Documents

Supplemental Coverage by Rider .............................................................. 31
Summary of Benefits ................................................................................ 31
Living Wills and Advance Directives ......................................................... 31

## Section XII. Member Rights and Responsibilities

What Are My Rights as a Member? ............................................................ 32
What Are My Responsibilities? .................................................................. 32

## Section XIII. General Administrative Policies and Procedures

Medical Records: Confidentiality and Authorization to Examine ............... 32
Coordination of Benefits (COB) ................................................................ 33
Effect of Coordination .............................................................................. 34
Reimbursement and Subrogation ............................................................. 34
Workers' Compensation............................................................................ 34
Medicare and Other Government Programs .............................................. 34

## Section XIV. General Provisions

........................................................... 35

## Section XV. Definitions

................................................................................ 36

# Getting Started

At Oxford, We recognize that trying to understand your health care coverage can be difficult. This document contains a detailed description of your Plan. You should be familiar with all of the Plan's terms and conditions. They determine what coverage you have and what amounts We will pay.

We also understand that you may need care before you have the time to read and understand all of the Plan. To assist you, the following summary may be helpful.

## 1. In-Network Services

As a Member of the Direct Plan, you may seek Primary, Preventive or Specialty Care from any Network Provider **without a referral**. However, **you are still required to select a PCP**. We encourage you to use your PCP when you need Primary or Preventive Care. We encourage you to allow your PCP to coordinate your Specialty Care needs. We will notify your PCP of any care you receive without the use of your PCP. In this manner, continuity of care can be maintained.

While referrals are not required, any requirements pertaining to **Precertification, as described in this Certificate, must be followed**.

To receive the highest level of benefits, contact a Network Physician when you need medical assistance. In most instances, he or she will be able to provide the care you need. If you require services from another provider, be sure that he or she is also a Network Provider. You can identify a Network Provider by checking the Roster of Network Providers, or by calling Member Services. **Except for Medical Emergencies, and Precertified visits to Out-of-Network Providers, only services provided by a Network Provider are Covered on an In-Network basis.**

If a Network Provider recommends Hospital or surgical services, they will need an OK from Us before you obtain those services. This process is referred to as Precertification. Before entering the Hospital, you may want to check with Member Services to verify that the Hospital is a Network Provider and that the services have been Precertified.

## 2. Out-of-Network Services

If you decide you do not want to use a Network Provider, the Plan still provides coverage for a broad range of medical services. However, Covered Services not obtained from Network Providers will be subject to Deductible, Coinsurance and UCR. Further, non-Network Providers may not be familiar with Our Plan. Therefore, you should review the "Covered Services" and "Limitations and Exclusions" sections of this Certificate. You may also contact Member Services if you have any questions concerning Covered Services under this Plan.

Surgical procedures and Hospitalizations still require Precertification. You are responsible for obtaining any required Precertification. **You must call (or you may have your Physician call) Member Services to obtain the Precertification. Failure to Precertify will result in a 50% reduction in benefits.**

## 3. Emergencies

If you have a Medical Emergency, you should obtain medical assistance immediately or call 911. Emergency room care is not subject to Our prior approval. However, **only Medical Emergencies, as defined in this Certificate, are Covered in an emergency room**. Therefore, before you seek treatment, you may to be certain that this is the most appropriate place to receive care. You can call Our Medical Management Coordinators. They are available 24 hours a day, 7 days a week. The Coordinator will direct you to the emergency room of a Hospital or other appropriate facility.

## 4. Member Services

All coverage is subject to the terms and conditions contained in your Plan documents. You should understand your rights and obligations before you obtain services. If you have questions, Member Services will be pleased to help you.

Member Services would also like to hear your suggestions on how We can improve. Your comments will be taken into consideration when Our administrative policies are developed or revised. Please feel free to write or call Member Services. The Member Service Representative who receives your comments and suggestions will forward them to the appropriate Oxford committee for consideration. We will also inform you of the committee's response.

## 5. More Information About Oxford Health Plans

As an Oxford Member, you automatically receive a Certificate, the attachment "Information About Your Oxford Coverage," a Summary of Benefits and a Roster. Please note, **you can request additional information** about Oxford and your coverage under this Certificate. Upon your written request, We will provide any or all of the following information:

Our Annual Report which contains: a list of the names, business addresses and official positions of Our Board of Directors, officers, controlling persons, and owners; and Our most recent annual certified financial statement which includes a balance sheet and a summary of the receipts and disbursements;

The information that We provide the State regarding Our consumer complaints as required by Section 210 of the Insurance Law;

A description of Our procedures for maintaining confidentiality of Member information;

A copy of Our drug formulary. You may also inquire if a specific drug is Covered or excluded under this Certificate.

A copy of Our Medical Policy regarding an experimental or investigational drug, medical device or treatment in clinical trials;

A copy of Our Medical Policy regarding a specific disease or course of treatment. You may also request how this information, and any applicable Utilization Review guidelines, may be used during the Utilization Review process. **Please note:** Requests for Medical Polices are limited to two per letter and must relate to a valid need on your part to assess your coverage under this Certificate.

To obtain this information, please send Us a letter indicating the information you require. Please address your letter to: Managed Care Act, Oxford Health Plans, 48 Monroe Turnpike, Trumbull, CT. 06611

# Section I:
# How the Plan Works

## Introduction

Whenever you need to obtain Covered Services, the Plan gives you a choice. You may obtain Covered Services either In Network or Out-of-Network. To obtain services In Network, you must receive care from a Network Provider. Your out-of-pocket costs are reduced when you seek care In Network. Out-of-Network coverage gives you the freedom to obtain Covered Services without using Network Providers. However, when you use non-Network Providers, reimbursement is subject to Deductible, Coinsurance and UCR.

Lower costs or greater freedom of provider choice. The decision is yours!

## In Network Coverage

### 1. Network Providers

**Important:** As a Member of the Direct Plan, you may seek Primary, Preventive or Specialty Care from any Network Provider **without a referral**. However, **you are still required to select a PCP**. We encourage you to use your PCP when you need Primary or Preventive Care. We encourage you to allow your PCP to coordinate your Specialty Care needs. We will notify your PCP of any care you receive without the use of your PCP. In this manner, continuity of care can be maintained.

While referrals are not required, any requirements pertaining to **Precertification, as described in this Certificate, must be followed**.

If you need medical assistance, you must contact a Network Provider. In most instances, he or she will provide the care you need. If you require services from an additional provider, be sure that he or she is also a Network Provider. Network Providers are listed in Our Roster. You may also call Member Services and inquire if a certain provider is in Our Network. **Except for Medical Emergencies, only Covered Services provided by a Network Provider are Covered on an In Network basis.**

If a Network Provider recommends Hospital or surgical services, they will need an OK from Us before you may obtain those services. This process is referred to as Precertification. Before entering the Hospital, you may want to check with Member Services to verify that the Hospital is a Network Provider and that the services have been Precertified.

### 2. Precertification

All admissions to health care facilities and certain diagnostic tests and therapeutic procedures must be Precertified by Us before you

are admitted or receive treatment. If you are unsure whether a procedure requires Precertification, please call Our Member Service Department.

Precertification starts with a call to Our Medical Management Department by the Network Provider involved. One of Our experienced Medical Management professionals examines the case, consults with your Network Physician and discusses the clinical findings. If all agree, the requested test, procedure or admission is Precertified. This comprehensive evaluation insures that the treatment you receive is appropriate for your needs and is delivered in the most cost-effective setting.

Covered inpatient services are Precertified for a specific number of days. If your Network Physician believes that a longer stay is Medically Necessary, the extension must be Precertified in order for it to be Covered.

Your Network Physician is responsible for obtaining any required Precertification. However, we recommend that you call Member Services to ensure that your services have been Precertified.

**Please remember:** Any Precertification you receive will not be valid if your coverage under the Plan terminates. This means that Covered Services received after your coverage has terminated will not be Covered even if they were Precertified (unless coverage is being continued in accordance with Section VIII of this Certificate).

### 3. Second Opinions

We reserve the right to require a second opinion for any surgical procedure. At the time of Precertification, you may be advised that a second opinion will be required in order for the services to be Covered. If a second opinion is required, We will refer you to a Network Provider for a second opinion.

In the event that the first and second opinions differ, a third opinion will be required. We will designate a new Network Provider. The third opinion will determine whether or not the surgery is Precertified. There will be no cost to you for the second or third opinion. You may also request a second opinion. Please see Section IV, 2, O for a complete explanation.

### 4. Medical Emergencies

If you have a Medical Emergency, you should obtain medical assistance immediately or call 911. Emergency room care is not subject to Our prior approval. However, **only Medical Emergencies, as defined in this Certificate, are Covered in an emergency room**. Therefore, before you seek treatment, you may want to be certain that this is the most appropriate place to receive care. You can call Our Medical Management Coordinators. They are available 24 hours a day, 7 days a week. Your Coordinator will direct you to the emergency room of a Hospital or other appropriate facility.

### 5. Urgent Care

For In Network coverage, you must call Our Medical Management Coordinators and follow the instructions you will be given. When this procedure is followed, your Urgent Care will be Covered in full,

less any required Copayment. This coverage will be provided regardless of where you are (in or out of the Service Area) when the need for Covered Services occur. **If you do not call first, coverage will only be available on an Out-of-Network basis.**

## 6. Diagnostic Testing and Laboratory Services

If your Network Provider recommends laboratory testing, remind him or her to use a Network Provider. In addition, Covered X-rays or diagnostic procedures performed at Network facilities will be Covered by Us without any required Copayment. Unless you are Hospitalized, Hospitals are not Network Providers for these tests.

### Out-of-Network Coverage

### 1. Freedom of Choice

The Plan also provides coverage when you elect not to use Network Providers. However, please remember that Covered Services received Out-of-Network are subject to Deductible, Coinsurance and UCR.

### 2. Precertification

Please remember that you will still need to comply with Our Precertification procedures (as described above). Surgical procedures and Hospitalizations still require Precertification. **You are responsible for obtaining any required Precertification.** You must call (or you may have your Physician call) Our Medical Management Department to obtain the Precertification. Please make the call at least 14 days in advance of the procedure or admission. **Failure to Precertify will result in a 50% reduction in benefits.**

Remember, not all diagnostic and therapeutic procedures and surgeries are Covered under the Plan. **If you are not sure if Precertification is required or if a service or supply is Covered,** please do not hesitate to call Our Member Services Department.

### 3. Second Opinions

At the time of Precertification, you may be advised that We will require a second opinion. We reserve the right to require a second opinion for any surgical procedure. If a second opinion is required, We will refer you to another provider. There is no cost to you.

If the event the first and second opinions differ, a third opinion will be required. At no cost to you, We will designate a third provider. The third opinion will determine whether or not the surgery is Precertified.

You may also request a second opinion. Please see Section IV, 2, for a complete explanation.

### 4. Medical Emergencies

Special rules apply to Medical Emergencies. Please see the "Medical Emergencies and Urgent Care" section of "Covered Services" in this Certificate.

**IMPORTANT: Utilization Review.** All services that you seek to have Covered under this Certificate are subject to Utilization Review. This means that our Medical Management Department reviews pertinent medical information in order to determine whether or not the proposed medical service, the service currently being provided, or the service that was provided is Medically Necessary and a Covered Service under the Certificate. Utilization Review is also required when We need to make a determination that a service is or is not experimental or investigational. For more information about Our Utilization Review Policies please see *Information About Your Oxford Coverage* which is attached to this Certificate.

# Section II.
# Selecting Your PCP

## 1. Selecting Your PCP

As described in Section I, you were required to select a PCP at the time you enrolled. However, sometimes our Members will neglect to select a PCP. If you did not select a PCP the following will occur:

- We will return your Enrollment Form and ask you to select a PCP.

- If you receive Primary or Preventive Care from one of the Our PCPs before We return the form, that PCP will automatically be assigned to you as your PCP.

Therefore, it is important to take the time and look through the Roster of Network Physicians and select a PCP for yourself and each of your Covered Dependents. If you have any questions or need assistance, Member Services will be happy to assist you.

## 2. Primary Provider of OB/GYN Care

In addition to a PCP, female Members should select a Network Provider of OB/GYN Care.

## 3. Network Specialists as PCPs

Members who have a life-threatening condition or disease and Members who have a degenerative and disabling condition or disease may request to elect a Network Specialist as their PCP. The designated Network Specialist will become responsible for providing and coordinating all of the Member's Primary Care and Specialty Care. He or she will be able to order tests, arrange procedures and provide referrals and medical services in the same capacity as a PCP.

This election is available only if the condition or disease requires specialized medical care over a prolonged period of time. The desired Network Specialist must have the necessary qualifications and expertise to treat the Member's condition or disease. A Member may request this election at the time of enrollment or upon diagnosis. The election will be permitted only if Our Medical Director, after consulting with your PCP and Network Specialist (if applicable) agrees that your care would most appropriately be coordinated in this manner. All Covered Services must be delivered in accordance with a treatment plan that has been approved by Our Medical Director, your PCP and Network Specialist (if applicable).

New Members may be asked to first elect a non-Specialist PCP who will work with them to find a Network Specialist, develop a treatment plan and consult with Our Medical Director. If a new Member's current specialist is a Network Specialist, the Network Specialist may prepare the treatment plan and consult with Our Medical Director; election of a non-Specialist PCP will not be required. **You, your PCP or Network Specialist may call Medical Management and request this election.**

### 4. Changing Your PCP

You may change your PCP (or Provider of OB/GYN Care) at any time. Select a new Provider from the Roster of Network Physicians. Then call Member Services, give them your ID number and tell them who you have selected. The change will become effective immediately.

**Please Note:** If for any reason you are not satisfied with the care you are receiving from any of Our Network Specialists, you may ask your PCP to refer you to another Network Specialist of your choice.

# Section III.
# Provider Participation and Transitional Care

### 1. Provider Participation

We cannot promise that a specific provider, even though listed in the Roster of Network Physicians, will be available. A Network Provider may end his or her contract with Us, or decide not to accept additional patients. If you have any questions about whether or not a particular Provider is currently participating or accepting new patients, please feel free to call Member Service and inquire. If your Network Specialist leaves, you should chose another Network Specialist. However, if you are undergoing a course of treatment at the time your Network Provider leaves the Network, you may be eligible for Transitional Care as described below.

### 2. Transitional Care

**Your Provider Leaves the Network:** If you are undergoing a course of treatment when your Provider leaves the Network, you may be able to continue to receive Covered Services from the former Network Provider. In such instances, you may receive Covered Services for up to 120 days after you receive notification from Us that the Provider is no longer in the Network. Regarding pregnancy, if the Provider leaves the Network while you are in your second trimester, you may receive Covered Services through delivery and any post-partum care directly related to the delivery.

However, Transitional Care is available only if the Provider agrees to continue to accept as payment the negotiated fee that was in effect just prior to the termination of Our relationship with the Provider. Further, the Provider must agree to adhere to all of Our Quality Assurance procedures as well as all other policies and procedures required by Us regarding the delivery of Covered

Services. If the Provider agrees to these conditions, you will receive these Covered Services as if they are being provided by a Network Provider. You will only be responsible for any applicable Copayments. Please note: If the Provider was terminated by Us due to a quality of care issue, Transitional Care is not available.

**New Members Currently Undergoing a Course of Treatment:** If you are undergoing a course of treatment with an non-Network Provider at the time your coverage under this Certificate becomes effective, you may be able to receive Covered Services from the non-Network Provider for up to 60 days from the effective date of your coverage under the Certificate. This coverage is available only if the course of treatment is for a life-threatening disease/condition or a degenerative and disabling disease/condition. Coverage is limited to the disease/condition. Regarding pregnancy, if your coverage becomes effective while you are in your second trimester, you may receive Covered Services from your non-Network Provider through delivery and any post-partum care directly related to the delivery.

However, Transitional Care is available only if the Provider agrees to accept as payment Our negotiated fees for such services. Further, the Provider must agree to adhere to all of Our Quality Assurance procedures as well as all other policies and procedures required by Us regarding the delivery of Covered Services. If the Provider agrees to these conditions, you will receive these Covered Services as if they are being provided by a Network Provider. You will only be responsible for any applicable Copayments.

In order to obtain Transitional Care, you or your Provider should call Medical Management at 1-800-444-6222 and request this coverage.

### 3. Patient/Provider Relationship

Network Providers are solely responsible for all health services that you receive. They will use their best efforts to render all necessary and appropriate professional services in a manner compatible with your wishes. All services are, of course, subject to the Network Provider's professional judgment. If you refuse to follow a recommended treatment, and the Network Provider believes that no professionally acceptable alternative exists, you will be so advised. In such a case, subject to the second opinion process, neither We nor the Network Provider will have any further responsibility to provide care for the condition under treatment. Continued refusal to follow recommended treatment or procedures will result in termination of coverage pursuant to the termination provisions of this Certificate.

### 4. Provider Reimbursement and Quality Assurance

#### Reimbursement

We reimburse our Network Providers in a variety of ways. The most common is a discount off the Provider's usual fee. This means the Provider agrees to accept less than what he or she would usually be paid for that service. In return, the Provider's name appears in Our Roster which gives the Provider an opportunity to gain new patients from among our Membership. For more information on other types of reimbursement methodologies,

please see *Information About Your Oxford Coverage* which is attached to this Certificate.

**Quality Assurance**

We carefully select the Providers who deliver services to our Members as Network Providers. This helps Us to insure that you receive consistent, quality care. For more information about Our Quality Assurance Program, please see *Information About Your Oxford Coverage* which is attached to this Certificate.

# Section IV.
# Who Can Join?

## 1. Eligibility

**A. The Subscriber.**  To be eligible to enroll as a Subscriber, you must be:

1. A full-time employee of the Group (or part-time employee or retiree if this coverage was purchased by the Group);and

2. entitled on his or her own behalf (in accordance with standard Group policy, including satisfaction of any standard probationary or waiting period established by Group and agreed to by Us), to participate in the medical and Hospital benefits arranged by the Group.

**B. Dependents.**  To be eligible to enroll as a Covered Dependent, a person must be: listed on the Enrollment Form completed by the Subscriber; meet all Dependent eligibility criteria established by the Group; and be either:

1. The Subscriber's lawful **spouse**; or

2. Any **unmarried child** who is either a step-child, legally adopted child or proposed adoptive child (who is physically placed in Subscriber's home), or a natural child of either the Subscriber or the Subscriber's spouse. In addition, a child for whom Subscriber or Subscriber's spouse is a court appointed legal guardian is eligible for coverage as a Covered Dependent provided proof of such guardianship is submitted with the Dependent's Enrollment Form. The child must also be dependent upon the Subscriber for support as defined by the United States Internal Revenue Code and federal regulations.

Any such Dependent child must be:

i. under age 19 unless otherwise specified in the Summary of Benefits, or

ii. between 19 and 26 years of age unless otherwise specified in the Summary of Benefits, provided the child is a full-time student in an accredited educational institution. We will require satisfactory proof of such full-time student status. Please note, In Network coverage outside of the Service Area, is limited to Medical Emergencies and Urgent Care; or

iii. a child, irrespective of age, who is or becomes and continues to be both: (1) incapable of self-sustaining employment by reason of

mental retardation, mental illness, developmental disability or physical handicap, which condition arose prior to attaining the age when Dependent coverage for such individual would otherwise terminate; and (2) chiefly dependent upon the Subscriber for economic support and maintenance.

If the child becomes incapacitated while Covered under the Plan, the Subscriber must provide Us with proof of such incapacity and dependency within 31 days of the date Dependent coverage would otherwise terminate.

For **any** such child, We will subsequently require proof of continued incapacity. Such proof will-be required annually after the initial two-year period following the child's becoming eligible by reason of this provision. Our determination of eligibility will be conclusive; or

iv. a newborn child of a Member, including a newly born adopted child.

## 2. Applying for Coverage

Applying for coverage is easy. Fill out an Enrollment Form and a Health Coverage History Form, and submit them, it to your employer's Employee Benefits Department. The form should list each eligible Dependent that you would like to have Covered. Include all requested information. Please remember to sign the forms before submitting them. You and your eligible Dependents may enroll only at the times and under the conditions described below.

**Important**: If you are continuing coverage under State Continuation or COBRA, you may need to submit the Enrollment Form and the Premium directly to Us. Please check with your employer or Member Services for further information.

**A. Group Open Enrollment Period.**  A Group Open Enrollment Period will be held at least annually. At this time, eligible employees and eligible Dependents may enroll as Members under this Certificate. No evidence of good health will be required.

**B. Newly Eligible Employee.**  A new employee hired by the Group, after the Group Open Enrollment Period, may apply for coverage for himself or herself and eligible Dependents, within 31 days of becoming eligible, subject to the Group's eligibility requirements. No evidence of good health will be required.

**C. Newly Eligible Dependents.**  Any person who becomes a Dependent may be enrolled by submitting an Enrollment Form within 31 days of becoming a Dependent. Dependents who are being enrolled pursuant to a court order must enroll within 60 days of the date of the court order. No evidence of good health will be required. This provision also applies to adopted and prospective adopted children (except for newborns as discussed below). In order for such child to be enrolled, the Subscriber must be legally obligated for such child's financial support and the child must be physical placed (in residence) in the Subscriber's home.

**D. Newborns and Newly Born Adopted Children.**  A newborn child of the Subscriber or Subscriber's spouse will be Covered for the first 31 days after the birth of the child if the Subscriber completes and submits an [Addition] Form specifically adding the

newborn child as well as submits any applicable Premium to the Group within 31 days following the birth. This provision also applies to newly born adopted children if the Subscriber takes physical custody of the child upon its release from the Hospital and files a petition pursuant to section 115-c of the domestic relations law within 30 days of birth, and provided no notice of revocation has been filed and consent for the adoption has not been revoked.

**IMPORTANT:** Even if the Subscriber is already paying the maximum Premium (Family Rate), an Addition Form is still necessary. We must have knowledge of the child's presence on the Plan in order to produce an accurate HIPAA Certificate of Prior Coverage. You will need (and are entitled to) such certificate if your coverage ends under this Plan.

**E. Change in Family Circumstances.** If the Group has established a plan in accordance with Section 125 of the U.S. Internal Revenue Code, eligible persons will be permitted to enroll without submitting an evidence of good health if the enrollment is the result of a "change in family circumstance," as defined by the Group's plan and Section 125.

**Limitation:** Persons who are either initially or newly eligible for enrollment and who do not enroll within 31 days of becoming eligible, may only be enrolled at the next Group Open Enrollment Period.

However, if all of the following conditions are met, an individual may be enrolled before the next open enrollment:

- the employee or dependent was covered under another group health plan or other health insurance at the time that coverage under this Certificate was initially available; **and**

- the employee stated in writing that this was the reason for rejecting coverage under this Certificate; **and**

- The previous coverage has ended because of any of the following: it was COBRA coverage that was exhausted; the individual lost coverage due to a loss of eligibility (legal separation, divorce, death, termination of employment or a reduction in work hours); or the employer contribution toward such coverage was terminated.

If these conditions are met, the employee or dependent may request enrollment if they otherwise meet the eligibility requirements of this Certificate. The individual must enroll within 30 days of the termination of the previous coverage or employer contribution.

Individuals who do not meet these requirements may only be enrolled at the next Group Open Enrollment Period.

In addition, no person is eligible to re-enroll if he or she has had coverage from Us terminated for cause as described in the termination provisions of this Certificate.

### 3. Effective Date of Coverage

Subject to all of the applicable terms and conditions of the Agreement (including the payment of Premiums by Group and Our receipt of completed Enrollment Forms), coverage will become effective as follows:

**A. Initial Enrollment** (During the initial Group Open Enrollment Period). Coverage is effective on either the first day of the next calendar month following the date of the Group Open Enrollment Period or the effective date of the Agreement. Please read your Summary of Benefits to determine which is applicable.

**B. Newly Eligible Employee** (Application within 31 days of becoming eligible). Coverage is effective on either the first day of the next calendar month following the date on which We receive the application or as of the date the employee became eligible. Please read your Summary of Benefits to determine which is applicable.

**C. Newly Eligible Dependents** (Application within 31 days of becoming eligible). Coverage is effective on either the first day of the next calendar month following the date on which We receive the application or as of the date the dependent became eligible. Please read your Summary of Benefits to determine which is applicable. Coverage is effective at birth for newborns and newly born adopted children subject to the enrollment requirements as described above.

**D. Group Open Enrollment Period.** Coverage will be effective on either the first day of the next calendar month following the date of the Group Open Enrollment Period or the renewal date of the Agreement. Please read your Summary of Benefits to determine which is applicable.

### 4. Increase or Reduction in Benefits

If for any reason your benefits must increase or decrease (because of a change in classification, earnings, etc.), your benefits will be adjusted accordingly. Any such change will be effective as of the date of the event which necessitated the change.

### 5. Notice of Change in Status

It is your responsibility to notify Us and your employer of any changes which will affect your eligibility or that of your Dependents for Covered Services or benefits under this Certificate. **This becomes very important should you or any of your Covered Dependents require a HIPAA Certificate of Prior Coverage.**

# Section V.
# Covered Services

You will receive Covered Services in accordance with the terms and conditions of this Certificate only when the Covered Service is:

- Medically Necessary;
- Properly Precertified, when required; and
- Received while your coverage is in force.

We reserve the right to provide the benefit in the manner We determine to be medically appropriate and the most cost effective.

FOR COVERED SERVICES PROVIDED BY A NETWORK PROVIDER, YOU WILL BE RESPONSIBLE ONLY FOR THE COPAYMENT OR COINSURANCE SHOWN IN YOUR SUMMARY

OF BENEFITS. EXCEPT FOR MEDICAL EMERGENCIES AND PRECERTIFIED URGENT CARE, **ALL OTHER COVERED SERVICES WILL BE SUBJECT TO DEDUCTIBLE, COINSURANCE AND UCR.** CHARGES THAT EXCEED UCR ARE NOT COVERED AND WILL NOT COUNT TOWARD YOUR DEDUCTIBLE OR OUT-OF POCKET MAXIMUM.

The only exception to this provision is when Our Medical Director determines that Our Network does not have an appropriate Network Provider who can deliver the care you need. In such instances, Our Medical Director will approve a referral to a non-Network Provider. All such referrals will be made only when Our Medical Director, after consulting with your Network Specialist, the non-Network Provider and you, approves the treatment plan for the delivery of these services. Covered Services rendered by this Provider will be paid as if they were received in Network. You will be responsible only for any applicable Copayment. **You or your Network Specialist may call Medical Management and initiate the request for this special referral.**

## 1. Primary and Preventive Care

Primary Care consists of office visits, house calls and Hospital visits provided by Provider for consultations, diagnosis and treatment of injury and disease.

Preventive Care consists of the following services, performed by your Provider, for the purpose of promoting good health and early detection of disease:

### A. Well-Baby and Well-Child Care

Well-baby and well-child care which consist of routine physical examinations including vision screenings (no refractions) and hearing screenings, developmental assessment, anticipatory guidance, and laboratory tests ordered at the time of the visit as recommended by the American Academy of Pediatrics. Immunizations and boosters as required by the State of New York are also Covered. This benefit is provided to Members from birth through age 19 and is not subject to annual Deductibles or Coinsurance.

### B. Adult Periodic Physical Examinations

Adult periodic physical examinations according to the schedule established by Our Medical Advisory Board. Vision screenings do not include refractions;

### C. Adult Immunizations

Adult immunizations as recommended by the U.S. Department of Health and Human Services;

### D. Well-Woman Examinations

Well-woman examinations which consists of a routine gynecological examination, breast examination and Pap smear. We will cover two such examinations each Calendar year. Mammograms are Covered as follows:

- one baseline mammogram for women age 35 through 39;
- every two years for women age 40 through 49 or more frequently upon the recommendation of a Network Physician; and

- annually for women age 50 and over.

If a woman of any age has a history of breast cancer or her mother or sister has a history of breast cancer, We will Cover mammograms as recommended by her Provider.

In no event will more than one screening per Calendar Year be Covered.

### E. Family Planning

Family planning services which consist of counseling on use of contraceptives and related topics. The costs related to the measuring and fitting of a contraceptive device are also Covered if the service is performed during the annual well-woman examination. We also Cover vasectomies and tubal ligations

### F. Diabetic Supplies, Education and Self-Management

Diabetic Supplies, Education and Self-Management are Covered as follows:

**Supplies.** The following equipment and related supplies will be Covered for insulin dependent and non-insulin dependent Members when Medically Necessary as determined by the Member's Physician:

Acetone Reagent Strips
Acetone Reagent Tablets
Alcohol or Peroxide by the pint
Alcohol Wipes
All insulin preparations
Automatic Blood Lance Kit
Blood Glucose Kit
Blood Glucose Strips (Test or Reagent)
Blood Glucose Monitor with or without special features for visually impaired, control solutions, and strips for home blood glucose monitor
Cartridges for the visually impaired
Diabetes data management systems
Disposable insulin and pen cartridges
Drawing-up devices for the visually impaired
Equipment for use of the Pump
Glucose Acetone Reagent Strips
Glucose Reagent Strips
Glucose Reagent Tape
Injection aides
Injector (Busher) Automatic
Insulin
Insulin Cartridge Delivery
Insulin infusion devices
Insulin Pump
Lancets
Oral agents such as glucose tablets and gels, Glucagon for with injection to increase blood glucose concentration
Oral anti-diabetic agents used to reduce blood sugar levels
Syringe with needle; sterile 1 cc box
Urine testing products for glucose and ketones

Additional items may also be Covered if the Member's Physician determines they are Medically Necessary and prescribes them for

the Member. Such additional items must be Precertified by one of Our Medical Case Managers and be in accordance with the treatment plan developed by the Physician for the Member.

All items are subject to the Copayments, maximums and limitations shown on the Summary of Benefits. When purchased through Our mail order pharmacy, *Merck-Medco* these items will be delivered directly to your home or office. Additionally, the *Merck-Medco* Copayment is less than the Copayment that would be required when these items are purchased through a pharmacy (this Copayment is the same as your office visit Copayment).

**Self-Management and Education.** Education on self-management and nutrition is Covered when: diabetes is initially diagnosed; a significant change in the Member's condition takes place; or the Physician decides that a refresher course is necessary. It must be provided:

- In a Physician's office either by the Physician or his or her qualified nurse during an office visit or in a group setting.

- Upon a Physician's referral to the following non-physician, medical educators (qualified health providers): certified diabetes nurse educators; certified nutritionists; certified dietitians; and registered dietitians.

- Whenever possible, in a group setting, regardless of whether the provider is a Physician or a qualified health provider. Education will also be provided in the Member's home if the Member is homebound.

**Limitations:**

- The items must be Medically Necessary as determined by the Member's Physician and will only be provided in amounts that are in accordance with the treatment plan developed by the Physician for the Member.

- All requests for insulin pumps must be reviewed by one of Our Medical Case Managers and be approved by Our Medical Director.

- Only basic models of blood glucose monitors will be Covered unless the Member has special needs relating to poor vision or blindness.

**G. Health Education**

Health education, information and health care literature which is made available to Members through various programs provided and developed by Us. These programs and information are provided without cost to Members. Such programs include Our Active Partners Program; Our Health Mother, Healthy Baby Program; Our Better Breathing Program and Our Healthy Mind, Health Body magazine.

## 2. Specialty Care

Specialty Care consists of medical care and services, including office visits, house calls, Hospital visits and consultations for the diagnosis and treatment of disease or injury that are not ordinarily treated by a general or family practitioner, internist or pediatrician.

**MOST SPECIALTY CARE SERVICES REQUIRE PRECERTIFICATION.**

**A. Surgical and Obstetrical Services**

Physicians' services for surgical and obstetrical procedures on an inpatient and outpatient basis, including the services of the surgeon or specialist, assistant, and anesthetist or anesthesiologist together with preoperative and post operative care. Deliveries and related services that are performed by a certified nurse midwife are also Covered.

**Please remember, elective surgery and Hospital admissions, including non-emergency maternity admissions, require Precertification.**

**B. Maternity and Newborn Care**

**Maternity Care**

Services and supplies for maternity care provided by a Physician, Hospital or Birthing Center will be Covered for prenatal care (including one visit for genetic testing), postnatal care, delivery and complications of pregnancy. We provide a minimum inpatient stay of 48 hours following a vaginal delivery and 96 hours following a cesarean delivery for both the mother and the newly born child. While in the hospital, maternity care also includes, at a minimum, parent education, assistance and training in breast or bottle feeding and the performance of any necessary maternal and newborn clinical assessments.

The mother has the option to leave the hospital sooner than as described above. If she decides to be discharged early, she will be provided with one home visit. The home visit must be **requested by the mother** within 48 hours of a vaginal birth or within 96 hours of a cesarean birth. The visit will occur within 24 hours of the later of: the mother's request; or her discharge from the hospital. **This visit is not subject to deductible Copayment or Coinsurance.** Additionally, the visit will not be deducted from the Home Health Care visits Covered under the Certificate. The home visit consists of a visit by a professional RN to provide the following post delivery care: an assessment of the mother and child, instruction on breastfeeding, cleaning and caring for child, and any required blood tests ordered by the mother's or the child's Provider.

In Network Coverage for a routine delivery or maternity care outside of the Service Area is limited. We define a "routine delivery" as a full-term delivery that has occurred without any complications. If you arrange to give birth at a facility outside of the Service Area, and the delivery is routine, it will not be Covered on an In Network basis. We will assume that you have "arranged" to give birth at a facility outside of the Service Area if you travel to the area of the facility near the time of your delivery. In those instances where the non-Network facility is near the Service Area, routine deliveries are not Covered on an In Network basis if you could safely have delivered in a Network Facility. Exceptions will be made on a "case by case" basis if We determine that circumstances beyond your control (such as a death in the family) required you to be outside of the Service Area at the time of your delivery.

## Interruption of Pregnancy

Therapeutic abortions are Covered. Non-therapeutic abortions in cases of rape, incest or fetal malformation are also Covered. One elective abortion per Member, per Calendar Year, is Covered subject to the benefit limit listed in the Summary of Benefits.

## Newborn Care

Care for newborns includes preventive health care services, routine nursery care, and treatment of disease and injury. Treatment of disease and injury includes treatment of prematurity and medically diagnosed congenital defects and birth abnormalities which cause anatomical functional impairment. We also Cover, within the limits of this Certificate, necessary transportation costs from the place of birth to the nearest specialized treatment center.

"In Network and Out-of-Network, routine and reventive Newborn Care does not require Precertification. However, services that generally require recertification (such as surgery) should be **Precertified** as described in this section, "Covered Services.""

## C. Allergy Testing and Treatment

Testing and evaluations to determine the existence of an allergy. Routine allergy injections, including serums are Covered.

## D. Rehabilitation Services

Rehabilitation therapy including physical therapy, speech therapy, and occupational therapy, is Covered on an outpatient or inpatient basis. Coverage on an outpatient basis is limited to the amount of visits shown on the Summary of Benefits. Coverage on an inpatient basis is limited to one consecutive 60-day period, per condition, per lifetime in a Rehabilitation Facility. **Admission to a Rehabilitation Facility requires Precertification.** For the purposes of this benefit (both inpatient and outpatient), "per condition" means the disease or injury causing the need for the therapy.

Speech or occupational therapy is Covered only when it is necessary to correct a condition that is the result of a disease, injury or a congenital defect for which surgery has been performed.

Covered Services must begin within six months of the later to occur:

1. the date of the injury or illness that caused the need for the therapy;

2. the date the Member is discharged from a Hospital where surgical treatment was rendered; or

3. the date outpatient surgical care is rendered.

And in no event will the therapy continue beyond 365 days after such event.

## E. Reconstructive and Corrective Surgery

Reconstructive and corrective surgery is Covered only when:

1. it is performed to correct a congenital birth defect of a dependent child which has resulted in a functional defect; or

2. Is incidental to surgery or follows surgery that was necessitated by trauma, infection or disease of the involved part.

Breast reconstruction (including surgery on the healthy breast to restore and achieve symmetry) or implanted breast prostheses are also Covered following a Covered mastectomy. Cosmetic surgery is not Covered.

**Precertification is required.**

## F. Oral Surgery

General dental services are not Covered. The following limited dental and oral surgical procedures are Covered in either an inpatient or outpatient setting:

1. Oral surgical procedures for jaw bones or surrounding tissue and dental services for the repair (not replacement) of sound natural teeth that are required due to accidental injury. Dental services must be obtained within 12 months of the injury.

2. Oral surgical procedures required for the correction of a non-dental physiological condition which has resulted in a severe functional impairment.

Removal of tumors and cysts requiring pathological examination of the jaws, cheeks, lips, tongue, roof and floor of the mouth. Cysts related to teeth are not Covered.

**Precertification is required.**

## G. Laboratory Procedures and X-ray Examinations

X-ray and laboratory procedures, services and materials, including diagnostic X-rays, X-ray therapy, fluoroscopy, electrocardiograms, laboratory tests, and therapeutic radiology services are Covered when performed on an outpatient basis.

**Major diagnostic procedures require Precertification.** It is important that you do not seek the services of a laboratory or imaging center without Precertification. If you do, you will be responsible for the costs of such services. Please contact Our Medical Management Coordinators before you obtain any of the procedures listed in your Summary of Benefits.

## H. Internal Prosthetic Devices

Surgically implanted prosthetic devices and special appliances will be Covered if they improve or restore the function of an internal body part which has been removed or damaged due to disease or injury. This includes implanted breast prostheses following a Covered mastectomy. Coverage also includes repair and replacement due to normal growth or normal wear and tear. Coverage does not include artificial organs.

**Services under this Section require Precertification.**

## I. External Prosthetic Devices

We Cover prosthetic devices that are worn externally and that temporarily or permanently replace all or part of an external body part that has been lost or damaged because of an injury or disease.

For adults, We Cover the cost of only one prosthetic device per lifetime. For children, the cost of replacements is also Covered but only if the previous device has been outgrown. **Purchase of the device must be Precertified.** Coverage is for standard equipment only. We do not otherwise Cover the cost of repairs or replacement.

In accordance with Our Medical Policy, external breast prostheses following a Covered mastectomy are also Covered.

### J. Durable Medical Equipment and Braces

**Durable Medical Equipment**

Durable Medical Equipment is equipment which is: 1) designed and intended for repeated use; 2) primarily and customarily used to serve a medical purpose; 3) generally not useful to a person in the absence of disease or injury; and 4) is appropriate for use in the home.

Coverage is for standard equipment only. All maintenance and repairs that result from a Member's misuse are the Member's responsibility. The decision to rent or purchase such equipment will be made solely at Our discretion. **Please see Section V "Exclusion and Limitations," of this Certificate for the list of excluded items.**

**Braces**

We Cover braces that are worn externally and that temporarily or permanently assist all or part of an external body part function that has been lost or damaged because of an injury, disease or defect. Coverage is for standard equipment only. Replacements are Covered when growth or a change in the Member's medical condition make replacement Medically Necessary. We do not otherwise Cover the cost of repairs or replacement (e.g., We do not Cover repairs or replacement that is the result of misuse or abuse by the Member). **Please see Section V, "Exclusion and Limitations," of this Certificate for the list of excluded items.**

**Precertification Required:** Precertification for the purchase of Durable Medical Equipment or braces is required when the item will cost $500.00or more.

### K. Medical Supplies

We Cover medical supplies that are required for the treatment of a disease or injury which is Covered under this Certificate. Maintenance supplies (e.g., ostomy supplies) are also Covered for conditions Covered under this Certificate. All such supplies must be Medically Necessary and in the appropriate amount for the treatment or maintenance program in progress. Diabetic Supplies are not Covered under this provision. Please see Section IV, F for a description of diabetic supply coverage. **Please see Section V "Exclusion and Limitations," of this Certificate for the list of excluded medical supply items.**

**Purchase of medical supplies does not require Precertification.**

### L. Transplants

We Cover only those transplants that We determine to be non-experimental and non-investigational. Covered transplants include but are not limited to: kidney, corneal, liver, heart, and heart/lung transplants; and bone marrow transplants for aplastic anemia, leukemia, severe combined immunodeficiency disease and Wiskott-Aldrich Syndrome.

**All transplants must be prescribed by your Specialist(s) and Precertified by Our Medical Director.** Additionally, all transplants must be performed at Hospitals that We have specifically approved and designated to perform these procedures.

We will Cover the Hospital and medical expenses, including donor search fees, of the recipient. We will Cover transplant services required by a Member when the Member serves as an organ donor **only if the recipient is a Member.** The medical expenses of a non-Member acting as a donor for a Member are not Covered if the non-Member's expenses will be covered under another health plan or program.

We do not Cover travel expenses, lodging, meals or other accommodations for donors or guests.

### M. Home Health Care

We Cover care provided in your home by a Home Health Service or Agency licensed by the appropriate state agency. The care must be provided by Physician-supervised health professionals pursuant to Your Physician's written treatment plan and **must be in lieu of Hospitalization or confinement in a Skilled Nursing Facility.** Home care includes (i) part-time or intermittent nursing care by or under the supervision of a Registered Professional Nurse (RN), (ii) part-time or intermittent services of a home health aide, (iii) physical, occupational, or speech therapy provided by the Home Health Service or Agency, and (iv) medical supplies, drugs and medications prescribed by a Network Physician, and laboratory services by or on behalf of the Home Health Agency to the extent such items would have been Covered during a hospitalization or confinement in a Skilled Nursing Facility.

Home Health Care is limited to the amount of visits shown in your Summary of Benefits. Each visit of up to two hours by a registered nurse or therapist is one visit. Each visit of up to four hours by a home health aide is one visit.

**Please note**: Any rehabilitation services received under this benefit will not reduce the amount of services available under Section D, "Rehabilitation Services," above.

**This benefit requires Precertification.**

### N. Chemotherapy

Chemotherapy is Covered on an inpatient basis in a Hospital or Skilled Nursing Facility, through Home Health Care or on an outpatient basis in an outpatient facility. Precertification is required. Chemotherapy is also Covered when provided in a Network Physician's office. When provided in the office, Precertification is not required.

## O. Second Opinions

There may be instances when you will disagree with a provider's recommended course of treatment. In such cases, you may request that We designate another Provider to render a second opinion. If the first and second opinions do not agree, We will designate another Provider to render a third opinion. After completion of the second opinion process, We will Precertify Covered Services supported by a majority of the Providers reviewing your case. You must pay any Copayment for a second opinion that you request.

**Important:** If the first opinion concerns a diagnosis of cancer (either negative or positive) or treatment for cancer, you may obtain a second opinion from a non-Network Provider on an In Network basis.

**Please note:** Providers who render a second or third opinion cannot perform the Precertified service. If We Precertify a service that is recommended by the second (or second and third ) Provider, you will be asked to use select another Provider to perform the actual service.

We also may require a second opinion before We Precertify a surgical procedure. In these instances, We will follow the procedure as described in Section I, 6 "How the Plan Works, above. There is no cost to you when You request a second opinion.

## P. Chiropractic Services

We will Cover spinal subluxation and related services when performed by a Doctor of Chiropractic ("Chiropractor"). This includes assessment, manipulation and any modalities. In Network and Out-of-Network, this benefit is unlimited. By "unlimited" We mean there is no dollar limit or visit limit on this benefit. However, if this Plan has a limit on all Out-of-Network services, the Out-of-Network benefit is subject to that limit.

This **benefit remains subject to Medical Necessity**. Coverage also remains subject to the Copayments, Coinsurance and deductible shown in your Summary of Benefits. Out-of-Network services are also subject to UCR as developed by Our Alternative Medicine Department.

Any Medically Necessary laboratory tests will be Covered in accordance with the terms and conditions of this Certificate.

**Exclusions:** We will not Cover any equipment, clothing, vitamins, supplements or other items and services that may be offered by the Chiropractor unless otherwise Covered under this Certificate. They must within the legal scope of the Chiropractor's practice.

## 3. Hospital and Other Facility Based Services

Please remember, in order to receive coverage for any facility based Covered Service, **the Covered Service must be Precertified.**

### A. Hospital Services (Excluding Alcohol and Substance Abuse)

**Inpatient:** Hospital Inpatient services for acute-care includes: semi-private room and board, unlimited days, general nursing care and the following additional facilities, services and supplies: meals and special diets: use of operating room and related facilities; use of intensive care or cardiac care units and related services; X-ray services; laboratory and other diagnostic tests; drugs; medications; biologicals; anesthesia and oxygen services; short-term physical, speech and occupational therapy; radiation therapy; inhalation therapy; chemotherapy; whole blood and blood products; and the administration of whole blood and blood products.

**Inpatient Stay for Lymph Node Dissection or Lumpectomy:** We will Cover inpatient services for Members undergoing a lymph node dissection or lumpectomy for a period of time determined to be Medically Necessary by you and your Physician.

**Autologous Blood Banking Services**: Autologous blood banking services are Covered only when they are being provided in connection with a scheduled, Covered inpatient procedure for the treatment of a disease or injury. In such instances, We will Cover storage fees for what We determine to be a reasonable storage period that is Medically Necessary and appropriate for having the blood available when it is needed.

**Outpatient Services**: The Hospital services and supplies listed above that can be provided to you while being treated in the outpatient facility. **Please remember**, unless you are receiving preadmission testing, Hospitals are not Providers for laboratory procedures and tests. Please note: lab work and X-rays performed in a Hospital on an outpatient basis do not require Precertification.

### B. Ambulatory Surgery Center

We Cover surgical procedures performed at Ambulatory Surgical Centers We also Cover the Covered Services and supplies provided by the Center the day the surgery is performed.

### C. Skilled Nursing Facility

We Cover services provided in a Skilled Nursing Facility, including care and treatment in a semi-private room, as described in Section IV, 3, A, "Hospital Services." Custodial, convalescent or domiciliary care is not Covered. In addition to Precertification, an admission to a Skilled Nursing Facility must be supported by a treatment plan prepared by your Provider and approved by Us. We Cover non-custodial care for the amount of days shown in your Summary of Benefits.

### D. Hospice

Hospice Care is available to Members who have a prognosis of six months or less to live. Coverage consists of palliative care rather than curative treatment. We Cover five visits for supportive care and guidance for the purpose of helping the Member and the Member's immediate family cope with the emotional and social issues related to the Member's death. Hospice Care will be Covered only when provided as part of a Hospice Care program certified by the appropriate state agency. Such certified programs may include Hospice Care delivered by; a Hospital (inpatient or outpatient), Home Health Care Agency, Skilled Nursing Facility or a licensed Hospice facility. Coverage is limited to 210 days.

Coverage is not provided for: funeral arrangements; pastoral, financial or legal counseling; homemaker, caretaker or respite care.

## 4. Alcoholism and Substance Abuse Services

**All services under this section Precertification**. Precertification may be obtained by calling Medical Management at 1-800-444-6222. On an Out-of-Network basis, if you do not obtain Precertification, you will be responsible for 50% of the costs. Services must be provided by Providers who are certified by the appropriate state agency to provide such services and whose programs for such services have been approved by Us.

### Outpatient Services

Outpatient services for the treatment of alcoholism and substance abuse will be Covered in accordance with an individual treatment plan prepared by your Provider. This benefit is limited to the amount of visits shown in your Summary of Benefits. A limited amount of these visits, also shown in the Summary, may be used by the Member's family.

Coverage for: detoxification for alcoholism and substance abuse; inpatient rehabilitation for alcoholism and substance abuse; inpatient mental health services, and outpatient mental health services are not Covered under this Certificate unless the Group has purchased Supplemental Coverage which adds these benefits. Please check the "Supplemental Coverage"section at the end of this "Covered Services" section or your Summary of Benefits to verify what coverage you have available.

## 5. Medical Emergencies

In order to obtain Coverage for Medical Emergencies, you should follow the instructions below **regardless of whether or not you are in the Service Area at the time of the Medical Emergency**.

We define a Medical Emergency as follows: A medical or behavioral condition the onset of which is sudden, that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, possessing an average knowledge of medicine and health, could reasonably expect the absence of immediate medical attention to result in (a) placing the health of the afflicted Member with such a condition in serious jeopardy, or in the case of a behavioral condition placing the health of such Member or others in serious jeopardy; (b) serious impairment to the Member's bodily functions; (c) serious dysfunction of any bodily organ or part of such Member; or (d) serious disfigurement of such Member. Medical Emergencies include, but are not limited to, the following conditions:

- Severe chest pain
- Severe or multiple injuries
- Severe shortness of breath
- Loss of consciousness
- Sudden change in mental status (e.g., disorientation)
- Severe bleeding
- Acute pain or conditions
- Poisonings requiring immediate attention
- Convulsions such as suspected heart attack or appendicitis

We reserve the right to review all appropriate medical records and make the final decision regarding the existence of a Medical Emergency. Regarding such retrospective reviews, We will Cover only those services and supplies that are Medically Necessary and are performed to treat or stabilize a Medical Emergency condition.

### A. Hospital Emergency Room Visits

In the event of a Medical Emergency, seek immediate care at the nearest emergency room **or call 911**.

Emergency room care is not subject to Our prior approval. However, only **Medical Emergencies, as defined above, are Covered in an emergency room**. Therefore, before you seek treatment, you may want to call to be certain that this is the most appropriate place to receive care. You can call Our Medical Management Coordinators. They are available 24 hours a day, 7 days a week. Your Coordinator will direct you to the emergency room of a Hospital or other appropriate facility.

**Follow-up care provided in a Hospital emergency room is not Covered**. You should contact or Us to make sure you receive the appropriate follow-up care.

### B. Emergency Hospital Admissions

In the event you are **admitted** to the Hospital:

**You or someone on your behalf must notify Us at the Medical Emergency telephone number listed in the front of this Certificate within 48 hours of your admission, or as soon as is reasonably possible. Failure to provide this notice will result in a 50% reduction of benefits.**

### Please Note

It is important to remember that only those conditions that meet all of the requirements contained in the definition of Medical Emergency will be Covered as a Medical Emergency. Routine care received in an emergency room is not Covered.

## 6. Urgent Care

We define Urgent Care as medical care for a condition that needs immediate attention to minimize severity and prevent complications, but is not a Medical Emergency.

Urgent Care is Covered in or out of the Service Area. Contact Our Medical Management Coordinators/Oxford On Call at 1-800-444-6222. You will be provided with instructions. Our Medical Management Coordinators are/Oxford On Call is available around the clock to help you in urgent medical situations.

In addition, you may be able to use one of several Urgent Care Centers in the Service Area. You must obtain Precertification from Our Medical Management Coordinators prior to seeking care at an Urgent Care Center. If you obtain Urgent Care Services without contacting a Medical Management Coordinator, the services will not be Covered. If Urgent Care results in an emergency admission please follow the instructions for Emergency Hospital Admissions described above.

## 7. Ambulance Services

Ambulance services for life-threatening Medical Emergencies will be Covered. Ambulance services for all other Medical Emergencies will be Covered when Medically Necessary. Your Medical Management Coordinator will make this determination at the time of your call.

Inter-facility ambulance transfers will also be Covered if they receive Precertification.

## 8. Reimbursement and Copayments

When you receive Covered Services for a Medical Emergency or Urgent Care situation (as described above) from a non-Network Provider, outside of the Service Area, We will limit reimbursement to the Usual, Customary and Reasonable Charges for those expenses incurred up to the time the Member is determined to be able to travel to a Network Provider. UCR is the amount charged or the amount We determine to be the reasonable charge, whichever is less, for a particular Covered Service in the geographical area it is performed. Additionally, reimbursement is subject to all applicable Copayments as similar services provided by a Network Provider.

You are responsible for the applicable Copayment or Coinsurance listed in the Summary of Benefits for each office visit, emergency room visit or emergency admission.

# Section VI.
# Exclusions and Limitations

(IMPORTANT: Neither the list of Covered Services nor the list of Exclusion and Limitations is exhaustive. Due to the ever changing availability of new medical technology, it is impossible to list every Covered Service or exclusion. If you cannot determine whether or not a specific services will be Covered, please call Us. Do not Assume that the service is Covered; there may be no coverage available.)

Unless coverage is specifically provided under this Certificate or provided under a rider or attachment to this Certificate, the following services and benefits are not Covered.

1. Services which We have determined are not Medically Necessary. If there is a dispute between a Provider and Us about the Medical Necessity of a service or supply, you or your Physician may appeal Our decision. Any disputed service or supply will not be Covered during the appeal process (please refer to the "Utilization Review Appeal" provision of this Certificate).

In no event will We seek reimbursement from a Member for the cost of any Covered Service provided under this Certificate that We determine is not Medically Necessary when such service was rendered by the Member's PCP or upon referral of the PCP

2. Fifty percent of the benefits normally payable for Covered Services for which a required Precertification was not obtained.

3. Unless added to this Certificate as described under "Supplemental Coverage," Acupuncture therapy.

4. Unless added to this Certificate as described under "Supplemental Coverage," Alcohol and Substance Abuse Services on an inpatient basis and detoxification are not Covered.

5. An adopted newly born infant's initial hospital stay if the natural parent has coverage available for the infant's care.

6. Birth control pills and implantable contraceptive drugs are excluded unless Supplemental Coverage for Outpatient Prescription Drugs (that includes these items) is purchased by the Group. Over-the-counter items such as condoms, foams or devices, contraceptive jellies and ointments are not Covered.

7. Care for conditions that by federal, state or local law must be treated in a public facility including, but not limited to, commitments for mental illness. Additionally, to the extent allowed by law, we do not Cover care or treatment provided in a Hospital that is owned or operated by any federal, state or other governmental entity.

8. Comfort or convenience items including, but not limited to: barber services; guest meals and accommodations; telephone, television or radio charges; travel expenses; or take-home supplies.

We also do not Cover the purchase or rental of household fixtures or equipment including, but not limited to: escalators; elevators; swimming pools; exercise cycles; air purifiers; air conditioners; water purifiers; allergenic pillows, mattresses or waterbeds.

9. Cosmetic surgery, plastic or reconstructive surgery which is performed primarily to improve the appearance of any portion of the body including but not limited to: surgery for sagging of extra skin; any augmentation or reduction procedure (e.g., mammoplasty); liposuction; keloids; rhinoplasty and associated surgery. Complications of such surgeries are Covered only if they are Medically Necessary and are otherwise Covered. Remedial work is not Covered.

10. Court ordered services or services that have been ordered as a condition of probation or parole. However, these services may be Covered if We agree that the services are Medically Necessary, are otherwise Covered, the Member has not exhausted their benefit for the Calendar Year, and the treatment is provided in accordance with our policies and procedures.

11. Custodial care, domiciliary care, long-term care, maintenance care, adult day care or rest cures. We do not Cover room, board, nursing care or personal care which is rendered to assist a Member who, in Our opinion, has reached the maximum level of physical or mental function possible and will not make further significant clinical improvement.

12. Dental services related to the care, filling, removal or replacement of teeth and the treatment of injuries or diseases of the teeth, gums and temporomandibular joint, including, but not limited to: apicoectomy, orthodontics, root canals, soft tissue impaction, temporomandibular joint dysfunction therapy, alveolectomy, treatment of periodontal disease or orthognathic surgery. As described in Section IV, 2, F, "Oral Surgery," only dental services required to treat accidental injury of sound, natural teeth are Covered.

13. Diabetic services or supplies as follows. The following are not Covered as diabetic services or supplies: services or supplies that are not both Medically Necessary and prescribed by the Member's Physician or qualified health professional; membership in health clubs, diet clubs or plans for the purpose of losing weight even if recommended by the Member's Physician or qualified health professional; any counseling or courses in diabetes management other than as described as Covered under this Certificate; stays at special facilities or spas for the purpose of diabetes education or management; and special foods, diets aids and supplements related to dieting;

14. Durable Medical Equipment: We do not Cover: orthotics, arch supports, corrective shoes, false teeth, and hearing aids.

15 . Experimental, investigational or ineffective; surgical or medical treatments, procedures, drugs, or research studies including, but not limited to: transplants, stem cell retrieval, cancer chemotherapy protocols, AIDS clinical trials or I.V. therapies that are not recognized as acceptable medical practice and any such services where federal or other governmental agency approval is required but has not been granted. We will make the determination as to whether the requested service is excluded in accordance with this provision. In certain instances, such procedures may be Covered if they are approved in advance by one of Our Medical Directors and provided in accordance with the provisions of this Certificate.

**Important:** In general, We will not Cover experimental or investigational treatments. However, We shall Cover an experimental or investigational treatment approved by an External Appeal Agent certified by the State. If an External Appeal Agent approves coverage of an experimental or investigational treatment that is part of a clinical trial, We will only Cover the cost of services required to provide treatment to you according to the design of the trial. We shall not be responsible for the costs of investigational drugs or devices, the costs of non-health care services, the costs of managing research, or costs which would not be Covered under this Certificate for non-experimental or non-investigational treatments provided in such clinical trail.

We will Cover autologous bone marrow transplants combined with high dose chemotherapy when **medically appropriate**, for the treatment of: advanced neuroblastoma, second remission acute leukemia, relapsed Hodgkin's disease, relapsed non-Hodgkin's lymphoma, and metastatic breast cancer or any other diagnosis that Our Medical Advisory Board determines to be appropriate. We will make the determination of when such treatment is **medically appropriate**. Such treatment must be approved in advance by one of Our Medical Directors and provided in accordance with the provisions of this Certificate.

16. Improper use of an emergency room or emergency admissions. Routine care and treatment for conditions that We determine were not Medical Emergencies, when received in an emergency room, are not Covered. If you are not certain whether the services you received are Covered, please submit them to Us for review.

17. Infertility treatment and supplies when used either to treat infertility or any other condition not Covered under this Certificate (e.g., genetic selection). The following, but not limited to, services and supplies are not Covered: injectable infertility drugs such as

Pergonal, Metrodin etc., cost for an ovum donor or donor sperm, embryo or ovum transfer procedures, artificial insemination, sperm storage costs, cryopreservation and storage of embryos, ovulation predictor kits, in vitro fertilization, and all costs for and relating to surrogate motherhood (maternity services are Covered for Members acting as surrogate mothers). We also do not Cover services to reverse voluntary sterilizations. Treatment of an underlying medical condition will not be denied (if the treatment is otherwise Covered under the Certificate) solely because the medical condition results in infertility.

18. Learning and behavioral disorders. Services for the evaluation or treatment (including remedial education) of: learning disabilities or minimal brain dysfunction; mental retardation; developmental and learning disorders or behavioral problems. We also do not Cover behavioral training or cognitive rehabilitation.

19. Unless added to this Certificate as described under "Supplemental Coverage," Mental Health Services are not Covered.

20. When Medicare is the primary payor, We Cover the Services provided by this Certificate only to the extent they are not Covered under Medicare. Please see Section XII, "General Administrative Policies and Procedures," subsection ,"Medicare and Other Government Programs."22. Services and treatment provided in a government facility.

21. Services and treatment provided in a government facility.

22. No-fault automobile insurance. Any Covered Services that are payable as personal injury benefits under mandatory no-fault automobile insurance. Where permitted by state law, any Covered Services which are eligible for payment under the provisions of an automobile insurance contract or pursuant to any federal or state law which mandates indemnification for such services to persons suffering bodily injury from motor vehicle accidents.

23. Non-eligible institutions. Any services or supplies furnished by a non-eligible institution, which is defined as other than a Hospital or Skilled Nursing Facility, and which is primarily a place of rest, a place for the aged, or any similar institution, regardless of how denominated.

24. Non-medical services and long-term rehabilitation services for physical therapy or the treatment of alcoholism or drug abuse, including rehabilitation services in a specialized inpatient or residential facility, except as specifically Covered under this Certificate.

25. No-show charges. If a Provider charges a fee for a missed appointment, you will be responsible for the payment of the fee.

26. Occupational conditions, ailments, or injuries arising out of and in the course of employment. Such conditions, ailments or injuries are not Covered if they are subject to coverage, in whole or in part, under any workers' compensation, occupational disease or similar law. This applies even if the Member's rights have been waived or qualified.

Unless added to this Certificate as described under "Supplemental Coverage," Outpatient prescription drugs are not covered. Over-the-counter medications, drugs and devices are also excluded.

28. Private or special duty nursing.

29. Rehabilitation services or physical therapy on a long-term basis. Speech or occupational therapy to correct a condition that is not the result of a disease, injury or a congenital defect for which surgery has been performed.

30. Routine foot care including nail trimming, corn and callous removal, cleaning, soaking or any other hygienic maintenance or care.

31. Sex, marital or religious counseling, including sex therapy and treatment of sexual dysfunction.

32. Sex Transformations. Any procedure or treatment designed to alter the physical characteristics of a Member from the Member's biological sex to those of the opposite sex regardless of any diagnosis of gender role or psychosexual orientation problems.

33. Special foods and diets, supplements, vitamins and enteral feedings. Please check your Summary of Benefits to see if coverage of these items has been added through a Outpatient Prescription Drug Supplemental Coverage.

34. Special medical reports not directly related to treatment. Appearances in court or at a hearing.

35. Third party requests for physical examinations, diagnostic services and immunizations in connection with: obtaining or continuing employment; obtaining or maintaining any license issued by a municipality, state or federal government; obtaining insurance coverage; foreign travel; school admissions or attendance including examinations required for participation in athletic activities.

36. Transplant services required by a Member when the Member serves as an organ donor are not Covered unless the recipient is a Member. The medical expenses of a non-Member acting as a donor for a Member are not Covered if the non-Member's expenses will be covered under another health plan or program. Donor fees in connection with organ transplant surgery are excluded. We do not Cover travel expenses, lodging, meals or other accommodations for, donors or guests. Transplants performed in facilities other than those designated by Us for the transplant procedure are not Covered on an In Network basis.

37. Coverage Outside of the United States. No coverage is available outside of the United States **if the Member traveled out-of-the country to obtain medical treatment**, drugs or supplies (with the exception of Canada, Mexico and U.S. possessions). Additionally, We will not Cover any treatment, drugs or supplies that are unavailable or illegal in the United States.

When a Member is traveling for other purposes, only Medical Emergencies and Urgent Care will be Covered outside of the United States (with the exception of Canada, Mexico and U.S. possessions).

38. Unnecessary Care. In general, We will not Cover any health care service that We in Our sole judgment, determines is not Medically Necessary. If an External Appeal Agent certified by the State overturns Our denial, however, We shall Cover the procedure, treatment, service, pharmaceutical product, or durable medical equipment for which coverage has been denied, to the extent that such procedure, treatment, service, pharmaceutical product, or durable medical equipment is otherwise Covered under the terms of this Certificate.

39. Usual, Customary and Reasonable Charges (UCR). Any charges by a Non-Network Provider that are in excess of the UCR Charges, as determined by Us, for Covered Services are excluded from coverage and are the Member's responsibility.

40. Eye glasses and examinations for the prescription or fitting thereof unless added through Vision Care Supplemental Coverage. Hearing aids are not Covered.

41. Weight Control. All services, supplies, programs and surgical procedures for the purpose of weight control; unless Medically Necessary for the treatment of morbid obesity.

42. Wigs, or any other appliance or procedure related to hair loss regardless of the disease or injury causing the Member's hair loss (except following chemotherapy).

43. Any supply or treatment for which the Member has no legal obligation to reimburse the provider. Any supply or treatment provided by a member of the Member's immediate family (e.g. spouse, mother, step-mother, father, step-father, sister, step-sister, brother, step-brother, etc. or any "in-law").

44. Preexisting Conditions. Starting from the Enrollment Date, We will not provide Covered Services for a Preexisting Condition for the first 12 months of coverage under this Certificate.

However, We will credit the time a Member was covered under Prior Continuous Creditable Coverage. In the case of previous HMO coverage, any affiliation period prior to the previous coverage becoming effective will also be credited.

# Section VII.
# **How Will the Plan Handle Any Questions or Problems?**

Our Grievance Procedure provides for a meaningful, dignified and confidential procedure to hear and resolve grievances between Members, Us and, when necessary, Network Providers. This Grievance Procedure also assures that Grievances are handled in a timely manner.

To make this process more accessible to non-English speaking Members, We will arrange to have an interpreter available who speaks your language. Because the interpreter will be an employee

of an independent translating service, Our ability to provide this service depends on the availability of the interpreter. We may need to arrange to call you at a time when an appropriate interpreter is available. Additionally, you always have the right to designate a representative to represent you during the Grievance Procedure. A copy of the Grievance Procedure is available in many languages. Depending on availability, a copy in your language can be forwarded to you upon your request.

**IMPORTANT:** All Complaints and Grievances **must be initiated within 90 days** of the date the Member became aware of the issue that initiated the Complaint or Grievance. Failure to initiate a complaint or grievance within such time shall not invalidate the claim or grievance if it shall be shown not to have been reasonably possible to initiate the complaint or grievance and that the complaint or grievance was subsequently initiated as soon as reasonably possible.

## Grievance Procedure

**Please Note:** The Grievance Procedure described below should be used when you have a problem with any of Our policies, procedures or determinations (Our administrative procedures,

access to providers, failure to use a Network Provider, Covered benefits under the Certificate, etc.) **except** for issues concerning Medical Necessity. All issues concerning Our determination of Medical Necessity must be resolved through the **Utilization Review Appeal** process described below.

There are two basic elements to the Grievance Procedure for Members:

### A. Complaints and Grievances

You may advise Us of a problem by calling a Member Services Representative 1-800-444-6222. The Member Services Representative will attempt to resolve your complaint at the time of the call. If you remain dissatisfied, you may file a Grievance, either by telephone or in writing with Our Correspondence Department. The staff of the Correspondence Department will acknowledge your grievance, in writing, within 15 business days of receipt. The acknowledgment will include the name, address and telephone number of the individual who has been designated to investigate your Grievance.

The individual will also conduct a review of the Grievance. Once the review is complete, he or she will provide you with Our written response. Our written response will include Our decision on the Grievance as well as the detailed reasons for the decision including the clinical basis (when applicable). It will also include information on how to file an Appeal.

If your Grievance concerns a referral or benefit issue (i.e. whether or not the benefit is Covered under the Certificate), you will receive Our written response within 30 days after Our receipt of all information needed to make Our determination. In all other instances, you will receive Our written response within 45 days after Our receipt of all information needed to make Our determination.

### B. Appeals

#### Written Appeal

If you are still dissatisfied, you may refile your written Grievance (which now becomes an "Appeal") with the Grievance Review Board ("the Board"). This Appeal must be filed within **60** business days of the date on which you received notice of the Issues Resolution Department' response. Within **15** business days of Our receipt of the Appeal, the Board will acknowledge receipt of the Appeal. The acknowledgment will include the name, address and telephone number of the Board's contact person as well as a request for any additional information the Board may need to reach its decision.

Within **30** days of receipt of all necessary information, the Board will:

1.  Rule that the grievance is valid and recommend corrective action to resolve the matter; or

2.  Rule that the grievance is without merit and does not require further action.

You will receive written notice of the Board's decision. The written notice will include detailed reasons for the determination and clinical rationale (when applicable).

The Board is a committee of Our employees appointed by Our President for the express purpose of reviewing and resolving Member Grievance/Appeals. When an Appeal is clinical in nature, the Board will include a licensed, certified or registered individual who did not review the issue at the Grievance level. There will also be at least one "clinical peer reviewer." If the Appeal pertains to an administrative issue, the Appeal will be resolved by individuals of a "higher level" than those who reviewed the Grievance.

#### Hearing

**As an alternative** to filing a written Appeal with the Board, you may request a hearing. The request must be made in writing to the Secretary of the Grievance Review Board.

The Appeal will be reviewed by a Committee appointed by the Board ("the Committee") for the purpose of considering such Appeals. You have the right to appear before the Committee to present your case. If you have indicated in the Appeal letter that you personally wish to appear, a notice indicating the time, date and place of the hearing will be mailed to you by the Secretary of the Grievance Review Board. You must request the Appeal/hearing within **60** business days of the date on which you received notice of the Correspondence Department's response. We will acknowledge receipt of the Appeal and the hearing will be scheduled not less than ten business days, nor more than **15** business days after the Board's receipt of the Appeal. The hearing will be held at either Our office in New York or at Our corporate office in Connecticut, whichever is more convenient for you.

Within **30** days of receipt of all necessary information, the Committee will:

Rule that the grievance is valid and recommend corrective
action to resolve the matter; or

Rule that the grievance is without merit and does not require
further action.

.ou will receive written notice of the Committee's decision. The
.ritten notice will include detailed reasons for the determination
.id clinical rationale (when applicable).

.he ruling of the Grievance Review Board or its Committee will be
.ir final position.

.ny final decision of the Grievance Review Board or its Committee
.ay be appealed through either (or both) the New York State
.isurance Department or the Department of Health, Office of
.1anaged Care, Bureau of Managed Care Certification and
.urveillance.

. .nsumer Services Bureau
.:ate of New York Insurance Department
.'. Beaver Street
.ew York, NY 1004-2319
.'12) 602-0203

.llice of Managed Care
.:ireau of Managed Care
. .ertification and Surveillance
.'l-w York Department of Health
.. .rning Tower - Room 1911
. mpireState Plaza
.\lbany, NY 12237
.18) 474-2121

. .ality Management and Provider Access Issues: 1-800-206-8125

Please note: You may also call the Department of Health's 1-800
.umber at any time during the Grievance Procedure process. You
.. not have to wait until the process is exhausted.

.ill information pertaining to each Grievance and Appeal will be fully
. locumented, and such records will be retained by Us for at least
.iree years

I xpedited Grievance Procedure

. iccasionally, medical circumstances require that certain
. irocedures be performed without significant delay. When the time
. :ames of the normal Grievance and Appeals process would
.significantly increase the risk to the Member's health, the
.. iievance Review Board will, upon your request for an Expedited
. i.:view, respond verbally, to Complaints, Grievances and Appeals
.. .ithin 48 hours. A written verification of the Board's decision will
. :llow within three business days of its decision.

. the Board determines that there are no grounds for an Expedited
.i.:view, you will be notified immediately and the request will be
. i.eated as a Grievance (see previous section).

## II.  Utilization Review Appeal

Please Note: This procedure must be used whenever your issue
. oncerns Our determination that a Covered Service is not Medically

Necessary. Complaints, Grievances and Appeals concerning all
other issues will be addressed through the "Grievance Procedure"
as described above.

### A.  What is Utilization Review Appeal?

Covered Services are subject to Utilization Review. This means
that our Medical Management Department reviews pertinent
medical information in order to determine whether or not the
proposed service (request for Precertification), the service currently
being provided ("Concurrent Review"), or the service that was
provided ("Retrospective Review") is a Covered Service under the
Certificate and Medically Necessary. If any of the following occur
because We have made the determination that such service is not
Medically Necessary ("Adverse Determination"), you may appeal
that determination:

1.  a request for **Precertification is denied.** (We will inform you
    and your Provider of Our decision, by phone and in writing,
    within 3 business days of receiving all of the necessary
    information);
2.  coverage for a **current service or course of treatment is
    terminated.** (We will inform you and/or your Provider of Our
    decision, by phone and in writing, within 1 business day of
    receiving all of the necessary information); or
3.  coverage for a **service received is denied** (We will inform
    you of Our decision within 30 days of receiving all of the
    necessary information).

**Please note:** If we **approve** a request for Precertification or
continuation of a current service or course of treatment, We will
inform you and your Provider of Our decision, by phone and in
writing, within time frames stated above. If We fail to make a
determination within these timeframes, the request will be deemed
an Adverse Determination subject to the appeals provisions below.

### B.  Appealing Adverse Determinations

Adverse Determinations relating to Precertification and Concurrent
Review may be appealed by the Member or the Member's
designee. The Member's Provider may also appeal such an
Adverse Determination if it is made without his or her input. If We
make such an Adverse determination without the input of the
Member's Provider, We will respond within one business day of
Our receipt of the appeal.

Retrospective Adverse Determinations may be appealed by either
the Member, the Member's designee or the Member's Provider.

All Appeals may be initiated either in writing or by telephone. All
Appeals will be reviewed by clinical personnel who did not
participate in the initial review.

After you are informed of the Adverse Determination, you, your
designee or your Provider (if applicable) have 45 days to initiate the
Appeal process. The person initiating the Appeal must write or
telephone Us within this 45-day period. To initiate an Appeal,
please call or write Medical Management Appeals at 1-800-444-
6222. We will acknowledge your Appeal, in writing, within 15 days
of Our receipt of such letter or telephone call. Within 60 days of
Our receipt of all appropriate information needed to conduct the

Appeal, We will make a decision to either uphold or reverse the Adverse Determination. We will inform you, your designee or Provider (if applicable) of this decision, in writing, within **two** business days after the decision has been made. If the Adverse Determination is upheld, the notice will include the reason for the decision and the supporting clinical rationale. Additionally, if you are not satisfied with the decision to uphold the Adverse Determination (which now becomes the Final Adverse Determination) and desire to pursue the issue further, you may request an External Appeal as described below.

If We fail to make an Adverse Determination Appeal decision within the timeframes listed above, the original Adverse Determination will be reversed.

## III. Expedited Utilization Review Appeal

If you are in an ongoing course of treatment and are seeking continued or extended services, or your Provider believes that an immediate Appeal is necessary because the time frames of the Utilization Review Appeal process would significantly increase the risk to your health, then you, your designee or your Provider may request an Expedited Utilization Review Appeal. Retrospective Final Adverse Determinations cannot be appealed on an expedited basis.

The Appeal may be made in writing or by telephone. Within **one** day of our receipt of the Appeal, We will provide reasonable access to Our clinical peer reviewer. We will provide access to Our facsimile machines or other services as needed. Within **two** days of our receipt of all the appropriate information needed to conduct the Appeal, We will make a decision to either uphold or reverse the Adverse Determination. A written notice informing you of Our Final Adverse Determination will be transmitted to you within 24 hours of Our decision. An Expedited Appeal that upholds the Final Adverse Determination may be Appealed through the Utilization Review Appeal process described above or the External Appeal process described below.

## III. EXTERNAL APPEAL

### I. YOUR RIGHT TO AN EXTERNAL APPEAL

Under certain circumstances, you have a right to an External Appeal of a denial of coverage. Specifically, if We have denied coverage on the basis that the service is not Medically Necessary or is an experimental or investigational treatment, you or your representative may appeal that decision to an External Appeal Agent, an independent entity certified by the State to conduct such Appeals.

### II. YOUR RIGHT TO APPEAL A DETERMINATION THAT A SERVICE IS NOT MEDICALLY NECESSARY

If We have denied coverage on the basis that the service is not Medically Necessary, you may appeal to an External Appeal Agent if you satisfy the following two criteria:

- The service, procedure or treatment must otherwise be a Covered Service under this Certificate; and

- You must have received a Final Adverse Determination through Our internal review process and We must have upheld the denial or you and We must agree in writing to waive any internal appeal.

### III. YOUR RIGHT TO APPEAL A DETERMINATION THAT A SERVICE IS EXPERIMENTAL OR INVESTIGATIONAL

If you have been denied coverage on the basis that the service is an experimental or investigational treatment, you must satisfy the following two criteria:

- The service must otherwise be a Covered Service under this Certificate; and

- You must have received a Final Adverse Determination through Our internal appeal process and We must have upheld the denial or you and We must agree in writing to waive any internal appeal.

In addition, your attending physician must certify that you have a life-threatening or disabling condition or disease. A "life-threatening condition or disease" is one which, according to the current diagnosis of your attending physician, has a high probability of death. A "disabling condition or disease" is any medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than 12 months, which renders you unable to engage in any substantial gainful activities. In the case of a child under the age of 18, a "disabling condition or disease" is any medically determinable physical or mental impairment of comparable severity.

Your attending physician must also certify that your life-threatening or disabling condition or disease is one for which standard health services are ineffective or medically inappropriate or one for which there does not exist a more beneficial standard service or procedure Covered by Us or one for which there exists a clinical trial (as defined by law).

In addition, your attending physician must have recommended one of the following:

- A service, procedure or treatment that two documents from available medical and scientific evidence indicate is likely to be more beneficial to you than any standard Covered Service (only certain documents will be considered in support of this recommendation – your attending physician should contact the State in order to obtain current information as to what documents will be considered acceptable); or

- A clinical trail for which you are eligible (only certain clinical trials can be considered).

For the purposes of this section, your attending physician must be a licensed, board-certified or board eligible physician qualified to practice in the area appropriate to treat your life-threatening or disabling condition or disease.

## IV. THE EXTERNAL APPEAL PROCESS

If, through Our internal review process, you have received a final adverse determination upholding a denial of coverage on the basis that the service is not Medically Necessary or is an experimental or investigational treatment, you have 45 days from receipt of such notice to file a written request for an external appeal.

We will provide an External Appeal application with the final adverse determination issued through Our internal review process or Our written wavier of any internal appeal.

You may also request an External Appeal application from New York State at 1-800-342-3736. Submit the completed application to State Department of Insurance at the address indicated on the application. If you satisfy the criteria for an External Appeal, the State will forward the request to a certified External Appeal Agent.

You will have an opportunity to submit additional information with your request. If the External Appeal Agent determines that the information you submit represents a material change from the information on which We based Our denial, the External Appeal Agent will share this information with Us in order for Us to exercise Our right to reconsider Our decision. If We choose to exercise this right, We will have three to amend or confirm Our decision. Please note that in the case of an expedited appeal (described below), We do not have the right to reconsider Our decision.

In general, the External Appeal Agent must make a decision within **30** business days of receipt of your completed application. The External Appeal Agent may request additional information from you, your physician or Us. If the External Appeal Agent requests additional information, it will have five additional business days to make its decision. The External Appeal Agent must notify you in writing of its decision within **two business days**.

If your attending physician certifies that a delay in providing the service that has been denied poses an imminent or serious threat to your health, you may request an expedited external appeal. In that case, the External Appeal Agent must make a decision within three days of the receipt of your completed application. Immediately after reaching a decision, the External Appeal Agent must try to notify you and Us by telephone or facsimile of that decision. The External Appeal Agent must also notify you in writing of its decision.

If the External Appeal Agent overturns Our decision that a service is not Medically Necessary or approves coverage of an experimental or investigational treatment, We will provide coverage subject to the other terms and conditions of this Certificate. Please note that if the External Appeal Agent approves of an experimental or investigational treatment that is part of a clinical trial, We will only Cover the costs of services required to provide treatment to you according to the design of the trial. We shall not be responsible for the costs of investigational drugs or devices, the costs of non-health care services, the costs of managing research, or the costs which would not be Covered under this Certificate for non-experimental or non-investigational treatments provided in such clinical trial.

The External Appeal Agent's decision is binding on both you and Us. The External Appeal Agent's decision is admissible in any court proceeding.

We will charge you a fee **$50** for an external appeal. The External Appeal application will instruct you on the manner in which you must submit the fee. We will also waive the fee if We determine that paying the fee would pose a hardship to you. If the External Appeal Agent overturns the denial of coverage, the fee shall be refunded to you.

## V.  YOUR RESPONSIBILITIES

**It is your RESPONSIBILITY to initiate the external appeal process.** You may initiate the External Appeal process by filing a completed application with the New York State Department of Insurance. If the requested service has already been provided to you, your physician may file an external appeal application on your behalf, but only if you have consented to this in writing.

**Under New York State law, your completed request for an Appeal must be filed within 45 days of either the date upon which you receive written notification from Us that We have upheld a denial of coverage during the internal Appeal process or the date upon which you receive a written wavier of any internal Appeal. We have no authority to grant an extension to this deadline.**

# Section VIII.
# Termination of Coverage

## 1. How Your Coverage May Terminate

Your Coverage under this Certificate will terminate:

A.   Where permitted by the Group, upon written notice from you. If you provide written notice at least 15 days prior to the beginning of the following month, coverage will terminate on the last day of the month in which notice is given. If 15 days notice is not received, coverage under this provision will not terminate until the end of the following month.

B.   Upon termination of the Agreement. Either We or the Group can terminate the Agreement under certain conditions. Coverage will cease at 11:59 midnight on the date the Agreement terminates. We are not obligated to notify you that your coverage under this Plan is being terminated. The Group will provide you with this notice. The fact that you did not receive notice from Us will not continue or extend your coverage under this Plan beyond the date of the Agreement.

C.   Upon loss of eligibility. Your coverage will cease on the date you no longer meet the eligibility requirements of your Group or the requirements of this Certificate regarding eligibility for coverage. When a Subscriber loses eligibility, his or her Covered Dependents will also become ineligible on that date.

D.   For cause, if you:

1. Do not make, within 31 days, a required Copayment or any other required payment to a Us or a Network Provider;

2. Do not cooperate with the Us by failing to provide information regarding other coverages, or providing releases, assignments and other documents as may be requested for reimbursement under COB, Workers' Compensation, Medicare or automobile insurance, or as otherwise required for the administration of the Plan by this Certificate;

3. Have permitted your Identification Card to be used improperly. We will not be responsible for the cost of any Covered Services obtained through the misuse of the card and We have the right to recover any expenditures incurred as a result of the misuse of the Identification Card. A Member's misuse of his or her Identification Card will not result in termination of coverage for the Member's entire family unless the Member is the Subscriber;

4. Have made a material misrepresentation to Us in your application. In this instance, We will rescind coverage and you will be responsible for the costs of all services received. No statement made for the purpose of obtaining coverage will result in recission of coverage unless the statement is contained in the application and a copy has been provided to you prior to termination;

5. Have made a material misrepresentation to Us (other than in your application), or have committed a fraud against Us. We will terminate coverage upon written notice. We have the right to recover any expenditures incurred on or after the date of the misrepresentation or fraud. No statement will be used to terminate coverage unless it is in writing and signed by the Subscriber or Member. All statements made by any Member or any person applying for coverage under this Certificate will be deemed representations, not warranties;

Coverage will not be terminated on the basis of your health status or health care needs. Exercising your Grievance rights will not result in the termination of coverage.

## 2. Effective Date of Termination

If you have been terminated for cause (subsection D. above), We will notify you of the termination in writing. All terminations are effective 31 days from the date the notice is mailed.

## 3. Reinstatement

A Member will not be reinstated automatically if Coverage is terminated.

**Re-application is required.**

# Section IX.
# What Happens If I Lose Coverage?

## 1. Termination or Loss of Eligibility: Coverage Options

## I. COBRA

Federal law provides that, in certain cases, coverage may continue under this Plan . The abbreviation for that law is COBRA. Electing coverage under this provision ends any rights under any applicable state continuation provision. The following is a summary of the terms and conditions.

### A. Continuation of Coverage for You and Your Covered Dependents

If you and your Covered Dependents become ineligible under the Certificate due to (a) termination of your employment for any reason (except for gross misconduct on your part), or (b) a reduction in your hours of employment, coverage may be continued under this Certificate for you and/or your Covered Dependents, subject to the following:

1. You and/or your Covered Dependents must elect to continue such coverage and coverage by the Plan within the 60-day period described in the Notice of Federal Continuation Rights given by the Group to you and/or your Covered Dependents;

2. You and/or your Covered Dependents make the required contributions;

3. You and/or your Covered Dependents are not entitled to Medicare or covered under Medicare or any other group health plan; and

4. You and/or your Covered Dependents comply with all other terms and conditions under this Certificate.

The coverage under this subsection A. will end on the earliest of:

1. The last day of the 18-month period from the date you became ineligible under the Certificate. This 18-month period may be extended to a 29-month period for you or a Covered Dependent who is and remains disabled as determined under Title II or XVI of the Social Security Act;

2. The date any required contribution for a Member on COBRA is not made;

3. The date any Member on COBRA becomes entitled for benefits under Medicare;

4. The date any Member on COBRA becomes covered under another group health plan without limitation or exclusion of preexisting conditions; and

5. The date that coverage under this Certificate is discontinued with respect to all employees of the Group.

## B. Continuation of Dependent Coverage Only

Coverage under this Certificate may be continued for Covered Dependents who become ineligible while Covered under this Plan. In addition to your termination of employment or reduction in hours, as described above in subsection 1, this provision applies when your Covered Dependents lose eligibility for any of the following reasons:

1. You die while providing coverage for your Covered Dependents under this Certificate;

2. There is a divorce or legal separation from you; or

3. A Covered Dependent (other than spouse) ceases to be a Covered Dependent as defined in the Certificate.

Newborns who are born while the Subscriber is on COBRA Continuation and children placed in the Subscriber's home for adoption while the Subscriber is on COBRA Continuation, are eligible for COBRA coverage. They must be enrolled in accordance with the Certificate's terms and conditions for Dependent coverage.

To obtain coverage under this provision, the Member must: notify the Group of the event; elect in writing to continue coverage within the 60-day period described in the Notice of Federal Continuation

Rights; make the required contributions; and not be entitled to Medicare or other Group coverage.

Coverage under this subsection B. will end on the earliest of:

1. The last day of the 36-month period from the date the Member became ineligible under the Certificate;

2. The date any required contribution is not made;

3. The date the Member becomes entitled to benefits under Medicare;

4. The date the Member becomes covered under any group health plan without limitation or exclusion of preexisting conditions; or

5. The date coverage under this Certificate is discontinued with respect to all employees of the Group.

## C. Other COBRA Information

**1. Coverage for Persons on COBRA Under a Prior Plan.** You or your Covered Dependent may have elected COBRA under a prior plan. In such a case, this Plan will provide coverage for the period remaining under COBRA subject to the termination provisions described above, and all other terms and conditions of

this Certificate. Any benefits paid under the prior plan, whether due to an extension of benefits or otherwise, will be deducted from benefits payable under this Certificate.

**2. Increases and Decreases in Coverage.** Any amount of coverage or benefits continued under COBRA is subject to any increases and reductions as set forth in Section II., "Increase or Reduction in Benefits."

## 3. Notification Requirements.

a. **Election**. The failure to elect coverage within the 60-day period discussed above will result in the loss of the COBRA option.

b. **Benefits**. You or your Covered Dependents must notify the Group no later than 60 days after any of the following events occur:

i. There is a divorce or legal separation between you and your spouse;

ii. A child ceases to be a Covered Dependent as defined in this document.
Failure to provide this notice will result in the loss of the COBRA option.

c. **Disability**. If coverage for you or your Covered Dependents is being continued for 18 months under Section A. above and it is determined that you or your Covered Dependent was disabled (as determined under Title II or XVI of the Social Security Act) either before or during the first 60 days of coverage under Section A, you or your Covered Dependent must notify the Group of such determination within 60 days after the date of the determination (if you or your Covered Dependent wishes to receive 29 months of COBRA coverage). The Group must also be notified within 30 days after the date of any final determination that you or your Covered Dependent is no longer disabled.

## 4. Payment Requirements

You or your Covered Dependents must pay for COBRA coverage. Payments are made on a monthly basis and must be paid to the Group in advance (in some instances, payment will be sent directly to Us). The first payment must be sent with the election notice to the Group.

## 5. Multiple Continuation Periods.

If a Covered Dependent is on an 18-month continuance under Section A, and one of the events listed in Section B occurs, coverage can be extended. Coverage for up to 36 months is available, measured from the date that coverage under Section A began. Any extended coverage is subject to all other terms of the Certificate.

## 6. Maximums, Deductibles and Copayments.

a. Any benefit maximums as well as any other limits on benefits under COBRA will be reduced by any corresponding amounts or limitations previously paid or satisfied, whether in whole or in part under this Certificate on the date before you became ineligible under this Certificate.

b. Any Copayments paid for the Contract Year under this Certificate before you became ineligible under this Certificate will be applied toward the satisfaction of the Copayment limit for that Contract Year.

### 7. Conversion

The conversion privilege described in Section IV. below is available to Members upon termination of COBRA.

## II. State of New York Continuation

If the Group is not subject to COBRA, continuation as required by the State of New York ("State Continuation") may be available as described below. Please note: A Member is not eligible for State Continuation if he or she:

- Is eligible for COBRA;
- Is covered or could be covered by Medicare; or
- Is covered or is eligible for coverage under another group health plan (either as an employee or dependent), regardless if the plan is insured or uninsured but only if such health plan does not contain an exclusion or limitation with respect to a Member's pre-existing condition.

### A. Continuation of Coverage for You and Your Covered Dependents

If a Member's coverage under this Certificate would end because the Subscriber:

- Has terminated employment ; or
- Has become a member of a class of employees who are not eligible for coverage the Member and/or Covered Dependents may apply for State Continuation. Members who wish to elect State Continuation must request the coverage, in writing, within the 60-day period following the later of: the date of the termination or ineligibility; or the date the Member is given notice by the Group.

The coverage under this subsection A. will end on the earliest of:

1. Eighteen months after the date the Member became ineligible under the Certificate. This 18-month period may be extended to a 29-month period for a Member who is and remains disabled as determined under Title II or XVI of the Social Security Act;

2. The date any required contribution is not made;

3. The date any Member becomes covered or eligible for coverage under Medicare;

A. The date any Member becomes covered or eligible for coverage under another group health plan (as either a subscriber or dependent) unless that plan restricts coverage of a pre-existing condition of the Member; or

B. The date that coverage under this Certificate is discontinued with respect to all employees of the Group.

### B. Continuation of Dependent Coverage Only

Coverage under this Certificate may be continued for Covered Dependents who become ineligible while Covered under this Certificate. This provision applies only when your Covered Dependents lose eligibility for any of the following reasons:

1. You die while providing coverage for your Covered Dependents under this Certificate;

2. There is a divorce or legal separation from you;

3. A Covered Dependent (other than spouse) ceases to be a Dependent as defined in the Certificate.

Newborns who are born while the Subscriber is on COBRA Continuation and children placed in the Subscriber's home for adoption while the Subscriber is on COBRA Continuation, are eligible for COBRA coverage. They must be enrolled in accordance with the Certificate's terms and conditions for Dependent coverage

To obtain coverage under this provision, the Member must, in writing, elect to continue coverage within the 60-day period following the event qualifying them for coverage.

Coverage under this subsection B. will end on the earliest of:

1. The last day of the 36-month period from the date the Member became ineligible under the Certificate;

2. The date any required contribution is not made;

3. The date the Member becomes eligible for benefits under Medicare;

4. The date the Member becomes eligible for coverage under any group health plan (either as a subscriber or dependent) unless that plan restricts coverage of a pre-existing condition of the Member; or

5. The date coverage under this Certificate is discontinued with respect to all employees of the Group.

### C. Other State Continuation Information

#### 1. Coverage for Members on State Continuation Under a Prior Plan

You or your Covered Dependents may have elected State Continuation under the Group's prior plan. In such a case, this Plan will provide coverage for the period remaining under State Continuation subject to the termination provisions described above, and all other terms and conditions of this Certificate. Any benefits paid under the prior plan, whether due to an extension of benefits or otherwise, will be deducted from benefits payable under this Certificate.

#### 2. Disability

If coverage for you or your Covered Dependents is being continued for 18 months under Section A. above and it is determined that you or your Covered Dependent was disabled (as determined under

Title II or XVI of the Social Security Act) either before or during the first 60 days of coverage under Section A, you or your Covered Dependent must notify the Group of such determination within 60 days after the date of the determination (if you or your Covered Dependents want to receive 29 month of continuation coverage). The Group must also be notified within 30 days after the date of any final determination that you or your Covered Dependent is no longer disabled.

### 3. Payment Requirements

You or your Covered Dependents must pay for State Continuation coverage. Payments are made on a monthly basis and must be paid to the Group in advance. The first payment must be sent with the election notice to the Group.

### 4. Multiple Continuation Periods

If a Covered Dependent is on an 18-month continuance under Section A, and one of the events listed in Section B occurs, coverage can be extended. Coverage for up to 36 months is available, measured from the date that coverage under Section A began. Any extended coverage is subject to all other terms of the Certificate.

### 5. Maximums, Deductibles and Copayments

a. Any benefit maximums as well as any other limits on benefits under State Continuation will be reduced by any corresponding amounts or limitations previously paid or satisfied, whether in whole or in part under this Certificate on the date before you became ineligible under this Certificate.

b. Any Copayments paid for the Contract Year under this Certificate before you became ineligible under this Certificate will be applied toward the satisfaction of the Copayment limit for that Contract Year.

### 6. Conversion

The Conversion Privilege described in Section IV below is available to Members upon termination of their State Continuation.

## III.  Extended Benefits

### 1. Eligibility for Extended Benefits

If a Member is Totally Disabled on the date his or her coverage under the Plan ends, the Plan will pay benefits only for those Covered Services that are for the treatment of the particular injury or sickness that is the cause of the Total Disability.

For purposes of this section, Total Disability means: a Subscriber who is prevented because of injury or disease from performing his or her regular or customary occupational duties and is not engaged in any work or other gainful activity for pay or profit. A Covered

Dependent who is prevented because of injury or disease from engaging in substantially all of the normal activities of a person of like age and sex who is in good health.

### 2. Termination of Extended Benefits

Extended Benefits will end on the earliest of the following:
a. The date the Member is no longer Totally Disabled as determined by the Member's Physician;

b. The date the contractual benefit limit has been reached:

c. Twelve months from the date coverage under the Extended Benefits Provision began.

d. The date the Member becomes eligible for benefits under any group policy providing medical benefits or services, or Medicare (if allowed by law).

### 3. Limits on Extended Benefits

We will not pay Extended Benefits:

a. For any Member who is not Totally Disabled on the date his or her insurance under this Certificate ends;

b. For any child born as the result of a pregnancy for which benefits are being extended; and

c. Beyond the extent to which We would have paid benefits under the Certificate if coverage had not ended.

Continuation of coverage under either COBRA or State of New York Continuation is not available if Extended Benefits has been elected or exhausted.

Conversion Coverage is not available once Extended Benefits has been elected or exhausted.

**You must inform Us of your decision to be Covered under Extension of Benefits within 30 days of the event causing your eligibility for such coverage.**

## IV.  Conversion Privilege

In the event you cease to be eligible for coverage under this Certificate, you may, within 45 days after termination of coverage under this Certificate convert to individual membership. The individual coverage will become effective as of the date of the termination. In order to be eligible for conversion coverage, your coverage, or the coverage of your Covered Dependents, must terminate for one of the following reasons:

1. The Agreement between the Group and Us is terminated and the Group does not replace the coverage provided by this Certificate with continuous and similar coverage;

2. A Subscriber ceases to meet the eligibility requirements of this Certificate. In this instance, the Subscriber and his or her then Covered Dependents are eligible to convert;

3. A Covered Dependent ceases to meet the eligibility requirements of this Certificate because of attaining the limiting age, death of the Subscriber or divorce or annulment; or

4. Continuation of coverage under COBRA, or State Continuation expires and the Member is not eligible for coverage under any other group health plan or Medicare.

In order to be eligible for conversion coverage a Subscriber must have been continuously Covered under this Certificate for at least three months immediately prior to the termination;

Conversion coverage is not available if:

1. The Member is or is eligible to be covered for similar benefits under: another group plan, medical services subscriber contract, medical practice or other prepaid plan regardless of whether the coverage is on an insured or self-funded basis; or any governmental program **and** such coverage combined with the conversion coverage would result in overinsurance (as defined by Our overinsurance rules which are filed with the State).

2. Coverage was terminated for cause as described in the "Termination of Coverage" section of this Certificate.

To obtain conversion coverage, you or your Covered Dependents must do two-things. First, you must submit a completed application for conversion to Us within 45 days after the date of termination. This 45-day period will be extended an for an extra 45 days (90 days total) if your employer does not give you timely notice of your conversion rights. Finally, you must submit the required premium payments. We will not ask for evidence of good health.

Please note that the premium under conversion will differ from that under the Group coverage. In addition, the terms of the conversion plan will be different. You or your Covered Dependents will be issued the conversion plan that is being offered by Us at the time of your application. This plan will offer benefits at the same level as are available to Our conversion subscribers in general.

Application for conversion is not initiated by Us. You or your Covered Dependents must initiate the application procedure. In accordance with its usual notification procedures, the Group is responsible for giving notice of your eligibility for conversion coverage. However, if coverage under this Certificate has ended due to the exhaustion of your or your Covered Dependents COBRA coverage, the Group must give you notice of your conversion rights. The Group must do this during the 180-day period prior to the expiration of the COBRA coverage.

## IV. Other Available Coverage

### 1. Leave of Absence or Lay-off

If your coverage would terminate because you are temporarily laid-off or receive an approved leave of absence, coverage may be continued for up to 60 days, or as otherwise agreed upon by Group and Us; if Group: (1) pays the Premium for the continued coverage; and (2) requires all participating carriers to provide continued coverage to employees whose coverage would otherwise terminate because of a temporary lay-off or approved leave of absence.

### 2. Family and Medical Leave Act

Federal law provides that certain employees can take up to 12 weeks of unpaid leave in a 12-month period for the birth or

adoption of a child, or for a serious health condition affecting the employee or a family member. Employers subject to this law are required to keep an employee's medical coverage in force to the same extent as if no leave had been taken. Your obligations, including any Premium contributions and compliance with Plan provisions, do not change during a leave.

If your employer is subject to this law, and you are eligible for leave under the Act, We will continue your coverage during a qualified leave. Coverage will terminate for failure to comply with Plan provisions, including the failure to pay Premium. You should check with your employer regarding family or medical leaves.

# Section X.
# What Happens If a Provider Bills Me?

## 1. Filing a Claim

You are financially responsible for the cost of any Covered Services received from non-Network Providers unless those services were either arranged by your PCP, Precertified by Us or were required to treat a Medical Emergency or Urgent Care situation as described in this Certificate.

In order to be reimbursed, you must complete a claim form, sign it, and send it to Us with the original, itemized bill(s). Only original bills will be considered. Itemized bills should contain:

- Patient name
- Type of service
- Name and address of provider making the charge
- CPT-4 codes, or HCPCS codes (description of services)
- Date of service
- Individual charge for each service
- ICD-9 codes (diagnosis or symptoms)

Be sure to keep a copy of your claim form and bills for your own records.

Claim forms are available from the Group or from Us by calling the Member Services telephone number listed in the front of this Certificate. Completed forms should be sent to the address listed for "Claims" at the front of this Certificate.

## 2. Payment Options

You may request Us to make payment directly to you or to the provider. If you want Us to pay the provider directly (referred to as assignment), you must give the provider a blank claim form to be completed and forwarded with the itemized bill.

If you decide to pay a provider directly, submit the completed claim form with your bill to Us for reimbursement as described above. Although We will generally follow your instructions, We reserve the right to make the final determination.

## 3. Limitations

All requests for reimbursement must be made within 90 days of the date Covered Services were rendered. Failure to request reimbursement within the required time will not invalidate or reduce any claim if it was not reasonably possible to provide such proof within the 90-day period. However, such request must be made as soon as reasonably possible thereafter.

All reimbursements to non-Network Providers are subject to UCR **unless** you were referred to a non-Network Provider by your PCP or Us.

## 4. If You Receive a Bill From a Network Provider

The cost of Covered Services provided by Network Providers in accordance with the terms of this Certificate will be billed directly to Us. **No claim forms are necessary.**

If you should receive a bill from a Network Provider for Covered Services, please contact the Member Service Department immediately.

## 5. Claim Information

Claims for Covered Services will be paid within 45 days after We receive proof of claim and all of the information we need to process the claim. If necessary, Our Claims Department will contact you for more information regarding your claim in order to speed up the processing. If you would like to inquire about the status of a claim, call the "Claims" telephone number list in the front of this Certificate. Please have the date of service and your ID number ready.

## 6. Physical Examination

We have the right and the opportunity to examine the Member who is the basis of any claim at all reasonable times while the claim is pending. This will be done at Our expense.

# Section XI.
# Other Important Documents

## 1. Supplemental Coverage by Rider

The terms and conditions of this Certificate are subject to revision, addition or deletion. Any such changes will be made by rider. The terms of a rider that is issued by Us and accepted by the Group will supersede conflicting terms in this Certificate. Riders that are part of your Plan will be issued with your Certificate. However, you may want to verify with the Group whether your Plan is subject to any rider.

Please check with your Benefits Administrator to make sure you have the most recent documents concerning your supplemental coverage under the Plan.

## 2. Summary of Benefits

In order to receive Covered Services under this Certificate, We may require that you pay a Copayment or Coinsurance to the Provider who supplied the Covered Services. In addition, certain other charges may be applied. You will receive a Summary of Benefits that will explain all of the applicable Copayments and Coinsurance as well as other similar features of your Plan. It will also list specific limitations on visits, days and dollar amounts for the benefits that are provided by the Plan.

Please check with your Benefits Administrator to make sure you have the most recent Summary of your coverage under the Plan.

## 3. Living Wills and Advance Directives

You have the right to participate in decisions relating to your health care. Working with your doctor, you can decide whether to accept or reject proposed medical treatments. That right extends to situations where, because of your medical condition, you are unable to communicate with your doctor or the hospital. This is done by the creation of an Advance Directive.

An Advance Directive is a written, signed document, that provides instructions for your care if you are unable to communicate your wishes directly. Depending on the state where you reside or are receiving treatment, the most common forms of Advance Directives are Living Wills and Durable Powers of Attorney. These documents instruct your health care providers how to proceed if you are not able to communicate with them.

Additionally, The New York State Health Care Proxy Law allows an adult to designate another adult, such as a trusted friend or loved one who knows the person and his or her wishes, to make these treatment decisions if the adult becomes incapacitated and is unable to do so.

If you decide to execute an Advance Directive or Proxy, you should notify all of your regular providers and a copy of the item should be placed in the medical file maintained by your PCP. In addition, you should have some way of notifying police and emergency medical personnel that you have made an Advance Directive. For example, you may want to keep a card in your wallet or purse.

You are not required to make an Advance Directive or a Proxy. If you do decide to make one, please note that you are free to amend or cancel it at any time.

# Section XII.

# Member Rights and Responsibilities

### What Are My Rights as an Member?

As a Member you have the following rights:

1. The right to obtain complete and current information concerning a diagnosis, treatment and prognosis from any Network Provider in terms that you or your authorized representative can readily understand. You have the right to be given the name, professional status and function of any personnel delivering Covered Services to you.

You also have the right to receive all information from a Network Provider necessary for you to give your informed consent prior to the start of any procedure or treatment.

Finally You have the right to refuse treatment to the extent permitted by law. We and, when appropriate, your PCP will make every effort to arrange a professionally acceptable alternative treatment. However, if you still refuse the recommended treatment and We and your Network Provider believe no professionally acceptable alternative exists, We will not be responsible for the cost of further treatment for that condition. You will be notified accordingly.

2. The right to be provided with information about Our services and medical providers that accurately provides relevant information in a manner that is easily understood.

3. The right to quality health care services, provided in a professional and respectful manner. You also have the right to participate in decision-making regarding your health care.

4. The right to privacy and confidentiality of your health records, except as otherwise provided by law or contract. You have the right to all information contained in your medical records unless access is specifically restricted by the attending physician for medical reasons.

5. The right to initiate disenrollment from the plan.

6. The right to file a formal grievance if complaints or concerns arise about Our medical or administrative services or policies.

7. You have, when Medically Necessary, the right to emergency care without unnecessary delay.

8. You have the right to be advised if any of the Network Providers participating in your care propose to engage in or perform human experimentation or research affecting your care or treatment. You or a legally responsible party on your behalf may, at any time, refuse to participate in or to continue in any experimentation or research program to which you have previously given informed consent.

9. You have the right to sign language Interpreter services in accordance with applicable laws and regulations, when such services are necessary to enable you, as a person with special communication needs, to effectively communicate with your Network Provider.

Should you have any difficulty in arranging for such services, please contact your Oxford Customer Service Representative. We can also arrange for TTY services. To receive payment for such service(s), please have your Network Provider mail Us an invoice from the translation service.

### What Are My Responsibilities?

Your Responsibilities Include:

1. To enter into this Plan with the intent of following the policies and procedures as outlined in this Certificate.

2. To take an active role in your health care through maintaining good relations with your Providers and following prescribed treatments and guidelines.

3. To provide, to the extent possible, information that professional staff need in order to care for you as a Member.

4. To use the emergency room only as described in this Certificate.

5. To notify the proper Plan representative of any change in name, address or any other important information.

# Section XIII.

# General Administrative Policies and Procedures

## 1. Medical Records: Confidentiality and Authorization to Examine

Your medical records are confidential documents. Access to those records will be limited to persons who need to see them. They will be used to determine appropriate medical care for you, to administer this Plan, and in some cases, to meet state and federal regulatory requirements. Your records will not be released for any other reason without your consent. By participating in the Plan, you agree and authorize Us, Network Physicians, other Network Providers and non-Network Providers to permit the examination and copying of any portion of your Hospital or medical records, when requested by Us for the reasons discussed above.

Additionally, Oxford has the right, without consent of the Member or Group, to review, including but not limited to; medical records, enrollment records and other information needed to verify services if potential fraud is suspected.

If you would like a description of Our procedures for maintaining confidentiality of Member information; Please follow the instructions in "Getting Started" under "More Information About Oxford Coverage."

## 2. Coordination of Benefits (COB)

A Member may be covered by two or more plans at the time that Covered Services are rendered. In determining what benefits are payable under this Certificate, We will do the following:

**First**: We will provide the Covered Services required. Then, as permitted by law, We will take into account any other coverages.

These other coverages are plans that provide medical, dental or prescription drug benefits or services, including but not limited to:

A. Any group insurance. prepaid health plans, or any other insured or uninsured arrangement of group coverage.

B. Where permitted by state law, any automobile insurance contract, pursuant to any federal or state law, which mandates indemnification for medical services to persons suffering bodily injury from motor vehicle accidents, but only if:

a. Covered Services are eligible for payment under the provisions of such policy; and

b. The policy does not, under its rules, determine its benefits after the benefits of any group health insurance.

**Please note:** This Plan does not coordinate benefits with itself.

**Second:** If there is other coverage, We will calculate the Allowable Expense. The Allowable Expense is any necessary, reasonable, and customary item of expense that is at least partly covered under one or more of the plans covering the Member.
When a plan provides services, instead of paying cash, the value of each service rendered will be considered to be both: an Allowable Expense and a benefit paid.

**Third:** We will determine the amount We will pay. We will pay the lesser of: Our regular benefits or a reduced amount. The reduced amount will only be paid when there is other coverage in effect, and the benefit under the other coverage plus the coverage under this Certificate equals 100% of the Allowable Expense.

In determining Our coverage, We will determine the order in which the various coverages will pay. Order of payment is determined using the following rules:

A. A plan with no COB provisions, or provisions that do not comply with applicable state law, will be considered to pay its benefits before a plan that contains such a provision.

B. A plan that covers a person as a Subscriber will be considered to pay its benefits before a plan that covers that person as spouse or dependent.

C. When a Member is covered under two or more plans as a dependent, We will compare the month and day of the birthday of each parent who is providing the coverage. The plan of the employee who has the earliest birth date will be considered to pay first. When both parents have the same birth date, the plan that has provided coverage the longest will be considered to pay first. If

the COB rules of any plan do not use the birth date to determine coverage, the procedures described in that plan will be used.

When the parents of the dependent are divorced or separated, the following rules will apply:

1. In some cases there will be a court decree that orders one of the parents to provide coverage. If that parent's plan covers the individual as a dependent, and the plan has actual notice of the decree, that plan will be considered to pay first.

If 1. does not apply, then:

2. The custodial parent's plan which covers the child as a dependent will be considered to pay before any other dependent coverage.

3. The plan that covers the custodial parent's spouse and which covers the child as a dependent will be considered to pay before any other dependent coverage.

4. If - 3. above do not apply, the plan that covers the child as a dependent of the parent without custody will be considered to pay benefits first.

D. A plan that covers a person as an active employee (or that employee's dependent) pays before a plan that covers a person as laid-off or retired employee (or that employee's dependent). If the other plan does not have the provision discussed in the previous sentence, it will not apply.

E. If A, B, C, and D above fail to establish the order of payment, the plan that has covered the person the longest will be treated as paying benefits first.

We have the right to release or obtain any information and make or recover any payments that We consider necessary to administer this provision. We may obtain information necessary to administer this provision without your consent or notice to you. You agree to provide Us with any information or cooperation We need to administer this provision.

If payments that We are required to make under this Certificate are made by another plan, We may be required by this provision to reimburse that plan. Amounts paid in this manner are deemed to be benefits paid under this Certificate and, to the extent of those payments, We are fully discharged from liability under this Certificate.

If we make payments in excess of Our obligations under this provision, We have the right to recover any excess from one or more of the following: any person, any other insurance company or any other organization.

Please note, that failure to cooperate with Us regarding this provision could subject you to all charges for Covered Services subject to this provision. Failure to cooperate is grounds for termination of coverage.

## 3. Effect of Coordination

When this Plan is secondary, the benefits of this Plan will be reduced so that the total benefits paid by the primary plans(s) and this Plan will not exceed our maximum available benefit for each Covered Service under the Certificate. Also, the amount paid or provided will not be more than the amount we would pay or provide if we were primary.

We will coordinate benefits with plans, whether insured or self-insured, which provide benefits which are stated to be always in excess or always secondary or use order of benefit determination rules which are inconsistent with those described above ("non-complying plans") in the following manner:

a. If this Plan is primary, We will pay or provide benefits first.

b. If this Plan is secondary, We will pay only the amount we would pay or provide as the secondary insurer.

c. If We request information from a non-complying plan and do not receive it within 30 days of our request, We will calculate the amount We should pay or provide on the assumption that the non-complying plan and contract provide identical benefits. When the information requested is received, We will make any necessary adjustments.

## 4. Reimbursement and Subrogation

### Reimbursement

This section applies when a Member recovers damages, by settlement, verdict or otherwise (in which sums for medical expenses have been specifically identified), for an injury, sickness or other condition. If the Member has made, or in the future may make, such a recovery, including a recovery from any insurance carrier and We have paid for or provided benefits, the Member, or the Member's legal representatives, estate or heirs must promptly reimburse Us for the reasonable value of the medical benefits paid for or provided by Us to the Member.

In order to secure Our rights under this section, the Member must assigns to Us any benefits the Member may have under any automobile policy or coverage, to the extent of Our claim for reimbursement. The Member must sign and deliver, at Our request or Our agents, any documents needed to effect such assignment of benefits.

The Member must cooperate with Us and Our agents and must: sign and deliver such documents as We or Our agents reasonably request to protect Our right of reimbursement; provide any relevant information; and take such actions as We or Our agents reasonably request to assist Us in making a full recovery of the reasonable value of the benefits provided. The Member shall not take any action that prejudices Our right of reimbursement.

We shall be responsible only for those legal fees and expenses to which We agree to in writing.

If the Member fails to cooperate with Us, the Member will be responsible to repay Us the amount of the benefits We have paid.

### Subrogation

This section applies when another party is, or may be considered, liable for a Member's injury, sickness or other condition (including insurance carriers who are so liable) and We have provided or paid for benefits.

We are subrogated to all of the rights of the Member against any party liable for the Member's injury or illness or for the payment for the medical treatment of such injury or occupational illness (including any insurance carrier), to the extent of the reasonable value of the medical benefits provided to the Member. We may assert this right independently of the Member.

The Member is obligated to cooperate with Us and Our agents in order to protect Our subrogation rights. Cooperation means providing Us or Our agents with any relevant information requested by them, signing and delivering such documents as We or Our agents reasonably request to secure Our subrogation claim, and obtaining Our or Our agents consent before releasing any party from liability for payment of medical expenses. We require that you notify Us or Our agents at least 30 days prior to entering into any settlement.

If a Member enters into litigation or settlement negotiations regarding the obligations of other parties, the Member must not prejudice, in any way, Our subrogation rights under this section.

In the event that you suffer an injury or illness for which another party may be responsible, such as someone injuring you in an accident, and We pay benefits as a result of that injury or illness, We will be subrogated and succeed to the right of recovery against the party responsible for your illness or injury to the extent of the benefits We have paid. This means that We have the right independently of you to proceed against the party responsible for your injury or illness to recover the benefits We have paid.

The costs of Our legal representation in matters related to subrogation shall be borne solely by Us. The costs of legal representation of the Member shall be borne solely by the Member.

## 5. Worker's Compensation

Injuries and diseases covered under any Worker's Compensation program are excluded from coverage under this Plan.

## 6. Medicare and Other Government Programs

This Plan is not intended to duplicate any coverage for which Members are, or could be eligible for, such as Medicare or any other federal or state government programs. Any benefits payable under any such programs for Covered Services provided or benefits paid under this Certificate shall be payable to and retained by Us. You agree to complete and submit to Us any documentation reasonably necessary for Us to receive or assure reimbursement under Medicare or any other government programs for which you or your Covered Dependents are eligible.

**Benefits for Medicare Eligibles Who are Covered Under this Certificate**

1. If your Group has 20 or more employees, any active employee or spouse of an employee who becomes or remains a member of the Group Covered by this Certificate, after becoming eligible for Medicare due to reaching age 65, will receive the benefits of this Certificate as primary unless such Subscriber elects Medicare as his or her primary coverage. However, the Subscriber must notify Us of the election by signing and submitting to Us and election card which indicates his or her choice. He or she must also pay any required premium. Any Subscriber who elects Medicare as primary shall not be eligible for coverage under this Certificate as of the date of election.

2. If your Group has 100 or more employees or your group is an organization which includes an employer with 100 or more employees, any active employee, spouse of an active employee or Dependent child of an active employee who becomes or remains a member of the Group Covered under this Certificate, after becoming eligible for Medicare due to disability, will receive the benefits of this Certificate as primary unless the Subscriber elects Medicare as his or her primary coverage. However, the Subscriber must notify Us of his or her election by signing an election card which indicates his or her choice. He or she must also pay any required premium. Any Subscriber who elects Medicare as primary will not be eligible for coverage under this Certificate as of the date of this election.

3. Any Subscribers who are not subject to subsections 1 and 2 of this Section and who are Medicare eligible must be enrolled in both Part A and Part B of Medicare to be eligible for benefits under this Certificate. FAILURE TO MAINTAIN MEDICARE BENEFITS UNDER PART A AND B WILL RESULT IN IMMEDIATE TERMINATION OF THIS COVERAGE. Subscribers with Part A and B of Medicare will receive the benefits of this Certificate reduced by any benefits available under Medicare Part A and B.This applies even if the Subscriber fails to claim the benefits available under Medicare.

# Section XIV.
# General Provisions

1. Entire Agreement. This Certificate, Summary of Benefits, any Certificate riders issued by the Us and accepted by the Group, the Group Enrollment Agreement, and the individual applications of you and your Covered Dependents, if any, constitute the entire contract between the parties, and as of the effective date, supersede all other agreements between the parties. Any and all statements made to Us by the Group and any Subscriber or Covered Dependent will, in the absence of fraud, be deemed representations and not warranties, and no such statement, unless it is contained in a written application for coverage under this Certificate, shall be used in defense to a claim under this Certificate.

2. Form or Content of Certificate. No agent or employee of Us is authorized to change the form or content of this Certificate. Such

changes can be made only through an endorsement authorized and signed by one of Our officers.

3. Identification Cards. The cards We issue to Members pursuant to this Certificate are for identification only. Possession of an identification card confers no right to Covered Services or other benefits under this Certificate. To be entitled to such services or benefits the holder of the card must, in fact, be a Member on whose behalf all applicable Premiums under this Certificate have actually been paid. Any person receiving services or other benefits to which he is not then entitled pursuant to the provision of this Certificate will be liable for the actual cost of such services or benefits.

4. Notice. Any notice required under this Certificate may be given to Us by U.S. Mail, first class, postage prepaid to the Member Services address listed in the front of the Certificate. Notice to a Member will be sent to the last address We have for that Member. Member agrees to provide Us with notice, within 31 days, of any change of address.

5. Interpretation of Certificate. The laws of the State of New York shall be applied to interpretations of this Certificate.

6. Assignment. This Certificate is not assignable by Group without Our written consent. Any benefits under this Certificate are not assignable by any Member without Our written consent. In addition, This Agreement shall not confer any rights or obligations on third parties except as specifically provided herein.

7. Gender. The use of any gender in this Certificate is deemed to include the other gender and, whenever appropriate, the use of the singular is deemed to include the plural (and vice versa).

8. Modifications. By this Certificate, the Group makes Our coverage available to Members who are eligible under the terms of the Certificate. However, this Certificate is subject to amendment, modification, and termination in accordance with this provision, the Group Enrollment Agreement or by mutual agreement between Us and Group's Board of Directors without the consent or concurrence of any Member. By enrolling in this Plan, all Members legally capable of contracting, and the legal representatives of all Members incapable of contracting, agree to all its terms, conditions, and provisions.

9. Clerical Error. Clerical error, whether by the Group or Us, with respect to this Certificate, or any other documentation issued by Us in connection with this Certificate, or in keeping any record pertaining to the coverage hereunder, will not modify or invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated.

10. Policies and Procedures. We may adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of this Certificate with which Members shall comply.

11. Waiver. The waiver by any party of any breach of any provision of the Agreement will not be construed as a waiver of any subsequent breach of the same or any other provision. The failure

to exercise any right hereunder will not operate as a waiver of such right.

12. Termination of the Agreement. The Agreement will continue in effect for the period of time specified in the Agreement, and may be canceled in accordance with the terms of the Agreement.

13. Incontestability. Except as to a fraudulent misstatement: No statement made by the Group or any Member will be the basis for voiding coverage or denying coverage or be used in defense of a claim unless it is in writing. No statement made by the Group will be the basis for voiding the Agreement after it has been in force for two years from its effective date.

14. Significant Change in Circumstances. If We are unable to arrange for Covered Services as provided under this Certificate as the result of events outside of Our control, We will make a good faith effort to make alternative arrangements. These events would include a major disaster, epidemic, the complete or partial destruction of facilities, riot, civil insurrection, disability of a significant part of Network Providers' personnel or similar causes. We will make reasonable attempts to arrange for Covered Services. We and Our Network Providers will not be liable for delay, or failure to provide or arrange for Covered Services if such failure or delay is caused by such an event.

15. Independent Contractors. Network Providers are independent contractors. They are not Our agents or employees. We and Our employees are not the agent or employee of any Network Provider. We are not liable for any claim or demand on account of damages arising out of, or in any manner connected with, any injuries alleged to be suffered by any Member while receiving care from any Network Provider or in any Network Provider's facility.

16. Legal Action. No action at law or in equity may be maintained against Us for any expense or bill unless brought within the statute of limitations for such cause of action.

17. Hold Harmless. Network Providers have contractually agreed that Members will not be held financially liable for any sums owed to Network Providers for Covered Services (with the exception of required Copayments, Coinsurance and Deductibles) in the event that We fail to pay for Covered Services.

18. Application of Deductibles, Limitations and Maximums. Calculations of annual deductibles, benefit limitations, out-of-pocket maximums and lifetime maximums under this plan, will take into consideration as applicable payments made by you and benefits provided by Us and/or Our affiliate, Oxford Health Plans (NY), Inc. (collectively "Oxford"), pursuant to any Group Enrollment Agreement between Group and Oxford.

# Section XV.
# Definitions

Defined terms will appear capitalized throughout the Agreement.

**Acute:** The sudden onset of disease or injury, or a sudden change in the Member's condition that would require prompt medical attention.

**Agreement:** The Group Enrollment Agreement between Oxford Health Insurance, Inc. and the Group including any attachments and this Certificate.

**Ambulatory Surgical Centers:** A facility currently licensed by the appropriate state regulatory agency for the provision of surgical and related medical services on an outpatient basis.

**Certificate:** this Certificate of Coverage issued by Oxford Health Insurance, Inc., including the Summary of Benefits and any attached riders.

**Coinsurance:** The percentage of charges for Covered Services that you are required to pay to a Provider.

**Contract Year:** that 12-month period commencing on the effective date of the Agreement or any anniversary date thereafter, during which the Agreement is in effect.

**Copayment:** The amount you are required to pay directly to a Network Provider at the time Covered Services are rendered.

**Cover, Covered or Covered Services:** The Medically Necessary services paid for or arranged for you by Us under the terms and conditions of this Certificate.

**Covered Dependents:** Dependents, as defined in this Certificate, who are Members.

**Deductible:** The amount specified in your Summary of Benefits that you are responsible for before benefits are payable under this Certificate.

**Dependents:** Your spouse, unmarried and newborn children as described in the "Eligibility" section of this Certificate.

**Enrollment Date:** The Enrollment Date is the Member's first day of coverage under the Certificate or, if earlier, the first day of the waiting period that must pass with respect to the Member before the Member is eligible to be Covered under the Plan.

**Enrollment Form:** Our form which Members must complete to enroll in the Plan.

**External Review Agent:** An entity that has been certified by the Commissioner of the State of New York Department of Health to perform external reviews in accordance with New York law.

**Group:** The employer or party that has entered into an Agreement with Us.

**Group Open Enrollment Period:** A period of time, established by Group and Us, during which eligible persons may be enrolled. Your employer or plan sponsor will have the dates for each period.

**Home Health Care Agency:** An organization currently certified or licensed by the State of New York which has entered into an contract with Us to render home health services.

**Hospital:** An institution rendering inpatient and outpatient services for the medical care of the sick or injured. It must be accredited as a Hospital by either the Joint Commission on Accreditation of Health Care Facilities or the Bureau of Hospitals of the American

Osteopathic Association. A Hospital may be a general, acute care, or a specialty institution, provided that it is appropriately accredited as such, and currently licensed by the proper state authorities.

**Medical Emergency:** A medical or behavioral condition the onset of which is sudden, that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, possessing an average knowledge of medicine and health, could reasonably expect the absence of immediate medical attention to result in (a) placing the health of the afflicted Member with such a condition in serious jeopardy, or in the case of a behavioral condition placing the health of such Member or others in serious jeopardy; (b) serious impairment to the Member's bodily functions; (c) serious dysfunction of any bodily organ or part of such Member; or (d) serious disfigurement of such Member. Medical Emergencies include, but are not limited to, the following conditions:

- Severe chest pains
- Severe or multiple injuries
- Severe shortness of breath
- Loss of consciousness
- Sudden change in mental status (e.g., disorientation)
- Severe bleeding
- Acute pain or conditions requiring immediate attention such as suspected heart attack or appendicitis
- Poisonings or convulsions

**Medically Necessary:** Services or supplies as provided by a Hospital, Skilled Nursing Facility, Physician or other provider required to identify or treat your illness or injury and which, as determined by Our Medical Director, are:

1. Consistent with the symptoms or diagnosis and treatment of your condition;

2. Appropriate with regard to standards of good medical practice;

3. Not solely for your convenience or that of any provider; and

4. The most appropriate supply or level of service which can safely be provided. For inpatient services, it further means that your condition cannot safely be diagnosed or treated on an outpatient basis.

Unless otherwise indicated in this Certificate, determinations as to Medical Necessity are made by Us, and such determinations are solely within Our discretion.

**Medicare:** Title XVIII of the Social Security Act, as amended.

**Member:** Subscribers and Covered Dependents for whom required Premiums have been paid. Whenever a Member is required to provide a notice pursuant to a grievance or emergency room visit or admission, "Member" also means the Member's designee.

**Network Physician:** A Physician who, at the time of providing or referring Covered Services, is contracted with Us to provide Covered Services to Members.

**Network Provider:** A Physician, Certified Nurse Midwife, Hospital, Skilled Nursing Facility, Home Health Care Agency, or any other

duly licensed or certified institution or health professional under contract with Us to provide Covered Services to Members. A list of Network Providers and their locations is available to you upon enrollment or upon request. The list will be revised from time to time by Us.

**Network Specialist:** A Network Provider who has limited his or her practice to certain areas of medicine, and who is contracted with Us to provide Covered Services to Members. A list of Network Specialists and their locations is available to you upon enrollment or upon request.

**Non-Occupational Disease or Non-Occupational Injury:** A disease or injury that does not:

1. Arise out of (or in the course of) any work for pay or profit; or

2. Result in any way from an injury that does.

**Physician:** A currently licensed doctor of medicine or osteopathy.

**Plan:** Coverage under the Group's health benefits program as provided under this Certificate by Oxford Health Insurance, Inc.

**Precertification:** An authorization given by Us that you must receive **before you can obtain certain Covered Services.** We indicate which Covered Services require Precertification in the "Covered Services" section of this Certificate.

**Preexisting Condition:** A Preexisting Condition is a physical or mental condition (regardless of the cause of the condition); for which treatment, diagnosis or medical advice was actually recommended or received within the prior six months ending on the Enrollment Date.

**Individuals who are enrolled under the Plan or Prior Continuous Creditable Coverage within 30 days of birth are not subject to the Preexisting Condition Limitation exclusion.**

**Children under the age of 18 who are adopted or who are placed for adoption and who are enrolled under the Plan or Prior Continuous Creditable Coverage within 30 days of placement or adoption are not subject to the Preexisting Condition Limitation exclusion.**

**In the absence of a diagnosis of a condition related to such information, genetic information will not be treated as a Preexisting Condition. Pregnancy is not a Preexisting Condition.**

**Premium:** The total payment, including any contributions by Subscribers, from Group to Us for coverage.

**Primary Care Physician:** A Network Physician who: maintains continuity of patient care provides and is listed in the Roster of Network Providers as a Primary Care Physician.

**Primary Provider of OB/GYN Care:** A Network Provider listed in the Roster of Network Providers as a Primary Provider of OB/GYN Care. Female Members may select a Primary Provider of OB/GYN Care in addition to a PCP

**Prior Continuous Creditable Coverage:**

1. Employer group health plans (including self-funded plans); health insurance coverage (including individual policies);

2. Part A or B of Medicare; Medicaid (other than coverage consisting solely of benefits under section 1928); the Federal Employees Health Benefits Plan;

3. Military or veterans benefits; and

4. Indian Health Service or tribal organization programs; a health plan offered under chapter 89 of title 5; United States Code; a public health plan as defined in the Health Insurance Portability and Accountability Act regulations; a health benefit plan under section 5 (e) of the Peace Corps Act; and state high risk pools are all **"creditable"** coverage. Creditable coverage is **"continuous"** only if the gap between the Enrollment Date under the new coverage and the prior coverage is **not more than 63 days**.

**Therefore:**

- if the prior coverage is not "creditable"; or

- if such a gap occurs between the Prior Continuous Creditable Coverage and new coverage **the Member does not receive credit for their prior coverage.**

**Rehabilitation Facility:** A currently licensed and accredited facility which primarily provides physical therapy treatment. Such facilities must be contracted with Us in order for Members to receive In Network Covered Services.

**Service Area:** The geographical area, designated by Us and approved by the State of New York.

**Skilled Nursing Facility:** An institution or a distinct part of an institution that is: currently licensed or approved under state or local law; primarily engaged in providing skilled nursing care and related services as a Skilled Nursing Facility, extended care facility, or nursing care facility approved by the Joint Commission on Accreditation of Health Care Organizations or the Bureau of Hospitals of the American Osteopathic Association, or as a Skilled Nursing Facility under Medicare law; or as otherwise determined by Us to meet the standards of any of these authorities.

**Specialized Rehabilitation Facility:** A Hospital or other facility that is certified by either the New York division of Alcoholism and Alcohol Abuse or the division of Substance Abuse Services for the treatment of alcohol or drug dependent individuals, respectively. It provides nursing, medical counseling and therapeutic services to such individuals according to individualized treatment plans. Such facilities must be contracted with Us in order for Members to receive Covered Services. Transitional living facilities are excluded from this definition.

**Subscriber:** An employee or member of the Group 1) who meets all applicable eligibility requirements of this Certificate, 2) whose Enrollment Form has been accepted by Us, and 3) on whose behalf the Group has paid any applicable Premium. This term is synonymous with "certificate holders," "insureds" and "participants."

**Totally Disabled:** A Subscriber who is prevented because of injury or disease from performing their regular or customary occupational duties and is not engaged in any work or other gainful activity for pay or profit. A Covered Dependent, who is prevented because of injury or disease from engaging in substantially all of the normal activities of a person of like age and sex who is in good health.

**Urgent Care:** Urgent Care is medical care for a condition that needs immediate attention to minimize severity and prevent complications, but is not a Medical Emergency. Urgent Care may be rendered in a Physician's office or Urgent Care Center.

**Urgent Care Center:** A licensed facility (except Hospitals) which provides Urgent Care.

**Us, We, Our:** Oxford Health Insurance, Inc. and anyone to whom we legally delegate to perform, on Our behalf, under the Agreement.

**Usual, Customary and Reasonable (UCR) Charge:** A UCR schedule is a compilation of maximum allowable charges for various medical services which varies by geographic location. What We Cover/reimburse is based on this UCR.

# Benefits Update Rider

## Explanation of Variability

Your Certificate is revised as follows:

## I.  End of Life Care

The following language has been added to the end of Section III, "Covered Services," subsection 3,"Hospital and Other Facility-Based Services," item D, "Hospice:"

**Important:** If a Member is diagnosed with advanced cancer and the Member has fewer than 60 days to live, We will Cover care provided in a licensed Article 28 facility or acute care facility (that specializes in the care of terminally ill patients). The Member's attending physician and the facility's medical director must agree that the Member's care will be appropriately provided at the facility. We will reimburse such non-Network Providers as follows:

1) We will reimburse a rate that has been negotiated between Us and the Provider.

2) If there is no negotiated rate, We will reimburse acute care at the facility's current Medicare acute care service rates.

3) Or if it is an alternate level of care, We will reimburse at 75% of the appropriate Medicare rates.

## II.  Prehospital Emergency Medical Services

The following language replaces  Section III, "Covered Services," subsection 6, "Ambulance Services:"

### 6.  Ambulance Services and Prehospital Emergency Services

Ambulance services for Medical Emergencies (as defined in this Certificate) are Covered.

We also Cover Prehospital Emergency Medical Services. This means We Cover the prompt evaluation and treatment of a Medical Emergency in addition to non-air-borne transportation of the patient.

Inter-facility transfers are also Covered if they are Precertified by Us.

## III.  Miscellaneous Provisions

This Rider forms a part of the Agreement between Oxford Health Insurance, Inc. ("Us") and the Group.  Unless otherwise agreed to in writing between the Group, and Us this Rider becomes effective on the date the Agreement becomes effective.

This Rider supersedes any amendment or rider concerning the above-mentioned provisions previously issued by Us.  In the event of a conflict between the provisions of this Rider and the Certificate, the provisions of this Rider will prevail.  All other terms and conditions of the Certificate remain in full force and effect.

OXFORD HEALTH INSURANCE, INC.

# INFORMATION ABOUT YOUR OXFORD COVERAGE

## PART I

# REIMBURSEMENT

### Overview of Provider Reimbursement Methodologies

Generally, Oxford pays Network Providers on a fee-for-service basis. Fee-for-service based payment schedules differ depending on the type of provider, geographic location, or site of service, and may include payment based on each office visit, a hospital day, procedure or service performed, item furnished, course of treatment, or other units of service. A unit of service, such as a hospital day, may include more than a single procedure or item. We may also limit the number of services or procedures that we will pay for during any single office visit or for any single procedure; or for multiple procedures performed at the same time. This practice is known as "bundling" and is used by many third party payers, including the Medicare program. Some providers have agreed to accept variable fee for service payments, payment based on a mutually agreed upon budget, so long as they receive at least a minimum fee. Oxford may make modifications to its fee for service compensation mechanism during the term of your coverage.

Oxford does not typically "withhold" a portion of a physician's contracted fees; which might be paid later depending on the physician's performance or financial performance of Oxford. (The amount retained is called a "Withhold.") However, Withholds are among the sanctions that Oxford may implement with respect to physicians who have a demonstrated practice of not following Oxford policies, for example, by improper billing practices, consistently referring Members to providers who are not Network Providers or by failing to obtain required referrals or Precertifications. Oxford may profile Network Providers' billing, referral, utilization, or other practices, and develop other financial disincentives for providers who do not follow Oxford's policies and procedures during the term of your coverage.

Oxford does not generally provide Bonuses or other Incentives to Network Providers. However, Oxford has entered into Incentive Agreements with a few "intermediaries", such as provider groups and independent practice associations (IPA's). Incentive Agreements may be based on membership, referrals to specialists or hospitals and other facilities, economic factors, quality factors, member satisfaction factors, or a combination of these and other factors. Incentive Agreements typically, but not always, require the

group to meet mutually agreed upon quality measures as a condition of obtaining a bonus based on cost or utilization.

Financial incentives or disincentives may also be adopted to promote electronic billing practices or other e-commerce initiatives; or to promote compliance with Oxford utilization management policies. In addition, physicians may be paid at higher rates for certain surgical procedures, if they perform the surgery in their offices, or at ambulatory surgical centers. Oxford may enter into additional Incentive Agreements with providers during the term of your coverage. Network Providers who contract through intermediaries that contract may be subject to Incentives. Oxford's contracts with intermediaries typically, but not always, limit the nature and scope of the Incentives the group may enter into with Network Providers.

Oxford does not pay individual Network Physicians or practitioners on a Capitated basis. However, as described above, Oxford has negotiated a few Capitation Agreements with IPAs. Oxford may enter into additional Capitation Agreements during the term of your coverage or terminate existing Capitation Agreements.

Individual practitioners who are paid from funds available under Capitated Agreements with IPAs are generally paid on a fee-for-service basis, but some IPAs may pay individual primary care physicians on a Capitated basis. In addition, practitioners contracting through IPAs may be subject to Incentive Agreements. IPAs with which Oxford contracts may enter into Capitation Agreements with Network Physicians. Intermediaries with which Oxford contracts might enter into or terminate Capitation Agreements or Incentive Agreements with Network Physicians, facilities or practitioners during the term of your coverage. Oxford may audit Network Providers' billing patterns, licensing compliance, or require documentation that services billed were provided. If the provider cannot demonstrate that services have been provided, or that the services billed are medically necessary and consistent with the services provided, Oxford may seek to recover funds paid to the provider, reduce future payments to the provider, or take other action such as a fee reduction or withhold until the provider has corrected their behavior.

A brief description of the compensation mechanisms applicable to different providers as of January 1, 2004 is set forth below.

***Network Physicians*** - The compensation mechanisms used for Network Physicians are described in the Overview above. A large majority of Our Network Physicians are reimbursed by Oxford or an

intermediary on a discounted "fee-for-service" basis. Some Network Physicians have contracted with IPAs or are aligned with other Network Physicians which either: 1) accept compensation based upon a predetermined budget for the cost of Covered Services to Members, or 2) are subject to an Incentive Agreement (Bonus) based on quality and utilization measurements. In addition, some physician groups are eligible to be paid a Bonus based either on the total cost incurred by Oxford for Covered Services rendered to members who select or are assigned to a member of the physician group as their primary care physician, or other utilization measures, such as the total number of days these members (in the aggregate) spend in the hospital or percentage of referrals to certain specialists, hospitals or other facilities.

**Limited License Practitioners** - We reimburse Limited License Practitioners (non-Physician health care professionals) on a fee-for-service basis. Oxford has contracted with a company to manage our physical therapy benefit and certain other therapy benefits. Oxford has also contracted with a company to manage our chiropractic benefit. Oxford may enter into additional Capitation and/or Incentive Agreements with other limited license practitioners during the term of your coverage.

**Laboratory Services** - We have entered into a Capitation agreement with a national laboratory services provider to furnish outpatient laboratory tests for Our Members. Laboratory service providers are reimbursed on a fee-for-service basis, with total payment for laboratory services limited by an agreed upon budget. The company may have a financial incentive to contain the annual aggregate cost of laboratory related services

**Pharmacy** - We have entered into an arrangement with a national pharmacy management company that, in turn, contracts with pharmacies and manufacturers to provide pharmacy products and services to Members. The pharmacies are paid on a fee-for-service basis for both pharmaceuticals and dispensing the prescriptions. The pharmacy management company also provides certain administrative services in connection with administration of Oxford's pharmacy benefits. If Oxford terminates this contract before expiration of its term, Oxford will pay the pharmacy benefit management company a fee, but this fee is reduced if costs exceed agreed upon targets. Oxford may contract with pharmacies known as "specialty" pharmacies to provide and manage benefits for certain pharmaceuticals, such as infertility drugs.

**Hospital and Other Ancillary Facilities** - Reimbursement to Network Facilities is made on a fee-for-service basis. For inpatient services, payment is generally on the basis of a "per day" rate, or on a case rate for an entire stay based on the diagnosis. In general, Oxford negotiates agreements with individual hospitals or hospital systems. We do not have Capitation agreements with any of Our Network Facilities. However, we have entered into an Incentive Arrangement with an IPA for medical management of subacute facilities. The IPA pays contracting sub-acute facilities on a fee-for-service basis. Certain hospitals are developing their own programs to reduce unnecessary hospital inpatient stays and lengths of stays. Oxford may enter into Capitation and/or Incentive Agreements with hospitals or physicians during the term of your coverage.

**Radiology Services** - Oxford, through an intermediary, has contracted with radiologists who have agreed to be paid on a fee-for-service basis, with total fees limited based on a mutually agreed budget for radiology services. The company may have a financial incentive to contain the annual aggregate cost of imaging services.

**Non-Participating Providers** - Providers that have not entered into contracts with Oxford (directly or indirectly through groups), including providers in the Oxford service area and providers outside the Oxford service area, are paid on a fee for service basis. Oxford has entered into agreements with preferred provider organizations under which certain non-participating providers will provide a discount from their usual charges. Other non-participating providers are paid based on Oxford's determination, using various industry standards, of the Usual, Customary and Reasonable Charge for the service or as otherwise provided in your summary of benefits. Oxford may seek to impose bundling rules or other limitations on bills received from non-participating providers, but will assure that Members are not charged more than permitted by their benefit plan. Oxford may audit non-participating providers' billing patterns, licensing compliance, or require documentation that services billed were provided and that the services provided were medically necessary. Any or all of these audits may result in non-payment to the provider for these unusual or fraudulent practices. In some circumstances, this may result in balance billing to the member. If that occurs, please contact Oxford.

**Effect of Reimbursement Policies** - We believe that the implementation of these reimbursement methodologies has produced the results they were designed to accomplish (i.e., access to high quality providers in our service area, and cost-effective delivery of care). Through the application of Our Quality Assurance protocols, We continuously monitor Our Providers to ensure that Our Members have access to the high standards of care to which they are entitled. If a particular reimbursement policy affects a physician's referral to a particular Network Provider, Our Members have the right to request referral to a different Network Provider.

**Definitions** - In addition to the definitions in your Certificate, Contract, or Handbook (whichever is applicable) the capitalized words in this attachment have the following meaning:

**Bonus:** An incentive payment that is paid to Physicians who have met all contractual requirements to obtain the Bonus.

**Capitation, Capitated:** An agreed upon amount, usually a fixed dollar amount or a percentage of premium, that is paid to or budgeted for the Provider or IPA regardless of the amount of services supplied. Capitation formulas may include adjustments for benefits, age, sex, and other negotiated factors. Usually, the Capitation amounts are paid or allocated on a monthly basis.

**Incentive Agreements:** In general, "Withholds" and "Bonuses" are known as "Incentive Agreements." Incentive Agreements may also include higher than standard fees, or penalties for failure to adhere to Oxford policies, such as making referrals only to Network

Providers when Network Providers are capable and available to provide necessary services to Members, or based on the provision of services at specific sites of service.  Under such agreements, Providers are paid less (some portion of their fee is reduced or withheld) or paid more (such as in the form of a bonus) based on one or more factors that may include (but are not limited to): member satisfaction, quality of care, compliance with Oxford policies, control of costs, and their use of services.

*IPA:*  An IPA (independent practice association) is an organization that contracts with physicians and other health care providers.

*Us, We, Our:*  When coverage is provided under Oxford's insurance company, it means Oxford Health Insurance, Inc. In addition, it can also include third parties to whom we delegate responsibility for providing administrative services relating to coverage, such as utilization management.

*Usual, Customary and Reasonable (UCR) Charge:*  The amount charged, the amount agreed upon with a non-participating provider, or the amount We determine to be the reasonable charge, for a particular Covered Service. UCR determinations may be based on Medicare fees, industry data regarding charges or costs, or other factors. The basis for determining UCR may be different for different benefit designs.

*Withhold:*  Percentage of a physician's fee that is held back or reserved as an incentive to encourage appropriate and efficient medical treatment or billing.

# PART II
# UTILIZATION MANAGEMENT PROGRAM

## A. PROGRAM OVERVIEW

Oxford has developed and implemented Utilization Management programs that are intended to reduce the volume of unnecessary services, direct members to appropriate providers and coordinate services among providers. In general, the utilization management protocols We use are based on industry-standard criteria developed by health care consultants and recognized clinical societies.

When We contract with network managers to provide utilization management services, they may use our protocols.  In some cases, we review and adopt some or all of the protocols that they develop as our own . Oxford's Utilization Management Programs are developed and implemented by the Oxford Medical Affairs department, except as described below.  Oxford's Medical Affairs Department is headed by Our Chief Medical Officer, who is a physician, and includes physician Medical Directors, registered nurses, and health practitioner consultants.

## B. PROTOCOL DEVELOPMENT OVERVIEW

In developing our Utilization Review protocols, Oxford typically utilizes guidelines from outside sources, which include external consultants, including but not limited to Milliman & Robertson UM principles.  We modify these protocols based on Our experience, medical evidence, and legislative requirements. All such policies are periodically reviewed and updated

## C. CASE MANAGEMENT

**Medical Case Management** - Medical Case managers work with Providers and Members to assess, plan, coordinate, and evaluate options, settings, services and time frames required to meet a Member's individual healthcare needs.  Medical case management

is a clinical goal-directed process requiring communication and coordination of all available resources to promote both quality and cost-effective outcomes. The interventions typically range from simple hospital discharge planning to complex case management in the outpatient setting.

**Disease Management and Complex Case management** - Our Disease Management Services are intended for complex or chronic cases that are likely to result in high utilization of medical services. These cases include but are not limited to, patients with the following conditions required for treatment:

- HIV
- End Stage Renal Disease
- Transplants (organ and bone marrow)
- High-risk maternity and high-risk neonates (newborns)
- Asthma
- Diabetes
- Congestive heart failure
- Coronary Artery Disease
- Rare chronic illnesses

During the term of your coverage, Oxford may introduce new disease management programs, contract with other companies to provide disease management, and terminate or modify existing disease management programs. For more information about disease management programs, contact Oxford.

*Concurrent Review*  - Concurrent review is the review of care that is in progress for purposes of determining the extent and scope of coverage during a course of treatment. Monitoring the course of treatment through the concurrent review process enables Us to assist with discharge planning from hospital inpatient stays. In addition, it assists us in identifying alternative options of care, such as home care, and when it is appropriate, We can begin case management.  We render benefit decisions regarding continuation of stay based on protocol criteria.

*Discharge Planning -* We begin planning for post-Hospitalization care when We are informed of a planned admission.  This is one reason that it is essential that your Provider notify Us of your

potential needs prior to your admission. Planning continues throughout the Hospital stay. Our purpose is to assist with prompt discharge when it is medically appropriate and to explore alternatives to continued Hospitalization. We may contract with other companies to assist Us in discharge planning.

**Second Opinion Program** - We may require members to get a Second Opinion for various inpatient and outpatient procedures. We provide the names of Network Specialists who can offer a Second Opinion. When a Member meets specific medical criteria, We may waive the Second Opinion requirement.

**Privileging** - We have established limitations on the range of services for which Network Providers can be paid. These payment policies may be based, among other things, on the Network Provider's license and area of specialty. We may establish or change privileging requirements for other services during your enrollment.

**Review of Utilization Patterns, "Upcoding" and Fraud Initiatives** - We may conduct reviews of Network Provider utilization practices to assess over- and under-utilization in treatment practices, as well as a physician's compliance with performance of 'effectiveness of care' measures as required by monitoring or regulatory agencies such as the National Committee on Quality Assurance ('NCQA'), Departments of Health or other agencies. Oxford may establish or change its focus or definition of practice pattern assessment during your enrollment.

Oxford may monitor unusual billing, treatment or referral patterns. Such monitoring is expected to enable Us to take action to address potential over- and under-billing by Network Providers. Such actions can include but are not limited to discussion with providers about appropriate billing, treatment and referral, review of medical records by Oxford or external experts, attempts to collect past overpayments, imposition of Withholds, fee reduction or other actions. Where required or appropriate, Oxford refers inappropriate billing or treatment to applicable government authorities.

**Quantity Level Limits** - In conjunction with our pharmacy benefits management company, we have established quantity level limits for coverage of the dosage of certain prescription drugs. We may establish or change quantity level limits during your enrollment.

**Precertification** - Precertification enables Us to review the Medical Necessity of a proposed service or treatment including the determination of a proposed site of care, manage benefit limitations, and whether the service will be performed by Network Providers. Precertification allows Us to notify the Member or the Member's Provider regarding coverage before the service is provided. In addition, it also allows Us to suggest appropriate and cost effective sites for the proposed service/treatment. We may establish or change precertification requirements during your enrollment.

**Referral Management** - We use referral management to assess how effective our PCPs and Specialists are at providing various services. We record demographic and referral information from each referral and use the data to monitor referral patterns

individually and on an aggregate basis. This allows Us to identify patterns of care and quality issues to manage costs and to make improvements in the quality of healthcare delivery. We may establish or change referral processes during your enrollment.

**Behavioral Health Case Management** - Members and PCP's may call Oxford at 800-201-6991 to obtain a referral for Mental Health and Substance Abuse services. The Behavioral Health Line is staffed by clinical professionals equipped to answer questions regarding Mental Health and Substance Abuse benefits. These professionals can also refer Members to an appropriate Network Provider and they can Precertify these services as necessary. Behavioral health services are subject to concurrent review and discharge planning.

## D. ADDITIONAL UTILIZATION MANAGEMENT FUNCTIONS

Oxford has contracted with certain provider groups and management companies to perform certain utilization management functions. These include:

**Precertification of Imaging Services**: Oxford has contracted with a company to assist Oxford in performing Precertification of imaging services. Payment to Network Providers who contract with the network manager is, in part, dependent on the volume of radiology services provided to Members. The company may have a financial incentive to contain the annual aggregate cost of imaging services. In addition, Network Providers will be paid only for certain imaging procedures, based on their specialty. All denials of precertification for imaging services are made by an Oxford Medical Director and appeals of denials may be made directly to Oxford in accordance with our established appeals process.

Review of Orthopedic, Therapy, Subacute Care, and Chiropractic Services: Oxford has contracted with companies to perform review of orthopedic, podiatry, physiatry, therapy, subacute care and chiropractic services. These companies may have a financial incentive to contain the annual aggregate cost of services. Appeals of denials may be made directly to Oxford

**Informal Subnetwork**: Oxford has contracted with IPAs (either on a Capitation or Incentive basis) that have formed informal subnetworks within the Oxford network. Network Providers who participate in an informal subnetwork can ordinarily be expected to refer Members for care to other Network Providers who participate in the same informal subnetwork. IPAs or their affiliates may perform utilization review functions and make coverage or payment recommendations to Us. Our determination of coverage, directly or on appeal, is separate from any such review activities. These IPAs may have a financial incentive to contain the annual aggregate cost of services. Members may however, obtain Covered Services on an In Network basis from other Network Providers.

**Pharmacy Services**: Our pharmacy benefit management company performs review of quantity and dosing guidelines for certain drugs in accordance with policies adopted by Our Pharmacy & Therapeutics Committee. In addition, certain drugs require Precertification.

**Please note:** Our utilization management programs, policies, and procedures may change, and the companies with which we contract to perform these services may also change during your enrollment.

# PART III
# QUALITY MANAGEMENT

Our Quality Management (QM) Program promotes the provision of quality health care and service for all OHP members.

Our QM Program identifies and pursues opportunities for improvement of care and service and provides a structure for documentation, tracking and reporting of these activities and identified problem areas across the organization and to the Board of Directors via the QM committee structure. This purpose is accomplished by:

- Identifying the scope of care and service provided through a systematic and methodical process focused on areas of care and service relevant to our member population;
- Developing clinical guidelines, practice guidelines, and service standards by which performance is measured taking into consideration prudent medical practice and widely accepted guidelines relevant to the clinical area;
- Periodically reviewing the medical qualifications of participating providers as required through regulatory mandated as well as various accreditation standards;
- Pursuing opportunities to improve access to health care, continuity and coordination of care, and customer service through compilation and analysis of various data including but not limited to: claims payment, member complaint/appeal information, provider practice patterns, and population-based outcome studies.
- Resolving identified quality issues, including follow-up on individual circumstances, through peer review processes and implementation of corrective action plans.

The QM Program's goals are to improve and/or maintain quality patient services through ongoing monitoring and assessment of:

- Provider compliance with recommended clinical treatment guidelines in the delivery of care through various mechanisms such as the annual HEDIS data collection, ongoing review of provider medical records, analysis of Disease Management outcomes and through other QM studies.
- Member and Provider satisfaction.
- Mechanisms to avoid adverse impact on quality of care resulting from Our cost-containment programs.
- Systematic education and outreach to Our providers and members to facilitate their involvement in quality improvement activities.
- Definition and implementation of processes for the adequate oversight of delegated functions.

We will periodically evaluate the effectiveness of individual quality improvement initiatives in addition to the effectiveness of the program as a whole.

## Credentialing/Recredentialing

**Credentialing Committees:** Oxford has Credentialing Committees in each regional office. Each committee is headed by the Regional Medical Director. At regular meetings, the Committee reviews applications and credentials of provider applicants.

**Credentialing Requirements**: In addition to meeting Our facility and records standards, physicians or providers participating in our HMO plans must generally meet the following (depending on specialty) credentialing requirements to be an Oxford Network Physician or Provider:

- Current, valid state license to practice;
- Current, valid DEA certificate;
- Proof of board certification or recent (5 years from completion of training) board eligibility, unless an exception to this requirement has been granted;

Admitting privileges at a Network Hospital; unless an exception to this requirement has been granted.

We also review information and representations furnished by the physician or provider regarding: physical and mental health status; lack of impairment from chemical dependency or substance abuse; and malpractice history. Providers participating with Our HMO plans are generally recredentialed every three years. We have contracted with a third party vendor that verifies credentialing requirements for Us.

Physicians and providers located outside the service areas of our HMO plans, but which are network providers in our PPO plans, are not subject to the same credentialing requirements as providers in HMO plans. Physicians and providers participating in PPO plans may be subject only to credentialing requirements of provider organizations that contract with Oxford.

Credentialing requirements and processes may change during your enrollment.

## Provider Discipline Policies and Procedures

Our Provider Discipline Policies and Procedures apply to all Providers affiliated with Us. Problems that may indicate the need for discipline include, but are not limited to:

- Quality of care concerns
- Noncompliance with utilization, quality or other program guidelines
- Unsatisfactory utilization management

Depending on the nature and severity of the situation, we may issue a warning, require a corrective action plan, reduce their fees,

require pre-certification of additional services, reduce or suspend a Provider's privileges or formally terminate their participation with Us. Disciplinary actions related to quality or utilization issues may be started based on the recommendation of the Vice President for Medical Affairs, Our Medical Director, or any of the Quality Management committees or subcommittees. Disciplinary actions related to administrative issues may be started by referral from any department in the company to the Administrative Management Committee.

Disciplinary actions that result in suspension for more than thirty (30) days or termination resulting from a finding of professional misconduct will be reported to the New York Department of Health, Office of Professional Medical Conduct, as required by law.

OXFORD HEALTH INSURANCE, INC.

# UCR Rider

The following Rider has been purchased by your employer group to supplement the coverage outlined in your Certificate of Coverage.

**I. Definitions –** The definition of Usual, Customary and Reasonable (UCR) Charge in your Certificate is revised as follows:

**Usual, Customary and Reasonable (UCR) Charge:** The UCR schedule is a compilation of the maximum allowable fees for covered medical services, supplies and drugs. The maximum allowable fee on the UCR schedule will be the lesser of (1) the amount charged, (2) the amount the provider agrees to accept as reimbursement for the particular covered services, supplies and/or drugs, or (3) the amount that in Our discretion is the usual, customary and reasonable fee for particular covered services, supplies and/or drugs. When We determine the usual, customary and reasonable fee, Oxford will consider data compiled by, and guidelines from, Ingenix, Medicare and other sources recognized by the health insurance industry and federal government payers of health care claims as a basis for evaluating and establishing fees for covered services, supplies and drugs. Normally, the data utilized to compile the UCR fee schedule will be based upon the geographic location where the services are provided or a comparable locale. There will be instances where national data will be utilized when the data source does not compile data geographically. The data We choose to consider when establishing a UCR fee schedule will be based upon the level of reimbursement purchased by an employer for the benefit of the employer's group plan.

## II. Miscellaneous Provisions

This Rider forms a part of the Agreement between Oxford Health Insurance, Inc. ("Us") and the Group. Unless otherwise agreed to in writing between the Group, and Us this Rider becomes effective on the date the Agreement becomes effective.

This Rider supersedes any amendment or rider concerning the above-mentioned provisions previously issued by Us. In the event of a conflict between the provisions of this Rider and the Certificate, the provisions of this Rider will prevail. All other terms and conditions of the Certificate remain in full force and effect.

Oxford Health Insurance, Inc.

# Mental Health and Substance Abuse Rider

Your Certificate of Coverage & Member Handbook ("Certificate") is revised as follows:

## I. Out-of-Network Coverage

### Mental Health Services

#### Outpatient

We cover outpatient visits for the treatment of mental or nervous disorders.   A "visit" for the purposes of this provision is 45 to 60 minutes of therapy.

Outpatient mental health services are Covered only when obtained from duly licensed: psychiatrists or practicing psychologists; or by certified social workers or mental hygiene facilities.  Alcoholism and substance abuse related rehabilitation are not considered mental health services under this provision.

We Cover up to the amount of visits shown in your Summary of Benefits.

## II. Precertification

All treatment received under this Rider must be precertified and described in Section I. Of your Certificate.

## III. Coinsurance and Benefit Limitations

All covered Services under this Rider are subject to UCR, Deductible and the Coinsurance shown in your Summary of Benefits.

## IV. Miscellaneous Provisions

All benefits are on a per Member, per calendar year basis.

The "Exclusions and Limitations," section of your Certificate is amended as follows:

a)   The exclusion regarding inpatient alcohol and substance abuse treatment and detoxification is removed from the Certificate.

b)   The exclusion regarding mental health services is removed from the Certificate.

This Rider supersedes any amendment or rider providing coverage for Mental Health and Substance Abuse previously issued by Us. In the event of a conflict between the provisions of this Rider and the Certificate, the provisions of this Rider will prevail.  All other terms and conditions of the Certificate remain in full force and effect.

Nothing contained in this Rider will be held to vary, alter, waive, or extend any of the terms, conditions, provisions or limitations of the Agreement to which this Rider is attached, other than as specifically stated herein.

Oxford Health Insurance, Inc.

# Mental Health and Substance Abuse Rider

Your Certificate of Coverage & Member Handbook ("Certificate") is revised as follows:

## I. In-Network Coverage

### 1. Mental Health Services

#### a. Inpatient

We Cover Inpatient and Equivalent Care for the treatment of mental or nervous disorders. We define "Inpatient Care" to mean treatment provided in a hospital as defined below. "Equivalent Care" is provided in a setting, other than such hospital, that We and the Provider deem to be safe and medically appropriate.

We reserve the right to provide this benefit in the modality We determine to be both medically appropriate and the most cost effective.

Inpatient and Equivalent Care mental health services are Covered only when obtained from facilities licensed by the appropriate state regulatory authority as well as any other Provider We deem appropriate to provide the Medically Necessary level of care. Alcoholism and substance abuse related rehabilitation are not considered mental health services under this provision.

For Inpatient and Equivalent care, We cover up to the amount of days shown in your Summary of Benefits.

#### b. Outpatient

We cover outpatient visits for the treatment of mental or nervous disorders.  A "visit" for the purposes of this provision is 45 to 60 minutes of therapy.

Outpatient mental health services are Covered only when obtained from duly licensed: psychiatrists or practicing psychologists; or by certified social workers or mental hygiene facilities. Alcoholism and substance abuse related rehabilitation are not considered mental health services under this provision.

We Cover up to the amount of visits shown in your Summary of Benefits.

## Alcoholism and Substance Abuse

### a. Detoxification

Inpatient detoxification is Covered up to the amount of days and admissions shown in your Summary of Benefits.

### b. Inpatient Services

Treatment in a Plan Specialized Rehabilitation Facility will be Covered, in accordance with an individual treatment plan prepared by your Provider.  Coverage is limited to the amount of days shown in your Summary of Benefits.

## II. Precertification

All treatment received under this Rider must be precertified and described in Section I. Of your Certificate.

## III. Coinsurance and Benefit Limitations

All covered Services under this Rider are subject to UCR, Deductible and the Coinsurance shown in your Summary of Benefits.

## IV. Miscellaneous Provisions

All benefits are on a per Member, per calendar year basis.

The "Exclusions and Limitations." section of your Certificate is amended as follows:

a) The exclusion regarding inpatient alcohol and substance abuse treatment and detoxification is removed from the Certificate.
b) The exclusion regarding mental health services is removed from the Certificate.

This Rider supersedes any amendment or rider providing coverage for Mental Health and Substance Abuse previously issued by Us.  In the event of a conflict between the provisions of this Rider and the Certificate, the provisions of this Rider will prevail.  All other terms and conditions of the Certificate remain in full force and effect.

Nothing contained in this Rider will be held to vary, alter, waive, or extend any of the terms, conditions, provisions or limitations of the Agreement to which this Rider is attached, other than as specifically stated herein.

# NOTICE TO OXFORD HEALTH PLANS MEMBERS REGARDING OXFORD'S PRIVACY PRACTICES

## THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN ACCESS THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

Oxford Health Plans LLC ("Oxford") is committed to maintaining the privacy and confidentiality of your protected health information (PHI). PHI is information about you that is used or disclosed by Oxford to administer your insurance coverage and to pay for the medical treatment you receive. It includes demographic information, such as your name, address, telephone number and Social Security number, and any medical information obtained from you or from providers who submit claims to Oxford related to your medical care. We are required by applicable federal and state laws to maintain the privacy of your PHI. This document serves as the required Notice of Oxford's privacy practices, our legal duties, and your rights concerning your PHI. Oxford is required to abide by the terms of this Notice unless and until it is amended. This Notice takes effect April 14, 2003, and will remain in effect until such time that it is amended or replaced.

Oxford reserves the right to change our privacy practices and the terms of this Notice at any time, provided that applicable law permits such changes. We reserve the right to make the changes in our privacy practices and the new terms of our Notice effective for all PHI that we maintain, including information we created or received prior to any such changes. When Oxford makes a significant change in our privacy practices, we will revise this Notice and send the revised Notice to our health plan subscribers.

**For additional copies of this Notice, please call our Customer Service Department at the toll-free number on your Oxford ID card, or visit our web site at www.oxfordhealth.com.**

**Q. How does Oxford use or disclose your PHI?**

**A.** Oxford may use or disclose your PHI, without your consent or authorization, under the following circumstances:

- Treatment: We may disclose your PHI to a healthcare provider who requests it in order to provide you with necessary medical treatment, such as emergency care, X-rays or lab work. A provider might be a doctor, a hospital, a home healthcare agency, etc.

- Payment: We may use or disclose your PHI to pay claims submitted by a healthcare provider for treatment provided to you. For example, we may ask a hospital emergency department for details about the treatment you received so that we can accurately pay the hospital for your care.

- Healthcare Operations: We may use or disclose your PHI to manage our business. Examples include using it to

determine appropriate premiums, to conduct quality improvement activities, to contact you regarding benefits or services that might be of interest to you, and to provide you with preventative health advisories.

- Plan Sponsor: We may disclose limited PHI to your health plan sponsor, benefits administrator, or group health plan in order to perform plan administrative functions such as activities related to billing and renewals.

- Underwriting: We may receive your PHI for underwriting, premium rating or other activities relating to the creation, renewal or replacement of a contract of health insurance or health benefits. Once an Oxford Member, use and disclosure of your PHI is governed by this Notice.

- Marketing: We may use your PHI to contact you with information about health-related benefits and services, treatment alternatives, or appointment reminders.

- Research; Death; Organ Donation: In limited circumstances, we may use or disclose your PHI for research purposes or to a coroner, medical examiner, funeral director or an organ procurement center.

- Required by Law: We may use or disclose your PHI when we are required to do so by law. For example, upon request, we would disclose PHI to the U.S. Department of Health and Human Services so that this agency can verify Oxford compliance with federal privacy laws.

- Health Oversight Activities: We may disclose your PHI to health oversight organizations and agencies as part of accreditation surveys, investigations related to our eligibility for government programs, regulatory audits, and for licensure and disciplinary actions.

- Workers' Compensation: We may disclose your PHI to comply with laws relating to workers' compensation or other similar programs that provide benefits for work-related injuries or illnesses.

- Public Health and Safety: We may disclose your PHI to the extent necessary to avert an imminent threat to your safety or the health or safety of others. We may disclose your PHI to appropriate authorities if we have reasonable belief that you might be a victim of abuse, neglect, domestic violence, or other crimes.

- Judicial and Administrative: We may disclose your PHI in response to a court or administrative order, subpoena, discovery request, or other lawful process.

- Sale of Business: We may disclose PHI upon sale of all or part of Oxford's business to another party.

- Law Enforcement: We may disclose limited information to law enforcement officials concerning the PHI of a suspect,

fugitive, material witness, crime victim or missing person. Under certain circumstances, we may disclose the PHI of an inmate or other person in lawful custody of a law enforcement official or correctional institution.

- Military and National Security: Under certain circumstances, we may disclose the PHI of armed forces personnel to military authorities. We may disclose PHI to authorized federal officials when required for national security or intelligence activities.

- To Family and Friends: If, in the event of a medical emergency, you are unable to provide any required authorization, we may disclose PHI to a family member, friend or other person to the extent necessary to ensure appropriate medical treatment or to facilitate payment for that treatment.

**Q. Does Oxford ever need an authorization to use or disclose your PHI?**

**A.** Yes. Except for the purposes described above, Oxford cannot use or disclose your PHI without a signed authorization from you. If you provide such an authorization to Oxford, you may revoke it at any time. Your revocation will not affect any use or disclosure of PHI made while the authorization was in place.

**Q. Can you inspect or receive copies of any PHI in Oxford's possession?**

**A.** Yes. You have the right to inspect or receive copies of your PHI with certain exceptions. You must make a request to Oxford in writing. Oxford reserves the right to charge a reasonable fee for the cost of producing and mailing the PHI. Request forms are available on the Oxford web site or by calling the number listed at the end of this Notice.

**Q. Can you find out if Oxford disclosed your PHI to a third party?**

**A.** Yes. You have the right to receive an accounting of all occasions when Oxford disclosed your PHI for any purpose other than treatment, payment, healthcare operations and certain other instances. Beginning with disclosures made on or after April 14, 2003, we will maintain a record of disclosures for six (6) years. A request for an accounting must be submitted to Oxford in writing. We reserve the right to charge you a reasonable fee for the cost of producing and mailing the information if you request this accounting more than once in a 12-month period. Please note, that Connecticut and New Jersey members will automatically get an abridged accounting whenever they make a request to inspect or receive copies of their PHI.

**Q. Can you restrict the use or disclosure of your PHI by Oxford?**

**A.** Yes. You have the right to request that Oxford place additional restrictions on the use or disclosure of your PHI. We are not required by law to agree to these restrictions. However, if we do

agree to the restrictions, we will abide by them except in the event of an emergency.

**Q. Can you request that Oxford use alternate means to confidentially communicate with you about your PHI or communicate with you at an alternate location?**

**A.** Yes. You must inform Oxford, in writing, that confidential communication by alternate means or to an alternate location is required to avoid potential harm to yourself or others. We must accommodate your request if it is reasonable, specifies the alternate communication means or location, and does not interfere with the collection of premiums, the payment of claims, or the administration of your health insurance coverage.

**Q. Do you have the right to request that Oxford correct, amend, or delete your PHI?**

**A.** Yes. You must make your request in writing, and it must explain why the PHI should be corrected, amended, or deleted. Oxford may deny your request if we did not create the PHI in question or for certain other reasons. If we deny your request, we will provide you with a written explanation. You may respond with a statement of disagreement to be added to the information you sought to change. If we accept your request to correct, amend, or delete the PHI, we will make reasonable efforts to inform others of the changes and to include the changes in any future disclosures of that information.

## Complaints

To express concern about a decision Oxford made about access to your PHI, to report a concern that we violated your privacy rights, or to express a complaint about any aspect of Oxford's privacy practices, please contact the HIPAA Member Rights Unit at the address below. You may also submit a written complaint to the Secretary of the U.S. Department of Health and Human Services at the following address:

Office of the Secretary
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
Telephone: 877-696-6775

Oxford supports your right to protect the privacy of your PHI and will not retaliate against you for filing a complaint with any government regulatory body or with us.

If you received this Notice on our web site or by electronic mail (e-mail), you are entitled to receive a written copy of the Notice as well. To request a written copy of the Notice, please call our Customer Service Department at the toll-free number on your Oxford ID card, or call 800-444-6222. You can also contact us by mail at:

HIPAA Member Rights Unit
Oxford Health Plans
48 Monroe Turnpike
Trumbull, CT 06611

All written communications related to this Notice and your rights under HIPAA should be mailed to the HIPAA Member Rights Unit at the address above.

## Privacy Notice Concerning Financial Information

At Oxford Health Plans LLC ("Oxford"), protecting the privacy of the personal information we have about our customers and members is of paramount importance and we take this responsibility very seriously. This information must be and is maintained in a manner that protects the privacy rights of those individuals. This notice describes our policy regarding the confidentiality and disclosure of customer and member personal **financial** information that Oxford collects in the course of conducting its business. Our policy applies to both current and former customers and members.

### The Information Oxford Collects

We collect non-public, personal financial information about you from the following sources:

- Information we receive from you on applications or other forms (such as name, address, social security number and date of birth.)
- Information about your transactions with us, our affiliates (companies controlled or owned by Oxford), or others; and
- Information we receive from consumer reporting agencies concerning large group customers.

### The Information Oxford Discloses

We do not disclose any non-public, personal financial information about our current and former customers and members to anyone except as permitted by law. For example, we may disclose information to affiliates and other third parties to service or process an insurance transaction; or provide information to insurance regulators or law enforcement authorities upon request.

### Oxford Security Practices

We emphasize the importance of confidentiality through employee training, the implementation of procedures designed to protect the security of our records, and our privacy policy. We restrict access to the personal financial information of our customers and members to those employees who need to know that information to perform their job responsibilities. We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your non-public, personal financial information.

**This notice is being provided on behalf of the following Oxford affiliates:**

**Oxford Health Plans LLC**
**Oxford Health Plans (CT), Inc.**
**Oxford Health Plans (NJ), Inc.**
**Oxford Health Plans (NY), Inc.**
**Oxford Health Insurance, Inc.**
**Investors Guaranty Life Insurance Company**
**Oxford Benefit Management, Inc.**

- you would like a copy of these Notices in **Spanish**, please contact Oxford Customer Service at the number on the back of your Oxford Member ID card.

- If you would like a copy of these Notices in **Chinese**, please contact Oxford Customer Service at the number on the back of your Oxford Member ID card.

- If you would like a copy of these Notices in **Korean**, please contact Oxford Customer Service at the number on the back of your Oxford Member ID card.



## ACCESS REQUEST FORM

**Purpose:** This Form is intended for use by an individual to exercise his/her right to access his/her protected health information in Oxford's designated record sets or the designated record sets of Oxford's business associates.

### Individual Seeking Access

Name: _____

Address: _____

Oxford I.D. Number: _____

Telephone: _____

### Scope of Access

You have the right to inspect and obtain a copy of your protected health information maintained by Oxford and its business associates. You are not, however, entitled to inspect or obtain a copy of any psychotherapy notes we may have or any information we may have compiled in anticipation of or for use in any civil, criminal or administrative action or proceeding.

Please specify the records you wish to inspect or obtain copies of:

_____

_____

_____

We may charge you to make copies and mail your protected health information. Oxford will notify you in advance of these charges. If you want to pick the copies up at our Trumbull, CT office please check here _____

Signature: _____        Date: _____

### Personal Representative

If this request is being made by a personal representative on behalf of the individual, please provide a description and any available documentation of authority to act as the individual's personal representative and sign below.

_____

_____

Print name _____

Signature _____

Please send completed form to:

       Oxford Health Plans
       Attn: HIPAA Member Rights Unit
       P.O. Box 7081
       Bridgeport, CT  06601-7081

### YOU ARE ENTITLED TO A COPY OF THIS REQUEST.

Oxford Health Insurance, Inc.

# Prescription Drug Rider

This Rider explains your coverage for Prescription Drugs under the Certificate. Your Prescription Drug coverage is as follows:

## A. Prescription Drug Coverage

### Definitions:

"Prescription Drugs" are (i) FDA approved legend drugs that can only be legally dispensed when ordered by a Physician, (ii) compounded medications of which at least one ingredient is a prescription legend drug, or (iii) any other drug which under applicable state law may only be dispensed upon the written prescription of a Physician or other lawful prescriber. Prescription drugs does not include medical supplies, drugs, medication, injections or intravenous therapies (i) provided at a Hospital, (ii) provided in connection with any Home Care benefit under the Certificate or (iii) administered by a Physician or Physician-supervised health professional. Prescription Drugs that are not Generic Drugs, as defined below, are Brand Name Drugs.

Important: Certain drugs may be subject to limitations in accordance with Our Medical Policies. Please feel free to call Customer Services if you have any questions concerning the coverage of your Prescription Drugs.

A "Tier 1 Drug" is a Generic Drug and is an equivalent Prescription Drug containing the same active ingredients as a Brand Name Drug but costing less. The equivalent must be identical in strength and form as required by the FDA.

A "Tier 2 Drug" is a Brand Name Drug that is listed in Our "Preferred Drug Formulary" as a Preferred Brand Name Drug.

A "Tier 3 Drug" is a Brand Name Drug that is not listed in Our "Preferred Drug Formulary."

### Covered Items:

1. Prescription Drugs "Tier 2" and "Tier 3" Brand Drugs and "Tier 1" Generic Drugs.

2. Nutritional supplements (formulas) for the therapeutic treatment of phenylketonuria, branched-chain ketonuria, galactosemia and homocystinuria are Covered when purchased at a Network Pharmacy.

3. Enteral formulas for home use when prescribed, in writing, by a Provider licensed to prescribe under title eight of the New York State education law. The written order must state that the enteral formula is Medically Necessary and has been proven to be effective as a disease-specific treatment regimen for those individuals who are or will become malnourished or suffer from disorders, which if left untreated, will cause chronic disability, mental retardation or death.

Nutritional supplements that are taken electively are not Covered

Modified solid food products that are low in protein or which contain modified protein are Covered, when Medically Necessary, for individuals with certain inherited diseases of amino acid and organic acid metabolism. Coverage for such products in any Contract Year is limited to $2,500 per Member.

4. Prescription osteoporosis drugs and devices approved by the FDA for the treatment of osteoporosis.

5. Pre-natal vitamins.

6. Children's Fluoride treatments.

7. The following drugs (including their Generic equivalent, if available) will be Covered in accordance with the applicable Medical Policy if they are determined by Us to be Medically Necessary for their intended use as evidenced by the advance written approval of Our Medical Director:

a. Injectible drugs intended for self-administration (which includes Enbrel, Forteo, Growth Hormones, Humira, Kineret, Serostim, Somavert, and Xolair).

b. Tretinoin (e.g., Retin A, Altinac, Avita), and Differin (40 years of age or older).

c. Androgens and anabolic steroids.

d. Lupron 3.75 mg. and/or 11.25 mg.

e. COX II Inhibitors (which includes Bextra, Celebrex, and Vioxx).

f. Life Enhancement Drugs related to the treatment of sexual dysfunction, (which includes Viagra, Caverject, Cialis, Edex, Levitra, and Muse). Limited to 6 doses per month.

g. Lotronex.

h. Oral and topical antiseptics.

i. Antifungal agents (which includes: Lamisil, Sporonox and Diflucan).

j. Angiotensin II Receptor Blockers (which includes: Atacand, Diovan, Cozaar, Avapro, Benicar, Cozaar, Micardis and Teveten).

k. Singulair (12 years of age or older)

l. Proton Pump Inhibitor (which include: Aciphex, Nexium, Prevacid, Prilosec and Protonix).

Oxford Health Plans

m. Central Nervous Stimulants (CNS) (which include: Adderall, Concerta, Desoxyn, Dexedrine, Dextrostat (over 18 yrs. of age)

n. Prescription Vitamin D preparations (which include Hectorol and Rocaltrol)

q. Provigil

r. Psychotropic Drugs

s. Zoloft 50 mg.

t. Strattera

u. Zavesca

v. Zelnorm

**Important:** Oxford reserves the right to require Precertification for any new drug on the market or of any currently available drug which undergoes a change in prescribing protocols and/or indications regardless of the therapeutic classification. Confirmation of any drug requiring precertification can be obtained by contacting Pharmacy Customer Service at 1-800-444-6222.

8 Certain Prescriptions may be ordered through Our mail order pharmacy. The required Copayment is per 90-day supply instead of per 30-day supply. Additionally, these items will be delivered directly to your home or office. You must pay the applicable Brand Name Drug Copayment for Brand Name Drugs and the applicable Generic Drug Copayment for Generic Drugs.

## B. Benefit Information

Your group has elected a Three Tier Prescription Drug Benefit. This means that there are three Copayment levels depending on the prescription drug: Generic, Preferred Brand Name, and Non-Preferred Brand Name.

## C. Annual Limits, Copayments, and Dispensing Requirements

Your coverage under this Rider is subject to the annual limit, deductible and Copayments shown in your Summary of Benefits.

Coverage for modified solid food products (as described above) is limited to $2,500 per Member per Contract Year. **Please Note:** The amounts We pay for this item will count toward the overall annual limit (if any) on your Prescription Drug coverage.

**Important:**

Your coverage is a **MAC C** program with a Three Tier Copayment Option. The applicable Copayment will be based on whether the drug is a Generic Drug or a Preferred Brand Name Drug. This means:

- If a FDA approved Generic Drug is purchased, the "Tier 1" (Generic Drug) Copayment will apply; or

- If a Preferred Brand Name Drug is purchased and there is no FDA approved Generic equivalent, the "Tier 2" (Preferred Brand Name Drug) Copayment will apply; or

- If a Brand Name Drug is requested and there is a FDA approved Generic equivalent, or the drug is not listed in our "Preferred Drug Formulary,"you must pay the "Tier 3" (Brand Name Drug) Copayment.

**Please Note:** All Brand Name Drugs that are not listed in Our "Preferred Drug Formulary" will be subject to the "Tier 3" (Brand Name Drug) Copayment.

Please refer to your Summary of Benefits for Copayment, Deductible and Maximum Limitation information.

## D. Terms of Coverage

1. Subject to the Exclusions in Section I "D" below, the cost of Medically Necessary Prescription Drugs will be Covered if they are FDA approved, ordered by a Physician, and are dispensed by a Participating Network Pharmacy.

2. The Covered supply of any Prescription Drug is limited to the amount normally prescribed by the Physician, but not to exceed a 30-day supply or 120 unit doses whichever is less. The only exception to this limit will be when a Physician provides in writing, the drug name, strength and dosage per day which would be reviewed by the Clinical Pharmacy Department.

**Please Note: 30 "day supply" limit will be administered in accordance with any applicable Medical Policy concerning Coverage limitations (e.g. Crixivan).**

3. Refills of Prescription Drugs will be dispensed only as ordered by a Physician and only after ¾ of the original prescription has been used. We will not Cover refills of prescriptions that are lost, damaged, stolen or misused by the Member, even if such refills are ordered by a Physician.

4. The Member must show his or her /Prescription Drug card and pay the Network Pharmacy any applicable deductible and/or Copayment for each supply or refill of a Covered drug.

Members who do not utilize their cards and instead submit claims for direct payment will be reimbursed at a rate equivalent to what We would have paid had the Prescription Drug card been utilized, less the applicable Copayment and/or deductible.

5. In the event that no Network Pharmacy is able to provide the Covered, prescribed drug, and cannot order that drug within a reasonable time, the Member may, with the prior written approval of Our Clinical Pharmacy Department, go to a non- Network pharmacy that is able to provide the drug. We will pay the Member the eligible expense for such approved drug, less the required deductible and/or Copayment, upon receipt of a Prescription Drug Claim Form from the Member.

## E. Exclusions and Limitations

1. Vitamins, minerals, hematinics and supplements, even if ordered by a Physician, unless specifically listed in the Covered Items section of this Rider.

2. Prescription smoking-cessation aids. Please note, all denials for these items are based on Medical Necessity. If coverage is denied, you are entitled to a Utilization Review Appeal.

3. Prescription weight loss aids other than those used for the treatment of morbid obesity. Weight loss drugs that are used in the treatment of morbid obesity are automatically covered under the Prescription plan. Please note, all denials for these items are based on Medical Necessity. If coverage is denied, you are entitled to a Utilization Review Appeal.

4. Topical Prescription anti-acne medications. Please note, all denials for these items are based on Medical Necessity. If coverage is denied, you are entitled to a Utilization Review Appeal.

5. Drugs labeled "Caution - limited by federal law to investigational use," or experimental drugs, even though a charge is made to the Member. Oxford will Cover experimental or investigational drugs that have been prescribed for Members with life threatening or disabling conditions and diseases as required upon the recommendation of an external appeal agent. Please see the "Utilization Review Appeal" section of your Certificate for your Appeal rights.

**Important:** If an External Appeal Agent approves coverage of an experimental or investigational treatment that is part of a clinical trial, We will only Cover the cost of services required to provide treatment to you according to the design of the trial. We shall not be responsible for the costs of investigational drugs or devices, the costs of non-health care services, the costs of managing research, or costs which would not be Covered under this Certificate for non-experimental or non-investigational treatments provided in such clinical trial.

6. Drugs when used for cosmetic purposes, including without limitation, Benzashave, Loniten (Minoxidil) compounded for hair growth, Rogaine, Tretinoin (Retin A), Avita, Propecia, Solage, Tri-Luma, Vaniqa and Renova. Please note, all denials for these items are based on Medical Necessity. If coverage is denied, you are entitled to a Utilization Review Appeal.

7. Non-FDA approved legend drugs, non-legend drugs and drugs which do not require a prescription and Prescription Drugs which have an over-the-counter equivalent.

8. Charges for the administration or injection of any drug.

9. Therapeutic devices, appliances or supplies, including hypodermic needles, syringes, support garments, and other non-medical substances, regardless of intended use, even if ordered by a Physician, including without limitation, diabetic test agents and lavage preparations.

10. Prescriptions which an eligible person is entitled to fill without charge under any Workers' Compensation Law or any municipal, state or federal program.

11. Biological sera, blood or blood plasma.

12. Medication which is to be taken by or administered (i) in a Physician's office; (ii) to a Member in whole or in part, while he or she is a patient in a licensed hospital, rest home, sanitarium, extended care facility, convalescent hospital, nursing home or similar institution which operates on it premises, or allows to be operated on its premises, a facility for dispensing pharmaceuticals; or (iii) in connection with any Home Care benefit Covered under the Group Certificate.

13. Any prescription refilled in excess of the number specified by the Physician; refilled too soon or in excess of therapeutic limits; or any refill dispensed after one year from the Physician's original order.

14. Oral and topical prescription antiseptics that have an over-the-counter therapeutic equivalent available.

15. Topical prescription antiseptics that are administered in a Physician's office as part of an office procedure.

16. Off label drug use, excluding drugs used for the treatment of certain types of cancer as recognized by one of the following: the American Medical Association Drug Evaluations, the American Hospital Formulary Service Drug Information, the United States Pharmacopeia Drug Information or recommended review article or editorial comment in major peer reviewed professional journal.

17. Drugs dispensed in unit dose packages.

18. Topical fluoride preparations, even if ordered by a Physician.

## F. Miscellaneous Provisions

1. Oxford's Pharmacy and Therapeutics Committee will review (1) all newly approved FDA drugs; and (2) current FDA approved drugs that have had a change in prescribing protocols or for which new information is available prior to adding them to the formulary. This review will determine the circumstances under which such drugs will be Covered and whether advance written approval of Our Medical Director will be required.

2. All of the terms, definitions, conditions and limitations of the Certificate to which this Rider is attached also apply to this Rider except where specifically changed by this Rider.

3. Formulary information is available upon written request.



**Oxford Health Plans®**

## The Medco Health Home Delivery Pharmacy Service™

### *Offering you convenience and potential cost savings*

Oxford offers Members the ability to obtain up to a 90-day supply of certain medications within several therapeutic categories of medications through the Medco Health Home Delivery Pharmacy Service. You pay the applicable copayment(s) for each new or refill prescription drug, based upon your plan design. Please refer to your Summary of Benefits and Prescription Drug Rider for more information.

Maintenance prescriptions to treat the following chronic medical conditions will be dispensed through the Medco Health Home Delivery Pharmacy Service.

Allergic rhinitis
Alzheimer's disease
Anxiety disorders
Benign prostatic hyperplasia
Chronic cardiovascular disorders
Chronic gastrointestinal disorders
Chronic hyperlipidemia
Chronic obstructive pulmonary disease
Clotting disorders
Colitis
Depression
Diabetes
Estrogen/Progestin therapy
Gastroesophageal reflux disease
Glaucoma
Gout
Hypertension
Osteoporosis
Parkinson's disease
Psychotic disorders
Seizure disorders
Thyroid disease

Additional medications such as contraceptives, children's fluoride vitamins, prenatal vitamins, and certain dermatological drugs are also available.

Please call Medco Health at 1-800-905-0201, or log on to *www.medcohealth.com*, for more information on specific drug coverage and instructions on using the Medco Health Home Delivery Pharmacy Service.



**www.oxfordhealth.com**

# EXHIBIT B

# United HealthCare Insurance Company of New York

# UnitedHealthcare Choice Plus

**Certificate of Coverage, Riders, Amendments, and Notices**

**for**

**AMERICAN SECURITIES CAPITAL PARTNERS, LLC**

**Group Number:** GA2P3104NM **Health Plan:** NF - D **Prescription Code:** K5
**Effective Date:** January 1, 2007

Offered and Underwritten by
United HealthCare Insurance Company of New York

United HealthCare Insurance Company of New York

# Dental Services Amendment

We provide Benefits for Dental Services as described in this Amendment to the Policy. Benefits described in this Amendment replace the Benefits stated in the Certificate of Coverage, (Section 1: What's Covered - Benefits), *Dental Services*.

| Description of Covered Health Service | Must You Notify Us? | Your Copayment Amount<br>% Copayments are based on a percent of Eligible Expenses | Does Copayment Help Meet Out-of-Pocket Maximum? | Do You Need to Meet Annual Deductible? |
|---|---|---|---|---|

## Dental Services

*Network*

### *Accidents*

| | Yes | 0% | No | Not Applicable |

Dental services when both of the following are true:

- Treatment is necessary because of accidental damage.

- Dental services are received from a Doctor of Dental Surgery, "D.D.S." or Doctor of Medical Dentistry, "D.M.D."

*Non-Network*

| | Yes | Same as Network | Same as Network | Same as Network |

Benefits are available only for treatment of a sound, natural tooth. The Physician or dentist must certify that the injured tooth was a sound natural tooth.

| Description of Covered Health Service | Must You Notify Us? | Your Copayment Amount % Copayments are based on a percent of Eligible Expenses | Does Copayment Help Meet Out-of-Pocket Maximum? | Do You Need to Meet Annual Deductible? |
|---|---|---|---|---|

Benefits are available only for dental services provided within 12 months of the accident.

Please note that dental damage that occurs as a result of normal activities of daily living, including biting, eating or chewing or extraordinary use of the teeth is not considered an "accident". Benefits are not available for repairs to teeth that are injured as a result of such activities.

### Notify Us

Please remember that you must notify us as soon as possible, but at least five business days before follow-up (post-Emergency) treatment begins. (You do not have to notify us before the initial Emergency treatment.) If you don't notify us, Benefits will be reduced to 50% of Eligible Expenses.

## *Congenital Disease or Anomaly*

Dental services for care and treatment necessary due to congenital disease or Congenital Anomaly.

United HealthCare Insurance Company of New York

*[signature]*

President

EXHIBIT C

Westlaw.

11 NY ADC 52.16                                                                    Page 1

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

C

Use Δ RegChange to view changes.
NEW YORK ADMINISTRATIVE CODE
TITLE 11. INSURANCE DEPARTMENT
CHAPTER III. POLICY AND CERTIFICATE PROVISIONS
SUBCHAPTER A. LIFE, ACCIDENT AND HEALTH INSURANCE
PART 52. MINIMUM STANDARDS FOR FORM, CONTENT AND SALE OF HEALTH INSURANCE,
INCLUDING STANDARDS OF FULL AND FAIR DISCLOSURE
REGULATION NO. 62

Current with amendments included in the New York State Register, Volume XXIX,
Issue 16, dated April 18, 2007, and updates received from the New York
Department of Insurance.

Section 52.16. Prohibited provisions and coverages

EMERGENCY RULE

(a) No policy or certificate shall provide benefits for specified diseases, or
for procedures or treatments unique to specified diseases, and no policy or
certificate shall provide additional benefits for such specified diseases or
procedures, unless the policy or certificate meets the standards set forth in
section 52.15 of this Part.

(b) No policy shall provide a return of premium or cash value benefit, except
return of unearned premium upon termination or suspension of coverage, retroactive
waiver of premium paid during disability, payment of dividends on participating
policies, experience rating refunds, nonforfeiture values permitted for long-term
care insurance, nursing home and home care insurance or nursing home insurance
only, or a return of premium benefit upon death permitted for long-term care
insurance, nursing home insurance only, home care insurance only, or nursing home
and home care insurance. This prohibition applies to an accidental death benefit
where the amount of the benefit equals the total premium paid to date of death.

(c) No policy shall limit or exclude coverage by type of illness, accident,
treatment or medical condition, except as follows:

(1) preexisting conditions or diseases, as defined in section 52.2(u) of this
Part or section 3232 or 4318 of the Insurance Law, except for congenital anomalies
of a covered dependent child; subject to limitations set forth in subdivision (f)
of this section, sections 52.17(a)(27)-(28), 52.18(a)(5) and 52.20 of this Part;

(2) mental or emotional disorders, alcoholism and drug addiction, except that
coverage must be made available or provided pursuant to section 52.7 of this Part

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

and sections 3221, and 4303 of the Insurance Law. Medicare supplement insurance
issued pursuant to sections 52.11 and 52.22 of this Part shall not include
limitations or exclusions which are more restrictive than those of Medicare for
this type of benefit;

  (3) pregnancy, except to the extent coverage is required pursuant to  sections
3216, 3221, 3232, 4303, and 4318 of the Insurance Law, and except for
complications of pregnancy as defined in section 52.2(e) of this Part, other than
for policies defined in section 52.8 of this Part;

  (4) illness, accident, treatment or medical condition arising out of:

  (i) war or act of war (whether declared or undeclared); participation in a
felony, riot or insurrection; service in the Armed Forces or units auxiliary
thereto;

  (ii) suicide, attempted suicide or intentionally self-inflicted injury;

  (iii) aviation, other than as a fare-paying passenger on a scheduled or charter
flight operated by a scheduled airline; and

  (iv) with respect to blanket insurance, interscholastic sports;

  (5) cosmetic surgery, except that *cosmetic surgery* shall not include
reconstructive surgery when such service is incidental to or follows surgery
resulting from trauma, infection or other diseases of the involved part, and
reconstructive surgery because of congenital disease or anomaly of a covered
dependent child which has resulted in a functional defect. However, if the policy
provides hospital, surgical or medical expense coverage, including a policy issued
by a health maintenance organization, then coverage and determinations with
respect to cosmetic surgery must be provided pursuant to Part 56 of this Title
(Regulation 183);

  (6) foot care, in connection with corns, calluses, flat feet, fallen arches, weak
feet, chronic foot strain or symptomatic complaints of the feet; unless the policy
is issued as Medicare supplement insurance pursuant to sections 52.11 and 52.22 of
this Part, in which case the policy shall not include limitations or exclusions
more restrictive than those of Medicare for this type of benefit;

  (7) care in connection with the detection and correction by manual or mechanical
means of structural imbalance, distortion or subluxation in the human body for
purposes of removing nerve interference and the effects thereof, where such
interference is the result of or related to distortion, misalignment or
subluxation of or in the vertebral column; unless the policy is issued as Medicare
supplement insurance pursuant to sections 52.11 and 52.22 of this Part, in which
case the policy shall not include limitations or exclusions more restrictive than
those of Medicare for this type of benefit;

  (8) treatment provided in a government hospital; benefits provided under Medicare

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

or other governmental program (except Medicaid), any State or Federal workers'
compensation, employers' liability or occupational disease law; benefits to the
extent provided for any loss or portion thereof for which mandatory automobile
no-fault benefits are recovered or recoverable; services rendered and separately
billed by employees of hospitals, laboratories or other institutions; services
performed by a member of the covered person's immediate family; and services for
which no charge is normally made;

   (9) dental care or treatment, except for such care or treatment due to accidental
injury to sound natural teeth within 12 months of the accident and except for
dental care or treatment necessary due to congenital disease or anomaly;

   (10) eyeglasses, hearing aids, and examination for the prescription or fitting
thereof;

   (11) rest cures, custodial care and transportation, unless the policy is issued
as Medicare supplement insurance pursuant to sections 52.11 and 52.22 of this
Part, in which case the policy shall not include limitations or exclusions more
restrictive than those of Medicare for this type of benefit; and

   (12) coverage while the insured is outside the United States, its possessions or
the countries of Canada and Mexico.

   (d) No policy shall contain provisions establishing a probationary or similar
period longer than the following:

   (1) for all specified conditions: 30 days;


   (2) for inception of pregnancy, except where otherwise specifically prescribed by
statute: 30 days; and

   (3) for accidents: none.

  This subdivision shall not apply to benefits for dental, hearing or vision care.

   (e) Except with respect to Medicare supplement insurance, as defined in sections
52.11 and 52.22 of this Part, nothing contained in subdivisions (c) and (d) of
this section shall preclude:

   (1) the use of a nonduplication of coverage or coordination of benefit provision;
or

   (2) unless otherwise provided by law, waivers to exclude, limit or reduce
coverage or benefits for specifically named or described disease, physical
condition or extra-hazardous activity, as defined in section 52.2(i) of this Part,
as an alternative to refusal to issue, renew or reinstate coverage.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

Where waivers are required as a condition of issuance, renewal or reinstatement, signed acceptance by the insured is required unless on initial issuance the full text of the exclusion is contained either on the first page or specification page of the policy. Waivers to exclude, limit or reduce coverage or benefits for specifically named or described preexisting diseases or physical conditions shall not be used in Medicare supplement insurance.

(f) No group or blanket medical expense insurance policy insuring 300 or more persons, excluding dependents, shall contain a provision which excludes or limits coverage for preexisting conditions for any person who elects coverage during the first 30 days of eligibility. This provision shall not apply to blanket insurance where enrollment for the coverage is voluntary, to dental insurance, to insurance written under section 4235(c)(1)(H), (K), (L) and (M) of the Insurance Law or to the extent that insurance written under section 4235(c)(1)(B) and (D) of the Insurance Law insures employees of an employer with less than 300 employees.

(g) Except as provided for in subdivision (c) of this section, and coverages in effect after eligibility for Medicare, no policy shall set more than a single maximum benefit limit for any class of covered persons in each of the following categories of services provided by a hospital:

(1) hospital services other than room and board; and

(2) outpatient services.

(h) No community-rated policy issued by an article 43 corporation, other than a policy providing benefits through a health maintenance organization or its equivalent, and no individual policy, as defined in section 52.2(n) of this Part, shall provide benefits which duplicate benefits recoverable under mandatory automobile no-fault insurance policies unless such benefits are contained in a rider purchased at the option of the contract holder at an appropriate premium.

(i) The terms Medicare supplement, Medigap, Medicare Wrap-Around and words of similar import shall not be used unless the policy is issued or amended to comply with sections 52.11 and 52.22 of this Part.

(j) The terms long term care and custodial care and words of similar import shall not be used in describing benefits unless the policy is issued or amended to comply with section 52.12 or 52.13 of this Part.

(k) Any application for a policy of limited benefits health insurance as defined in section 52.10 of this Part and any such policy, when offered to persons who are 65 years of age or older, must include the following notice:

(1) The application form shall incorporate immediately above the applicant's signature in bold print at least four points greater than the largest print used in the application, excluding the company name, logo and address, the following statement only:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NY ADC 52.16                                                          Page 5

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

 The coverage applied for provides limited benefits health insurance only. This
coverage does not meet the minimum requirements for Medicare supplement, long term
care insurance, nursing home insurance only, home care insurance only, or nursing
home and home care insurance in the state of New York. Purchase of this coverage
may be unnecessary if you already have or intend to purchase Medicare supplement
insurance or long term care insurance.

 (2) The policy shall incorporate into the top quarter of the first page in bold
print at least four points greater than the largest print used in the policy,
excluding the company name, logo and address, the following statement only:

 This policy provides limited benefits health insurance only. This coverage does
not meet the minimum requirements for Medicare supplement, long-term care
insurance, nursing home insurance only, home care insurance only, or nursing home
and home care insurance in the state of New York. Purchase of this coverage may be
unnecessary if you already have or intend to purchase Medicare supplement
insurance or long term care insurance.

 (1) No policy or certificate shall provide benefits for custodial care services
unless that policy or certificate also provides insurance which meets the
definition contained in section 52.11, 52.12 or 52.13 of this Part. For purposes
of this section custodial care services means help in transferring, eating,
dressing, bathing, toileting, and other such related activities.

                                   CREDIT(S)


Sec. filed April 21, 1972; amds. filed: Nov. 17, 1972; Nov. 28, 1973; Aug. 26,
1974; June 16, 1975; Dec. 23, 1980; repealed, new filed April 2, 1982; amds.
filed: Aug. 17, 1984; Dec. 24, 1985 as emergency measure; Feb. 19, 1986; Sept. 1,
1989; June 19, 1990; July 2, 1991; March 12, 1992; Feb. 10, 1998 as emergency
measure; March 31, 1998; May 11, 1998 as emergency measure; July 14, 1998; Nov.
18, 1999 eff. Dec. 8, 1999. Amended (c)(9); amd. filed Aug. 1, 2002 eff. Aug. 21,
2002; emergency rulemaking eff. Aug. 2, 2006, expired Oct. 30, 2006; emergency
rulemaking eff. Oct. 31, 2006; expired Jan. 28, 2007; emergency rulemaking eff.
Jan. 30, 2007; expires Apr. 29, 2007.

                    REGULATION NO. 62 -- General Materials

Insurance Product Line: General, Health

A-to-Z Index Terms:

     ACCIDENT AND HEALTH INSURANCE

     POLICY

     POLICY - Filing requirements


              © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NY ADC 52.16                                                        Page 6

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

        11 NY ADC 52.16
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



OXFORD
HEALTH PLANS·

August 21, 2006

State of New York Insurance Department
25 Beaver Street
New York, New York 10004

Re: Oxford Health Insurance, Inc.
NAIC#: 78026

| | |
|---|---|
| Complainant: | Kim Kaufman |
| Oxford Id#: | 8635085*02 |
| Department File#: | CSB-473951 |
| Date of Your Correspondence: | July 26, 2006 |
| Date Received by Oxford: | July 26, 2006 |

Dear Sir or Madam:

This letter is in response to your inquiry regarding the referenced matter.

On May 5, 2006, an Expedited Dental review (see authorization 81494407) was requested by Ms. Kaufman for services to be rendered by Dr. Burton Langer, a non-participating Periodontics specialist. Member was told that Dr. Langer needed to submit a Letter of Medical Necessity, X-Rays and Treatment Notes before a determination is made. Therefore, at this time, authorization 81494407 was pending. Ms. Kaufman asked if she went ahead with the surgery without waiting for the approval would that be a reason for a denial. Ms. Kaufman was advised that would not be a reason; however, if surgery was performed without an authorization and the authorization was denied, Ms. Kaufman would be liable for all charges.

On May 15, 2006, a Letter of Determination was sent to Ms. Kaufman and Dr. Langer. Since the requested documentation was not received, authorization 81494407 was denied per Dr. Jonathan Zucker, an Oxford Health Plans Medical Director.

On May 31, 2006, the requested documentation was received and forwarded to Dr. David Behrman, an outside consultant whose specialty is Oral Surgery.

On June 6, Dr. Behrman determined Ms. Kaufman has a history of unilateral cleft repair. Dental implant and bridge were also placed as part of cleft repair to replace teeth missing due to cleft. Dental treatment has now failed due to peri-implantitis. There is also bone loss under the pontic area of 7 and 8. Cleft repair remains intact and the dental treatment that is needed is due to failure of the implant and bridgework, not because of failure to the cleft repair. This is considered replacement of teeth and is dental.

Continued on Page 2

203 459 6000
48 Monroe Turnpike, Trumbull, CT 06611

Page 2

A Letter of Determination, dated June 7, 2006, was sent to Ms. Kaufman and Dr. Langer.

On June 26, 2006, Oxford's Clinical Appeals Department received an appeal from Dr. Lawrence Brecht, a non-participating Plastic Surgeon, in support of Ms. Kaufman's denial of authorization 81494407.

On July 3, 2006, a Letter of Determination was sent to Ms. Kaufman and Dr. Langer. Dr. Donald Stangler, an Oxford Health Plans Medical Director, continues to uphold Current Procedural Terminology (CPT) codes 20680 (Removal of implant; deep (eg, buried wire, pin, screw, metal band, nail, rod or plate) and D4273 (Subepithelial connective tissue graft procedures, per tooth). Ms. Kaufman was given the option to exercise her Second-Level Appeal Rights.

I trust this should be sufficient to resolve this matter.

Sincerely,


Vinnie Maiolo
Regulatory Complaint Associate

Enclosure(s)

EXHIBIT E



**OXFORD**
**HEALTH PLANS**
A UnitedHealthcare Company

This is an electronic file copy of correspondence previously sent by Oxford. Please note that
any statement(s) in this correspondence were made based upon the laws, regulations and/or
benefit plans available at the time the correspondence was sent.

May 15, 2006

Kim Kaufman
74 Fairway Ave
Rye, NY 10580

Dear Kim Kaufman,

United HealthCare Services, Inc. on behalf of Oxford has received and reviewed a request from
your provider, Burton/Laureen Langer, DMD. Your provider has requested the following
services:

**Service Request Summary**
Member Name: Kim Kaufman -- Oxford ID#: 863508502
Service Code(s): 20680
Description of Service Code(s): Removal of support implant
Date of Service: 05/11/06 -- **Reference #: 81494407**

Our Medical Director has determined that the request is: Denied - Lack of Clinical
Information.

After consideration of all available information, our Medical Director has determined that
the requested procedure will not be covered for the following reason(s): Requested clinical
information has not been received.

If your provider has any questions regarding this decision, he or she may contact the
clinical staff under the direction of Jonathan Zucker at 800-889-7658 Extension 6156.

Your satisfaction is important to us. As part of our continuing efforts to increase Member
satisfaction, it is our goal to thoroughly review your request and provide you with a prompt
response. If you have any additional questions, please contact Customer Service at the number
on your Oxford Member ID card. As an added service to you, you may review claims, check
referrals, change your primary care physician (PCP), and obtain other helpful Member
information through our web site, *www.oxfordhealth.com*.

We have enclosed a detailed explanation of the Member's Appeal Rights. A Member has the
right to request a review of a denial of services. If the Member would like to appeal, the
Member should follow the First-Level Member Appeal Rights process described in the enclosure
in response to the question, *"How do I submit a First-Level Appeal request?"*.

If you are hearing impaired and require assistance, please call our TTY/TDD line at
1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for

203 439 6000
48 Monroe Turnpike, Trumbull, CT 06611

assistance in Korean, 1-800-449-4390 *para ayuda en espanol,* or the number on your Oxford ID card for assistance in other languages. Interpreters are available Monday through Friday between 8:00 AM and 6:00 PM.

Sincerely,
Nicole Lopes, Dental Administrator

Enclosure: Explanation of Your Appeal Rights

cc:  Burton/Laureen Langer DMD , Kim Kaufman

EXHIBIT F

BURTON LINGER, D.M.D., P.C.
LAUREEN LINGER, D.D.S.
400 CENTRAL PARK AVENUE
SCARSDALE, NEW YORK 10583

TEL. (914) 723-0900
FAX. (914) 723-1776

May 18, 2006

Ms. Nicole Lopes
Oxford Insurance
Medical Management
Dental Department
48 Monroe Turnpike
Trumbull, CT  06611

Re.: Mrs. Kim Kaufman
Oxford ID#:  863508502
Date of Service 5/77/06  Reference #81494407

Dear Ms. Lopes,

On May 11, 2006, Mrs. Kim Kaufman was seen by me for the removal of an implant in the position of #6, which was dehisced on the buccal and inflamed.  In addition, there was a major deficiency in the amount of keratinized tissue surrounding the implant and bordering position of tooth #7 deeming the need for a subepithelial connective tissue graft.

Ms. Kaufman had a previous cleft palate and lip, which was partially repaired.  In the future, Dr. Court Cutting is planning on performing a bone graft to re-establish normal integrity of the area between #6 – 7, so that osseointegrated implants could be placed in this area.  This would be impossible with the previous inflamed implant and lack of adequate tissue.  The recognized medical code, which should be applied for the removal of the implant, is D20680 and the diagnosis code for the subepithelial connective graft is D4273.  In addition, the diagnosis code is 749.21 (unilateral cleft lip).

Page 1

Ms. Nicole Lopes                                                    May 18, 2006

   It should be noted that on December 8, 1999, New York State Insurance Commission passed insurance regulation, Section 52.16 c(9) of Regulation 62 (11NYCRR52) bringing it into compliance with Articles 42 and 43 of New York State insurance law which states that dental care and treatment be covered under the medical plan due to a congenital anomaly. In view of Mrs. Kaufman diagnosis, treatment and future procedures, this should be considered a medical necessity and reimbursable under her medical insurance reimbursement.

   If any additional information is necessary, please do not hesitate to contact me.


                                        Sincerely,


                                        Burton Langer, D.M.D.


BL/vmd

EXHIBIT G

**From:** "Britt, Elizabeth J." <EBritt@oxhp.com>
**Date:** May 24, 2006 3:49:47 PM EDT
**To:** Kim Kaufman <kimkaufman@mac.com>
**Cc:** "Zucker, Jonathan S." <JZucker@oxhp.com>
**Subject: RE: Kim Kaufman, Referenence #81494407**
Ms. Kaufman-

Thank you for your response. I will advise Dr. Zucker. I must however I must advise you that we have 14 days (from original denial on 5/13/06) to reconsider and the 14th day is 5/27/06.

I believe it is important to note that if you cannot get the information submitted to us by that date, in order to be in compliance with our regulations, we will have to uphold the original denial. You will, of course, have appeals rights and will need all the requested information for the appeal review. The appeal review would be conducted by a different clinical reviewer .

Please refer to the letter dated 5/13/06 to review your appeals rights. Exercising your appeals rights will give you additional time to collect the necessary information.


Elizabeth Britt, RDH
Project Manager II
Internal: 8-204-6156
External: 203-459-6156

**From:** Kim Kaufman [mailto:kimkaufman@mac.com]
**Sent:** Wednesday, May 24, 2006 3:35 PM
**To:** Britt, Elizabeth J.
**Cc:** Zucker, Jonathan S.; Glenn Kaufman; Dr. Lawrence Brecht; Linda Lao; burtl2@aol.com; staff@benefitcoverage.com
**Subject:** Re: Kim Kaufman, Referenence #81494407

Dear Elizabeth,

I can obtain some information regarding my cleft treatment. As I stated before, the bulk of my treatment was done in the years 1969 - 1987 and my cleft surgeon, Dr. Ralph Millard has since retired and I can no longer obtain my files.

I have a scant amount of information as it relates to my bone grafting, as Dr. Anthony Wolfe who was partners with Dr. Millard at the time of my treatment, is still in practice (Chief of Plastic and Reconstructive Surgery, Miami Children's Hospital, 6280 Sunset Dr Ste 400 South Miami, FL 33143-4860).   However, Dr. Wolfe's records only relate to my bone grafting treatment which was minimal.

Last year, when it became apparent that the Maryland bridge was jeopardizing the teeth in my mouth,  I had a couple of minor bone grafting procedures performed by a Dr. William Weber (Maxillofacial surgeon, 41 E 57th St # 1204, New York, 10022, 212.593.0303), however, it became apparent that I needed a cleft team to address my issues as my cleft is largely "unfilled" with any bone.  I can obtain his records and have them sent.

Dr. Jeffrey Blum (DDS, Oral Surgeon, 400 Arthur Godfrey, Suite 412, Miami Beach, FL 33140, 305.538.4556) performed the implant about 2 1/2 years ago (I will get exact date). Regarding x-rays prior to the fabrication / insertion of my former prosthesis, I am not sure what I have at all, but will ask Dr. Blum what he may have on file and will have him send whatever he may have.  I will obtain his records and have them sent to Dr. Zucker.

Regarding current x-rays, to be honest, I don't know if I have a complete set, but I will be happy to send you everything I have (both Dr. Brecht and my regular dentist, Dr. Zadik, have some).  I will require all of this information be sent back to me upon Dr. Zucker's review, as the x-rays need to be returned and I would like all documentation in my possession.

I will stress to all doctors involved that this information is needed as soon as possible, but I cannot guarantee their expediency.  This will take some coordinating, so I ask you bear with me.

This is as complete a history I can possibly provide.

On May 24, 2006, at 11:54 AM, Britt, Elizabeth J. wrote:

> Dear Ms. Kaufman-
>
> I relayed the information you left on my voice mail to Dr. Zucker.
>
> This morning he asked me to contact you and request :
> - all information concerning your cleft treatment
> - x-rays of your teeth prior to the fabrication/insertion of your current prosthesis
> - date the prosthesis was inserted
> - current full mouth x-rays
> Please mail the clinical information to :
>
> Dr. Jonathan Zucker
> Oxford Health Plans
> 48 Monroe Tpke
> Trumbull, CT 06611
>
>
> Thank you.
>
> Elizabeth Britt, RDH
> Project Manager II
> Internal: 8-204-6156
> External: 203-459-6156

**From:** Britt, Elizabeth J.
**Sent:** Monday, May 22, 2006 11:50 AM
**To:** 'Kim Kaufman'
**Subject:** RE: Kim Kaufman, Refererence #81494407

Ms. Kaufman-

Dr. Zucker would like a history of your cleft repair.
You may fax this to me at 203-452-4619.

Thank you

Elizabeth Britt, RDH
Project Manager II
Internal: 8-204-6156
External: 203-459-6156

**From:** Kim Kaufman [mailto:kimkaufman@mac.com]
**Sent:** Friday, May 19, 2006 3:08 PM
**To:** Britt, Elizabeth J.
**Subject:** Re: Kim Kaufman, Refererence #81494407

Dear Elizabeth,
Thank you.  I'm glad to know you have all materials.  Thank you again for helping me through this process.
Best,
Kim Kaufman
On May 19, 2006, at 2:30 PM, Britt, Elizabeth J. wrote:

> Good Afternoon-
>
> The express mail pkg containing the following listed information has been received and forwarded to Dr. Zucker for review.
>
> x-ray of the implant (to be sent by me via overnight FedEx for Friday delivery as Dr. Langer did not have this in his possession)
>
> Dr. Zucker is not in the office today and will review the clinical information on Monday, 5/22/06.
> Elizabeth Britt, RDH
> Project Manager II
> Internal: 8-204-6156
> External: 203-459-6156

**From:** Kim Kaufman [mailto:kimkaufman@mac.com]
**Sent:** Thursday, May 18, 2006 5:00 PM
**To:** Lopes, Nicole M.
**Cc:** Britt, Elizabeth J.; burtl2@aol.com; Linda Lao; Glenn Kaufman; Zucker,

Jonathan S.; Dr. Lawrence Brecht
**Subject:** Re: Kim Kaufman, Reference #81494407

Dear Nicole,
Dr. Langer does not release his notes without specific forms being filled
out and signed by me. However, in Dr. Langer's medical necessity letter
he details my situation quite specifically and this should answer all
questions. If after you've received the packet and reviewed the materials
you still require additional information, please call Vina directly at:
914.723.0900 or 212.772.6900.
Thank you.
Best,
Kim Kaufman
On May 18, 2006, at 8:45 AM, Lopes, Nicole M. wrote:

> Good Morning Ms. Kaufman,
>
> Thank you for getting the information FedEx'd for Friday.
> Could you also please also get a copy of Dr. Langer's Treatment Record
> Notes (must be legible or transcribed), that was also part of the clinical
> information that was originally requested.
>
> Thank You,
>
> Nicole Lopes, Dental Administrator
> Medical Management/ Dental Department
> Internal 8-204-6361
> External 203-459-6361
>
> **From:** Kim Kaufman [mailto:kimkaufman@mac.com]
> **Sent:** Wednesday, May 17, 2006 6:24 PM
> **To:** Britt, Elizabeth J.; Lopes, Nicole M.
> **Cc:** burtl2@aol.com; Linda Lao; Glenn Kaufman; Zucker, Jonathan S.;
> Dr. Lawrence Brecht
> **Subject:** Kim Kaufman, Reference #81494407
>
> Dear Elizabeth and Nicole,
>
> Thank you for assisting me with the submission of my claim for
> removal of support implant and sub epithelial connective tissue
> graft performed on me by Dr. Burton Langer on 5/11/06. As we
> discussed, the claim has been re-opened provided you receive all
> necessary materials from Dr. Langer's office by this Friday, May
> 19th. I have spoken to Vena at Dr. Langer's office and she has
> assured me that she will be sending the materials to Nicole's
> attention via overnight FedEx for Friday delivery. Just so I can be
> sure that all materials requested are being included I would like to
> confirm with you both what is being sent:

1) a letter of medical necessity from Dr. Burton Langer
2) the receipt detailing payment and procedure codes
3) x-ray of the implant (to be sent by me via overnight FedEx for Friday delivery as Dr. Langer did not have this in his possession)

If there is anything additional that you will require, PLEASE LET ME KNOW IMMEDIATELY so that I may have those materials included in the packet. Just in case there is any confusion, I will list all the appropriate codes here again:

DIAGNOSIS CODE: 749.21 (unilateral cleft lip)
PROCEDURE CODE: 20680 (deep removal of implant)
PROCEDURE CODE: D4273 (sub epithelial connective tissue graft)
DR. LANGER'S CODE: 3801508

Elizabeth, I do understand from our conversation that since I did not know that the sub epithelial connective tissue graft was considered a separate procedure, I did not originally obtain a separate code. As I explained, as a cleft patient, all of this work is related to a larger bone grafting procedure that I will have with Dr. Court Cutting and Dr. Lawrence Brecht in July. Dr. Burton Langer is part of the NYU cleft team and has been assisting Drs. Cutting and Brecht by removing an infected implant and treating the tissue that was adversely affected by the infection. Dr. Langer did not know if he would even perform a tissue grafting as he needed to see how my mouth reacted after the implant had been removed. He was pleased to find that he was still able to perform the tissue grafting which will ultimately help to support the bone grafting in July.

I hope this information is useful and please feel free to contact me with any further questions or requests.

Thank you for your time.

Best,

Kim Kaufman

# EXHIBIT H



June 7, 2006


Kim Kaufman
74 Fairway Ave
Rye, NY 10580


Dear Kim Kaufman,

United HealthCare Services, Inc. on behalf of Oxford has received and reviewed a request from your provider, Burton/Laureen Langer, DMD. Your provider has requested the following services:

**Service Request Summary**
Member Name: Kim Kaufman -- Oxford ID#: 863508502
Service Code(s): 20680, D4273
Description of Service Code(s): Removal of support implant, Subepith conective tiss grft tooth
Date of Service: 05/11/06 -- **Reference #: 81494407**

Our Medical Director has determined that the request is: Denied - Not Covered Benefit.

After consideration of all available information, our Medical Director has determined that the requested procedure will not be covered for the following reason(s): Dental treatment including removal of teeth and services needed to prepare the mouth for the replacement of teeth are not covered benefits.

If your provider has any questions regarding this decision, he or she may contact the clinical staff under the direction of Jonathan Zucker at 800-889-7658 Extension 6156.

Your satisfaction is important to us. As part of our continuing efforts to increase Member satisfaction, it is our goal to thoroughly review your request and provide you with a prompt response. If you have any additional questions, please contact Customer Service at the number on your Oxford Member ID card. As an added service to you, you may review claims, check referrals, change your primary care physician (PCP), and obtain other helpful Member information through our web site, *www.oxfordhealth.com*.

We have enclosed a detailed explanation of the Member's Appeal Rights. A Member has the right to request a review of a denial of services. If the Member would like to appeal, the Member should follow the First-Level Member Appeal Rights process described in the enclosure in response to the question, *"How do I submit a First-Level Appeal request?"*.

If you are hearing impaired and require assistance, please call our TTY/TDD line at 1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for assistance in Korean, 1-800-449-4390 *para ayuda en espanol*, or the number on your Oxford ID card for assistance in other languages. Interpreters are available Monday through Friday between 8:00 AM and 6:00 PM.

Sincerely,
Nicole Lopes, Dental Administrator

Enclosure: Explanation of Your Appeal Rights

cc:  Burton/Laureen Langer DMD , Kim Kaufman

## Explanation of Member Appeal Rights

**Can I designate a representative to appeal on my behalf?**
A Member may designate a person to act on his or her behalf, including the Member's healthcare provider, to appeal this decision ("Designee"). To do so, the Member must provide Oxford with written consent, at the time of the appeal, for the Designee to act on his or her behalf. The consent must be signed by the Member, or by the Member's guardian, if the Member is a minor. A copy of Oxford's approved consent form to designate a representative may be obtained on Oxford's web site at *www.oxfordhealth.com*.

For appeals of benefit determinations concerning urgent care, a healthcare provider with knowledge of the Member's medical condition shall be permitted to act as the Member's authorized representative without written consent. A benefit determination concerning urgent care is defined as a determination which, if subject to the standard appeal time frames, could seriously jeopardize the life or health of the Member or the ability of the Member to regain maximum function, or in the opinion of a physician with knowledge of the Member's condition, would subject the Member to severe pain that cannot be adequately managed without the care or treatment that is the subject of the determination.

**How can I obtain a copy of the criteria used to make this determination?**
A claim is any request by a covered Member for certification of a benefit, or payment for a service, as required under the terms of the Member's health plan. A claim is denied when it does not meet the criteria established by the Member's plan. If the Member would like a copy of the criteria used to make this determination, the Member must send a written request to **ERISA Disclosure Requests, c/o Oxford Health Plans, Inc., 48 Monroe Turnpike, Trumbull, CT 06611** .The criteria will be provided to the Member free of charge.

**How do I submit a First-Level Appeal request?**
A Member has the right to request a review of a claim denial. The Member or the Designee may file a **First-Level Member Appeal** to Oxford's Clinical Appeals Department within **180 days** of receipt of this determination letter. While an appeal may be initiated by calling Oxford's Customer Service Department at 1-800-444-6222, we strongly recommend that the Member file an appeal in writing. The written request will give us a clear understanding of the issues being appealed. Please send the request for appeal along with any documentation/information already requested by Oxford (if not previously submitted) and any additional information the Member would like to submit in support of the appeal, to **Clinical Appeals Department, c/o Oxford Health Plans, Inc., P.O. Box 7078, Bridgeport, CT 06601-7078,** (Fax number: 1-203-459-5423).

**When will I receive a decision on my appeal?**
Upon receipt of an appeal request, we will provide a full and fair review of the Member's claim. An appeal of an adverse benefit determination where the services have not been rendered (pre-service appeal) will be resolved not later than **15 days** from the Clinical Appeals Department's receipt of the Member's appeal request. An appeal of an adverse benefit determination where the services have been rendered (post-service appeal) will be resolved not later than **30 days** from the Clinical Appeals Department's receipt of the Member's appeal request.

**Can I file an expedited appeal?**
If a Member is receiving an ongoing course of treatment, if the Member's health or life could be seriously jeopardized by pursing the standard appeals process or if the Member's provider believes an immediate appeal is warranted, the Member or the Designee, may request an Expedited Utilization Review Appeal. In addition to submitting a written or verbal appeal, an expedited appeal may be initiated by faxing a request to 1-203-459-5423. The Clinical Appeals Department will then provide notification as to whether the request was accepted as an expedited or standard appeal. A determination on an expedited appeal will be made within **72**

hours from receipt of the appeal or **2 business days** from receipt of the information necessary to review the appeal.

**Please note:** Determinations concerning services that have already been provided are not eligible to be appealed on an expedited basis.

### What additional appeal rights do I have if my First-Level Appeal is denied?

If the claim remains denied, additional Member appeal rights will be supplied with the First-Level Appeal determination letter. These additional appeal rights include (1) an external appeal pursuant to NY State Law, and (2) a Second-Level Appeal internally to Oxford's GRB (described below).

The Member may only utilize the external appeal option only if the Member has received a final adverse determination ("FAD"). A FAD is a denial where the basis for the decision is (1) lack of medical necessity or (2) the experimental/investigational exclusion. When a Member has received a FAD, the Member or their Designee may file an application through the **New York State External Appeal Process** to have the decision reviewed by an independent utilization review organization. (An application and instructions for external appeal will be provided with the FAD.) First-Level Appeal determinations concerning clinical trials and experimental or investigational procedures may be appealed through the external appeal process only if the Member's physician has certified that the Member's condition meets the statutory definition of a "life threatening" or "disabling" condition. To determine eligibility for external review and file an external appeal, the Member, or *Designee must file a written application with the New York State Department of Insurance (DOI) within 45 days of receipt of the First-Level Appeal determination.* The DOI will assign the case to a state-certified external appeal agent who has no affiliation with Oxford. The external appeal agent will issue a standard appeal decision **30 days** from receipt of the application and an expedited external appeal decision **3 days** from receipt of the request. An external appeal agent's medical necessity decision is binding upon both the Member and Oxford, so long as the benefit is available under the Member's plan. **Please note: The 45-day timeframe for requesting an external appeal begins upon receipt of the FAD regardless of whether the Member decides to initiate an internal Second-Level Appeal to the GRB as described in the next paragraph. If the Member decides to appeal to the GRB, he or she does not waive the option to file an external appeal with the New York State DOI. However, the Member may miss the 45-day timeframe for requesting an external appeal.**

All Members who have received a First-Level Appeal determination where any part of the claim remains denied, including a FAD, or their Designee, on their behalf, may submit a **Second-Level Member Appeal** through Oxford's internal appeal process to the GRB within **60 business days** of receipt of the First-Level Appeal determination letter. The request for a Second-Level Appeal and any additional information must be submitted to **Grievance Review Board, c/o Oxford Health Plans, Inc., 48 Monroe Turnpike, Trumbull, CT 06611.** The Member or Designee will need to include all information previously requested by Oxford (if not previously submitted), and include any additional facts or information that the Member believes to be relevant to the issue. The Member or Designee may send us written comments, documents, records or other information regarding the claim. The GRB will consider all available information relevant to the Member's appeal when making its review. A pre-service appeal will be resolved not later than **15 days** from the GRB's receipt of the Member's request for a Second-Level Appeal. A post-service appeal will be resolved not later than **30 days** from the GRB's receipt of the Member's appeal request.

### If my claim still remains denied, what additional right do I have?

Members who have obtained their health benefits through an employer group plan may have additional rights under the Employee Retirement Income Security Act (ERISA). ERISA rights do not apply if the Member's coverage for health benefits was (1) obtained through employment with a church or government group or (2) purchased as an individual plan from Oxford. If we

have not approved the Member's claim after all mandatory internal reviews have been completed, the Member may have the right to file a civil action under 502(a) of the Employee Retirement Income Security Act.

**Please note:** A Second-Level Appeal is voluntary under ERISA when the Member's First-Level Appeal is expedited. In other words, if the First-Level Appeal was expedited, ERISA eligible Members need not complete a Second-Level Appeal to pursue their ERISA rights. Additionally, the New York State External Appeal Process is not part of a Member's rights under ERISA.

### How can I obtain an interpreter to assist me if I am hearing impaired or I need language assistance?
For a hearing impaired interpreter, contact Oxford's **TDD/TTY** line at 1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for assistance in Korean, 1-800-449-4390 *para ayuda en Espanol* ,or the number on your Member ID card for assistance in other languages. Interpreters will be available Monday through Friday between 9:00 PM and 6:00 PM.

### Explanation of Provider Appeal Rights

### Do I have my own appeal rights?
Under the New York Insurance Law, providers may appeal **retrospective** adverse determinations based upon (1) medical necessity or (2) the experimental/investigational exclusion when the Member has a life-threatening or disabling condition. A retrospective adverse determination is one where the initial determination is made after the services have been rendered. A provider must follow the First-Level Member Appeal process described in the Member Appeal Rights Section in answer to the question **"How do I submit an appeal request?"** All requests by providers for retrospective appeals must be made within **60 days** of receipt of the initial adverse determination. Providers are not entitled to take a Second-Level internal appeal. Retrospective appeals will be resolved within **60 days** from the Clinical Appeals Department's receipt of the information necessary to review the appeal. If the Clinical Appeals Department upholds all or part of such a determination, the provider may submit an external appeal within **45 days** of the receipt of that determination. The provider must follow the External Appeal Process outlined above in answer to the question **"What additional appeal rights do I have if my claim remains denied?"**

Additionally, providers who have contracted with Oxford should refer to the appeal rights contained in the Provider Reference Manual. Providers who do not have a contract with Oxford do not have their own independent right to appeal, other than appeal rights associated with retrospective adverse determinations described above.

APX051 15/NY-04-1225

# EXHIBIT I

# J. PEAT & ASSOCIATES
### EMPLOYEE BENEFIT SPECIALISTS

June 19, 2006

Clinical Appeals Department
Oxford Health Plans, Inc.
P.O. Box 7078
Bridgeport, CT  06601-7078

**Re:**  **Claim Denial: Patient Kim Kaufman Reference #81494407, ID#863508502**

Dear Sir or Madam:

We request that you please review the processing of Mrs. Kaufman's claim, and subsequent denial (DOS 5/11/2006, Reference #81494407) (exhibit 1). We also request the expedited review appeals process be utilized as this patient is scheduled for related surgery July 20, 2006. An attached letter authorizing our firm to work on behalf of Mrs. Kaufman is enclosed (exhibit 2).

Mrs. Kaufman was born with a severe cleft palate. This congenital anomaly, and the associated functional impairment, is a covered medical benefit not only under Oxford's contract but also covered by state law (Section 52.16 (9) of Regulation 62-11NYCRR52). Past work to correct the anomaly has failed and created a further deterioration of the mouth leading to the inability to properly eat, drink and speak without pain and discomfort. This work was done in the hope it would allow Mrs. Kaufman to function normally without having to undergo major reconstructive bone grafting of the cleft.

Now that all other corrective measures have failed, Mrs. Kaufman is scheduled for an alveolar bone grafting surgery on July 20, 2006 at the Institute of Reconstructive Plastic Surgery at the NYU Medical Center by Dr. Court Cutting, the Director of the IRPS, and his team of highly specialized surgeons and dentists (Drs. Lawrence Brecht and Burton Langer) who are experts in the field of cleft palate reconstructive medical surgery (the Oxford project manager for the July 20th surgery is Shelia Chatman). A preliminary surgical procedure with Dr. Burton Langer took place on May 11, 2006 in anticipation of this upcoming complex surgery. This surgery on May 11th required the removal of a failed and infected implant, as well as a tissue grafting to help resolve the infected gum area. The immediacy of this procedure was required to allow enough time for healing and absence of infection prior to the June 20th surgery.

Elizabeth Britt was the Oxford project manager assigned to review the file of Mrs. Kaufman for the 5/11/06 claim. In leading to the claim denial we were also informed by Ms. Britt that the Medical Director in the Dental Department of Oxford, Dr. Jonathan Zucker, consulted with an Oxford contracted maxillofacial surgeon, Dr. David Behrman. Dr. Behrman's office confirmed with us that he has no experience with the specialized area of cleft palates, nor any bone grafting experience relating to cleft palate deformities, therefore he is unqualified to opine on an implant removal/sub-epithelial tissue grafting related to a cleft palate (which is an entirely different procedure for a cleft patient vs. a non-cleft patient).

We find it very disconcerting that Oxford would rely on a medical practitioner's opinion that admittedly has no experience with the patient's unique circumstance. We also are very disturbed because we went through a similar process with Mrs. Kaufman in early 2004 when her husband's group coverage was under United Healthcare, group #207394. Claims were also initially denied regarding procedures related to the cleft palate. We went through the level one, level two and hearing appeal whereby medical professionals not properly qualified to review her unique situation also reviewed her claims, and as such, the claims were subsequently denied. Not until we filed a complaint with the New York State Insurance Department were her claims properly and correctly paid.

We have attached documents and information about the required procedure, the surgeon's qualifications and letter of appeals directly from these same physicians. The packet labeled Exhibit 3 was previously sent to Oxford to support the surgery of 5/11/2006. Exhibit 4 includes additional information related to the necessary reconstructive process.    This supporting information, in addition to Oxford's own contract language covering these types of oral surgical procedures and state law governing small group medical plans should be enough information to have the claim of 5/11/2006 re-processed and covered, the surgery of 7/20/2006 covered, and the subsequent surgeries (which will include, but may exceed, dental implants by Dr. Langer as well as the construction of teeth by Dr. Lawrence Brecht, none of which can be scheduled until the results 7/20 are reviewed) to complete the reconstruction paid for under the provisions of the certificate of coverage.

Mrs. Kaufman is well aware of New York State Law entitling her to damages if claims are unnecessarily denied and she will act as necessary or appropriate to protect her interests as respects any matters related to her cleft treatment.

We appreciate your prompt response. Please contact either Kim Kaufman or myself with your findings expeditiously.

Sincerely,


Mark DeRosa
President


cc:    Kim Kaufman
       Kevin Hill, CEO Northeast Region, Oxford Health Plans
       Mitchell Gennaour, Assistant Chief of Consumer Services Bureau,
          NYS Insurance Commission

EXHIBIT J

Kim Kaufman
74 Fairway Avenue, Rye, NY   10580
914.921.1536

June 20, 2006

Oxford Health Plans
Attn: Clinical Appeals
P.O. Box 7078
Bridgeport, CT  06601

**RE:    Kim Kaufman, Member # 8635085\*02**

To Whom It May Concern,

Attached please find an Oxford Health Plans form signed and dated by me.  You will also find two letters of medical necessity, one from Dr. Cutting and one from Dr. Brecht.

I wish I could be more specific as to what exactly this form is, but I cannot as this form was mysteriously faxed to Dr. Brecht's office, but there was no explanation accompanying this fax other than I am supposed to sign it.  I have called and emailed Ms. Elizabeth Britt in the dental department as well as emailed Dr. Jonathan Zucker in the dental department but I have yet to obtain any explanation as to whether or not this form indicates my claim has been denied and is now in the appeals process.  Since I have not received any letter from Oxford Health Plans denying this claim I can only assume this is the situation as the address is to the attention of the Clinical Appeals department.

If it's not too much of an inconvenience it would be a great help if someone from your office could contact me regarding this claim and shed some light as to where this is within the Oxford Health Plans system.  I was on the phone yesterday for approximately one hour speaking with various Oxford representatives, none of who could tell me the status of this claim.  If a letter is written by someone at Oxford explaining the status of the claim I kindly ask that the name and contact information of the person writing the letter be included so I can contact a real person with any questions I may have.

I can be reached at 914.921.1536.  Thank you so much for your time and effort on my behalf.

Best,

Kim Kaufman

COURT B. CUTTING, M.D., P.C.
PLASTIC AND RECONSTRUCTIVE SURGERY
333 EAST 34TH STREET, SUITE 1K
NEW YORK, NY 10016

TELEPHONE: (212) 447-6229                              FACSIMILE: (212) 447-6228

June 6, 2006

Oxford
Attn: Pre-determination Dept.
PO Box 7082
Bridgeport, CT 06601

RE:    PATIENT: KIM KAUFMAN          DOB: 02/21/69        ID#: 8635085*02
       INSURED: GLENN KAUFMAN        DOS: 07/20/06

To Whom It May Concern:

I have been caring for your insured, Kim Kaufman, with cleft lip and palate. She has undergone a recently
failed dental implant to the alveolar cleft. She will first have a removal of the previous dental implant followed
by, eventually, my performing an iliac bone graft to her alveolar cleft to make possible a repeat placement of a
dental implant. Prior to this procedure Dr. Lawrence Brecht (prosthodontist) and Dr. Burton Langer (oral
surgeon) will be performing, or have performed, palatal mucosal grafts to the alveolar cleft to the prepare the
area for a bone graft. It is essential that bone graft placement be done inside a pocket that is not buckled
mucosa. This tissue does not bind securely around the neck of a dental implant or around the neck of a
permanent tooth. This leads to severe periodontal disease, often with premature loss of either the tooth or the
dental implant. For this reason true gingival tissue needs to be brought into the area. This is what is currently
being done with Dr. Langer's help. Further prosthetic reconstruction of this area is being done by Dr. Brecht. It
should be emphasized that although these two specialists are dentists, their care is peri-surgical and related
completely to the rehabilitation of her cleft palate. As such, these procedures should be paid for by her medical
insurance. This will also be true when Dr. Langer places a dental implant into the bone graft procedure five
months following the bone grafting.

I hope this information is helpful. Please contact me if further clarification is required.

Sincerely,

Court Cutting, M.D.
CC/dp

**Dictated by:** Cutting, MD, Court
**Specialty:** Plastic Surgery
**Patient Name:** KAUFFMAN, KIM
**MRN:** 00
**DOB:** Feb 21, 1969

DATE OF SERVICE: April 26, 2006

She is been evaluated in concert with Dr. Brecht and myself. She has been receiving periodontal care with Dr. Langer and she has had several grafting procedures and some heroic attempts to preserve a dental implant she has on the edge of her alveolar cleft. This clearly is not working. There is a very, very long abutment projecting, producing very poor quality gum tissue, which is certainly carrying bacteria up along that abutment into the pocket. After much discussion with Dr. Brecht on examination of the x-rays, it is revealed that the dental implant is holding on on the cleft side by approximately 3 to 4 drills of the screw of the implant. We feel that it is not possible to save the implant at this time. For this reason we feel strongly that the dental implant should be removed and the socket healed prior to the bone graft. This would necessitate Dr. Brecht to make a removable prosthesis to cover the hole. It was stressed with the patient, the importance of dental hygiene and Waterpik treatment to this area to get a good quality and healthy gums prior to the bone grafting procedure. She will be scheduled to have the implant removed with Dr. Langer in early May. Her bone graft procedure is scheduled for the end of July. This should allow sufficient time for the socket to heal and become contamination free.

Court Cutting, MD


cc: Dr. Lawrence Brecht
    Dr. Court Cutting

11/22/2001 03:52 FAX                                                                        ☑02



**LAWRENCE E. BRECHT, D.D.S., P.C.**
PROSTHODONTICS & MAXILLOFACIAL PROSTHETICS
ESTHETIC AND RECONSTRUCTIVE DENTISTRY

15 June 2006

Oxford Health Plans
Attn: Clinical Appeals
PO Box 7078
Bridgeport, CT 06601

RE: MRS. KIM KAUFMAN-reference # 81494407

To Whom This May Concern:

I am writing in support of Mrs. Kim Kaufman, my patient, and your client as an Oxford Health Plans insured individual and her effort to gain rightful approval of upcoming procedures to care for her cleft lip, cleft alveolus and cleft palate condition. It is my understanding that Mrs. Kaufman's meticulously documented pre-certification request for a *medically necessary procedure* was recently denied as being "dental" in nature. Let us assure you, Oxford Health Plans and the reviewing consultant, Dr. David Behrman, that Mrs. Kaufman's indicated procedures are a part of the *overall management of her congenital condition*-her cleft palate birth defect.

Without restating her entire history (thorough documentation of which has been provided to your office by a Fedex mailing dated 26 May 2006), Mrs. Kaufman was referred to me by her reconstructive plastic surgeon, Court B. Cutting, MD, the Director of the Cleft Palate Team at the Institute of Reconstructive Plastic Surgery at New York University Medical Center. Dr. Cutting's practice is almost solely devoted to the care of patients with cleft palate and craniofacial anomalies. Mrs. Kaufman was found to have multiple problems that were directly related to her cleft condition. She had a failing dental implant that was originally placed to replace a congenitally missing tooth-missing due to her birth defect. Off that one implant was cantilevered *two* prosthetic teeth-again replacing teeth missing due to her cleft condition. A significant hard and soft-tissue defect was found in the region of her cleft underneath her dental prosthesis. The sum of these cleft-generated problems necessitate the current round of treatment that the patient is undergoing.

275 MADISON AVE  SUITE 2900  NEW YORK  NEW YORK 10016-1101
TEL 212 557 1300   FAX 212 557 1675   labrecht@nycpros.com

As I am sure you are well aware, on December 8th, 1999, the New York State Insurance Commission passed insurance regulation, Section 52.16 (9) of Regulation 62 which states that *dental care and treatment must be covered under the insured's medical plan, if the care is related to a congenital anomaly*. It is totally within the realm of her overall cleft palate management to have the necessary treatment this patient requires covered under her major medical insurance plan.

I have *routinely* seen care of this nature at first denied, and then ultimately covered almost 100% of the time. I think Mrs. Kaufman's request is appropriate, just and ultimately mandated by New York State law.

I certainly hope this matter may be resolved in a timely fashion so that she may proceed with the next phase of her required treatment and not have the work she has had performed so far be put at risk by the delay incurred by Oxford's ill-informed and erroneous decision.

Respectfully,

Lawrence E. Brecht, DDS

LEB/mqm

cc:     Mrs. Kim Kaufman
        Court B. Cutting, MD
        Burt Langer, DMD
        Mark DeRossa
        patient's chart

# EXHIBIT K



**OXFORD**
HEALTH PLANS®
A UnitedHealthcare Company

July 3, 2006

Kim Kaufman
74 Fairway Ave
Rye, NY 10580

Dear Kim Kaufman,

United HealthCare Services, Inc. on behalf of Oxford has completed its review of the
request to appeal the decision to deny CPT Code 20680, D4273(Removal Of Support, Implant
Subepith Conective tissue Graft).

**Medical Service Summary**
Member Name: Kim Kaufman -- Oxford ID Number: 863508502
Contract Type: NY SMALL FREEDOM PLAN DIRECT (2-50)
Service Date(s):  -Service Provider: Lawrence Brecht
Type of Appeal: Precertification
**Reference Number: 81494407**

We have considered the information submitted in support of your appeal. Based upon the
review of all available information and the terms of your plan, our Medical Director has
decided to uphold the initial adverse determination because the request for removal of teeth
and the preparation of the mouth for the replacement of teeth is not a covered benefit.
Therefore, the requested service is not certified.

We have enclosed a detailed explanation of the Member's Appeal rights. A Member has a right
to request a review of a denial of services. If the Member would like to appeal the services
denied in this notice, the Member should follow the Second-Level appeal procedure described
in the enclosure in response to the question, *"How do I appeal this determination?"*

Your satisfaction is important to us. As part of our continuing efforts to increase Member
satisfaction, it is our goal to thoroughly review your appeal and provide you with a prompt
response. If you have any additional questions, please contact Customer Service at the
number on your Oxford Member ID card. As an added service to you, you may review claims,
check referrals, change your primary care physician (PCP), and obtain other helpful Member
information through our web site, *www.oxfordhealth.com*. If you have a suggestion about how
we can improve your satisfaction with Oxford, please contact us via e-mail at
*membersatisfaction@oxfordhealth.com*.

Sincerely,
Venice Scott, Project Manager 1

Enclosure:  Explanation of your Second-Level Appeal Rights

cc:  Burton/Laureen Langer DMD , Kim Kaufman
MMS17.0696MS40-449                    07/03/2006

# EXHIBIT L

# J. PEAT & ASSOCIATES
## EMPLOYEE BENEFIT SPECIALISTS

July 21, 2006

Carolyn M. Linen
Examiner
Consumer Service Bureau
State of New York Insurance Department
25 Beaver Street
New York, NY 10004

Re:  Claim  Denial:  Patient  Kim  Kaufman  Reference  #81494407,  Oxford
ID#8635085*02

Dear Ms. Linen:

We request that you please review the processing of Mrs. Kaufman's claim, and subsequent denial (DOS 5/11/2006, Reference #81494407) (exhibit 1). Prior claims related to Mrs. Kaufman's condition were also initially denied by the insurance company at the time, United Healthcare, but overturned by the State Insurance Department. We ask for your personal involvement once again as you were the claim examiner (Dept. File #CSB-377515) who assisted us (exhibit 2). An attached letter authorizing our firm to work on behalf of Mrs. Kaufman is enclosed (exhibit 3).

Mrs. Kaufman was born with a severe cleft palate. This congenital anomaly, and the associated functional impairment is a covered medical benefit not only under Oxford's contract (exhibit 4) but also covered by New York State law (Section 52.16 (9) of Regulation 62-11NYCRR52). Past work to correct the anomaly has failed and created a further deterioration of the mouth leading to the inability to properly eat, drink and speak without pain and discomfort. This work was done in the hope it would allow Mrs. Kaufman to function normally without having to undergo major reconstructive bone grafting of the cleft.

Please examine Mrs. Kaufman's attached letter that goes into much greater detail about the required medical procedure and Oxford's review of the situation and ultimate denial. Oxford continues to view each medical procedure outside of the context of the treatment of a cleft palate, thereby creating a foundation to deny, for example, a dental procedure by stating dental procedures are not covered under medical insurance. Oxford continues to ignore letters from Mrs. Kaufman's cleft team stating that all work being done, including the dental work, is part of the larger rehabilitation of the cleft. Oxford also continues to have unqualified medical professionals review Mrs. Kaufman's claims. Supporting documentation is also enclosed and referenced in Mrs. Kaufman's letter.

This supporting information, in addition to Oxford's own contract language (exhibit 5) covering these types of oral surgical procedures and state law governing small group medical plans should be enough information to have the claim of 5/11/2006 re-processed and covered, the surgery of 7/20/2006 covered, and the subsequent surgeries (which will include but may exceed, dental implants by Dr. Langer as well as the construction of teeth by Dr. Lawrence Brecht, Oxford pre-certification reference numbers 81894812 and 81835708, respectively) to complete the reconstruction paid for under the provisions of the certificate of coverage. Please note that it is impossible to know for certain if Mrs. Kaufman will need more cleft work beyond what has been forecasted, and as Mrs. Kaufman has already been significantly hindered by Oxford's refusal to pay valid claims, we are requesting declaratory relief to cover all future cleft work.

We ask that you please review this claim set in its entirety, as we feel the member has completely met the burden of proof. As you review the series of events, it is also apparent that Oxford clearly failed to act in good faith with Mrs. Kaufman. The restrictive and unrealistic deadlines set by Oxford personnel added an unnecessary amount of stress to an already stressful situation for Mrs. Kaufman and her family. We seek full remuneration, and ask that interest as well as all damages and penalties associated with Oxford's failure to properly process these claims be so applied. We also ask for a declaratory order for Oxford to make any future claim payments related to the cleft palette condition. We appreciate your consideration and prompt response. Please contact either myself or Kim Kaufman with your findings.

Sincerely,


Mark DeRosa
President


cc: Kim Kaufman

EXHIBIT M

KIM K. GERMAN
72 FAIRWAY AVENUE
RYE, NY 10580
914.921.1534

July 19, 2006

Howard Mills
Superintendent
New York State Insurance Department

Mitchell Gennaour
Assistant Chief of Consumer Services Bureau
New York State Insurance Department
C/o Consumer Services Bureau
25 Beaver Street
New York, NY 10004

     **RE:**    **Letter of Complaint Against Oxford Health Plans:** rejection of claim for
medical benefits arising from a congenital anomaly, a cleft palate and lip.

     **Summary of Violation of NY Laws and Insurance Regulations by Oxford Health
Plans:** Insurance regulation, Section 52.16 (9) of Regulation 62 (11NYCRR52). On
December 8, 1999, New York State Insurance Commission passed Section 52.16 (9) of
Regulation 62 bringing it into compliance with Articles 42 and 43 of New York State
insurance law which makes it mandatory that dental care and treatment is covered under a
group medical plan arising from a congenital anomaly.

Dear Mr. Mills and Mr. Gennaour,

This letter is to inform the Consumer Services Bureau of the New York State Insurance
Department (as well as the Insurance Department itself) that I am submitting a formal complaint
against Oxford Health Plans regarding the most recent denial of the required payment of medical
benefits provided to me for the recent treatment of a congenital cleft palate. Moreover I am
requesting declaratory relief whereby your agency will require Oxford to make all future
payments associated with any future claims arising from the medically necessary rehabilitation of
my cleft palate. Finally, I am seeking any and all damages and/or penalties available associated
with the failure of Oxford to reimburse me for medical expenses associated with the rehabilitation
of my cleft palate.

Please be advised that I am an insured beneficiary under a group health policy of Oxford Health
Plans (a subsidiary of United Health Care), policy/ID # 8635085*02 **(Exhibit A)**. I am a 37 year-
old mother of two and my family has been covered by this policy through my husband's
employer, American Securities, 666 Third Avenue, NY, NY 10017 since March 1, 2006.

By way of history, I was born in 1969 with a severe cleft palate and lip. I was fortunate that
medical and specialized surgical reconstructive care throughout my childhood years was provided
by the renowned surgeons, Drs. Ralph Millard and his associate, S. Anthony Wolfe, MD **(Exhibit
B)**, the originators of many of the cleft reconstructive procedures used today.

As advanced in surgical techniques as these doctors were, they were limited by only one thing—technology. Starting at age three months, I had perhaps ten progressive surgeries to repair the cleft palate however there remains a large area at the forward roof of my mouth that is without any bone. As a result there are no teeth in this area and this was resolved by the insertion of a *Maryland Bridge*, affixing teeth in the area of my cleft where there is no bone (using the abutting natural teeth as anchors).

This solution had not adversely affected my adult life until the last three years, when the *Maryland Bridge* failed. It is important to note here that when I received this bridge, in 1985 or so I was 16, and dental implants were never even considered for a cleft patient. In fact it has only been in the last 5 years that cleft patients have been candidates for dental implants. So the failure of my bridge was not due to poor construction, etc., but rather time and technology. When this bridge failed however, additional medical problems resulted including the loss of two natural teeth (which were used as anchors for the bridge) which placed me in a perilous situation that resulted in a severe functional impairment (inability to masticate, etc.). It has become a medical necessity to surgically repair the cleft in order for me to live a normal life and affix teeth in my gum line though bone grafting **(Exhibit C)**. Without rehabilitating my cleft I will be unable to live a healthy life, which I define as a life where I am able to live without pain, eat or drink without pain, eat a normal diet and speak without discomfort.

I was referred to Dr. Court Cutting, M.D. and his cleft palate medical team (in my case consisting of Dr. Burton Langer, D.M.D., P.C. and Dr. Lawrence Brecht, D.D.S., P.C.) **(Exhibit D)** at the Institute of Reconstructive Plastic Surgery at the NYU Medical Center, who have accepted me as a patient and recommended a surgical alveolar bone grafting procedure that involves the transfer of bone from my hip to my palate and is scheduled to be performed at NYU Medical Center on July 20, 2006 **(Exhibit E)**. Dr. Cutting and his team are considered the premier cleft team of the world and they are certainly very educated on my situation. Dr. Cutting and his team advise that the combination of the un-repaired palate and loss of teeth to which a bridge can be secured has resulted in a situation where the only viable option for me to have teeth in my mouth (where the teeth are currently missing) is to undergo reconstructive bone grafting of the cleft. Without these teeth I will be unable to masticate or properly speak and thereby cannot function normally or live a healthy life. Dr. Langer and Dr. Brecht have been performing certain procedures necessary in advance of the significant bone grafting Dr. Cutting will be performing. Then, upon completion of the bone grafting performed by Dr. Cutting, Dr. Langer will surgically insert dental implants in the new bone, thereby allowing for a way to implant the missing teeth in my mouth. Once the implants are secure Dr. Brecht will affix to the implants my "permanent" false teeth **(Exhibit F)**.

For the past two years and likely for an additional year, I have been and will be, through a long, excruciating and grueling process, requiring several surgeries leading up to the more major bone grafting procedure and then several more procedures (including the insertion of dental implants) after the bone grafting procedure. No one would undergo such a painful, debilitating process unless it was absolutely medically necessary.

This leads me to my current situation with Oxford Health Plans. In order to have a successful bone grafting procedure, Dr. Cutting and his cleft team had determined that (i) certain subepithelial connective tissue grafting procedures were necessary to prepare the area to accept the new bone and (ii) one dental implant in my mouth had to be removed. The implant was resting at the edge of the cleft, with threads exposed and had caused an infection in the gums of my mouth **(Exhibit G)**. Bone grafting a cleft is a complicated and difficult procedure and if there is any possibility of an infection it will compromise the complex surgery in July.

New York, New York xxxxxx
New York Health Care Department
07/15/06
Page 3 of 7

As a result, the cleft team scheduled a surgery on May 11, 2006 with Dr. Burton Langer for an implant removal and possible tissue grafting. The procedure needed to be expedited as the cleft team determined there needed to be enough time for my mouth to heal between the implant removal and the July 20th bone grafting procedure. I contacted Oxford Health Plans in order to obtain pre-authorization and gave them the following information and codes provided to me by my physicians:

DIAGNOSIS CODE:    749.21 (unilateral cleft lip)
PROCEDURE CODE:    20680 (deep removal of implant)
PROCEDURE CODE:    D4273 (subepithelial connective tissue graft)

As normal course, on May 19, 2006, Elizabeth Britt, the Claims Project Manager handling my claim at Oxford Health Plans and Dr. Jonathan Zucker, the Medical Director at Oxford Health Plans responsible for reviewing my claim, received a letter of medical necessity from Dr. Burton Langer as well as the receipt detailing payment and procedure codes, and a x-ray of the implant to be removed **(Exhibit H)**. At this time I emailed Elizabeth Britt and Dr. Zucker listing the materials being sent (these were the materials requested) and emphasizing if any additional items were needed to please let me know immediately **(Exhibit I)**. Additionally, after my procedure, Dr. Zucker spoke on the phone at length with Dr. Button Langer regarding my case.

On Wednesday, May 24, 2006, Elizabeth Britt emailed me requesting additional medical records on behalf of Dr. Zucker.  These additional materials/medical records included, and I quote:
- "All information concerning your cleft treatment
- X-rays of your teeth prior to the fabrication / insertion of your current prosthesis
- Date the prosthesis was inserted
- Current full mouth x-rays" **(Exhibit J)**

Moreover, only after contacting Ms. Britt directly by email did she inform me that the deadline for receipt of the above-mentioned medical materials was Saturday, May 27th (less than three days). According to Ms. Britt, if these materials/records were not delivered by this date, the claim would automatically be denied and would have to go through the appeals process with a whole new team of people at Oxford Health Plans. It is evident to me that this second request for records with a nearly impossible deadline was designed to facilitate a denial of the claim based on a lack of sufficient records to support the claim for medical benefits.

As I didn't have in my possession my pediatric cleft files and x-rays of my implant (pre and post implant) and records regarding all of my procedures, I spent the next two days hustling in near panic trying to get all of the materials from my various doctors so that I could overnight deliver them to Dr. Zucker for Saturday delivery (by the way, this deadline was set on the Saturday of Memorial Day weekend). After a great deal of time and energy I was able to compile all of the requested materials, including my pediatric cleft files (why this is relevant to the review of this claim is still puzzling to me) and FedEx it by the Oxford Health Plans' mandated Saturday deadline **(Exhibit K)**.

To make a very long and harrowing story as brief as possible, Oxford Health Plans nonetheless denied my claim on June 7, 2006. The stated reason for the denial is:

**"After consideration of all available information, our Medical Director has determined that the requested procedure will not be covered for the following reason(s): Dental treatment**

including removal of teeth and service needed to prepare the mouth for the replacement of teeth are not covered benefits." (Exhibit L)

It is important to note that this denial came after the Medical Director in the Dental Department at Oxford Health Plans, Dr. Jonathan S. Zucker, *a dentist with no cleft experience*, had obtained all of the originally requested medical documents detailing not only the 5/11/06 procedure, but also x-rays of the implant, as well as the additional medical records requested on 5/24/06. Moreover, Dr. Langer reported to me that he had spoken at length with Dr. Zucker regarding my case and had explained in great detail that this work was directly in relation to the medical treatment of my cleft and not dental or cosmetic in nature.

After the claim was denied by Oxford Health Plans, upon further inquiry Ms. Britt verbally informed me that Dr. Zucker consulted with a maxillofacial surgeon by the name of Dr. David Behrman, apparently hired by Oxford Health Plans to support the decision of Dr. Zucker. Oxford Health Plans went this extra step because they concede that a dentist without cleft experience is not medically qualified to opine on a cleft claim, as cleft surgery is performed by a cleft team that is overseen by a medical doctor who specializes in cleft palate reconstructive surgery.

However, the problem with the carrier's backup choice of maxillofacial surgeons is that Dr. Behrman does not in fact perform any cleft work in his practice. I know this because I called Dr. Behrman's office on June 7, 2006 and asked his receptionist, Emette, if Dr. Behrman performs any bone grafting for clefts or performs any cleft work whatsoever. Emette asked me to hold and when she came back to the phone she informed me that she had interrupted Dr. Behrman in a meeting to ask if he performed any cleft work and he responded "no". Next, Emette referred me to the Craniofacial Clinic at New York-Presbyterian/Weill Cornell (the hospital with which Dr. Behrman is affiliated) explaining that they could best point me in the direction of a doctor who performs cleft work. Considering that the repair of my congenital deformity is highly specialized why would Oxford Health Plans consult with a medical professional who admittedly has no experience whatsoever in this complex field of reconstructive surgery?

When I looked up Dr. Behrman's CV online, it states his areas of expertise are:

Dental Implants
Oral Pathology
Tempromandibular Joint Disorder TMJ
Maxillofacial Surgery
Oral Surgery **(Exhibit M)**

Apparently, the insurance carrier contracted Dr. Behrman to review one of the surgical procedures leading to the alveolar bone grafting surgery---removal of a dental implant. However, cleft surgical procedures are an area of expertise, and dental implants and/or implant removals as well as tissue grafting and related procedures are very different for a cleft patient than for a non-cleft patient. Moreover and most importantly, these procedures are directly related to the success of a medically necessary cleft bone grafting surgery I will be having in July. To consider this procedure as something onto itself is like claiming the chemotherapy used to shrink a tumor prior to surgery is elective and unnecessary.

It is my firm belief that the initial medical documents provided to Dr. Zucker, as well as his conversation with Dr. Langer, were more than sufficient in detailing my cleft condition, providing

Mr. M D. & M . .  
New York Insurance Department  
7/18/06  
Page 5 of 7

an explanation as to why I needed this procedure and how the removal of the implant and osteo grafting are connected to a congenital anomaly for which I am having surgery in July. However, because this insurance carrier chose doctors who are not medically qualified to review and opine on a surgical cleft procedure arising from a congenital birth defect, my claim has been denied. Further, having appealed the Oxford decision, I am now expecting a letter from Oxford Health Plans denying my appeal..

I anticipate that my appeal has been denied because on Monday, July 3rd Ms. Venice Scott, the Project Manager assigned to review my appeal, contacted me. When I spoke to Ms. Scott at 12:15 p.m. in the afternoon I was informed that the only way my case could be properly reviewed by Oxford Health Plans was if I retracted my appeal and then reissued the appeal so that Oxford Health Plans would have more time to find the appropriate medical doctor to review my case. I was then told that Oxford Health Plans would close at 3:00 that day and that my retraction was required by that time in writing or my appeal would automatically be denied, as it also just so happened that the deadline for my appeal was on this very day I was contacted, Monday, July 3rd. Amazingly the reasoning for this retraction / reinstatement was that Oxford Health Plans had not used the time provided to date to get my claim reviewed by properly qualified medical professionals and as a result I was now put in the unexplainable and inexcusable position of having to retract my appeal.

Despite the unreasonable timing in which I was expected to write this letter, my husband and I expressed willingness to consider granting the retraction and reinstatement subject to Ms. Scott sending an email to us formally outlining what she had said on the phone about why Oxford Health Plans was seeking this retraction and why Oxford Health Plans had not been able to properly conduct its review in the time period provided previously. Ms. Scott said that she was going to speak with the M.D. assigned to review my case and then respond to me via email ("one way or another") so that I could make an educated decision on Oxford Health Plans' last minute request.

I never did receive any email from Ms. Scott, nor has any further communication taken place, even after I wrote an email to Ms. Scott questioning why it was she had not emailed me with the details of her request as promised (Exhibit N). Of course, based on my conversation with Ms. Scott it is very safe to assume that my appeal has now been denied. The timing, as previously, was impeccably devised to create an impossible deadline thereby providing Oxford Health Plans with a platform on which they could deny my appeal. This denial is despite the fact that I have multiple letters supporting my appeal stating in detail why Oxford Health Plans is legally obligated to reimburse me for the medical expenses associated with this claim (Exhibits C, O).

All of the above resonates as a very severe example of the "insurance game". First request information and hope the insurance beneficiary does not submit it in time. If the insurance beneficiary does, request superfluous medical documentation and hope that the insurance beneficiary is unable to submit it within an unreasonable deadline. If the insurance beneficiary does, deny the claim and hope that the individual is too frustrated, not savvy enough, or just plain exhausted to further pursue reimbursement of medical bills (and in most cases unable to pursue further necessary medical treatment as the insurance beneficiary is unable to pay out of pocket for the treatment). If the insurance beneficiary actually puts the claim through the appeals process, continue to make unreasonable demands with deadlines impossible to meet. If this fails, continue to deny the claim until the New York State Insurance Commission is reviewing it, and only then pay the obviously valid claim.

This probably sounds quite cynical, but, you see, this is not the first time I have come up against an insurance company trying to avoid reimbursement of payment associated with a legitimate cleft claim by claiming "it's dental; it's cosmetic." This is round two. We have already won on this very issue, but only after the insurance company (United Health Care, the parent company of Oxford) exhausted every possible option to avoid paying a claim they new they were legally obligated to pay. United Health Care required us to file two separate appeals and conduct an appeal hearing where once again the insurance company did not include even one qualified medical professional to properly review my situation. From the initial claim denial of 3/26/04 it took us until 9/30/04 to complete United Health Care's claims appeal process. At that point we filed a complaint with your office, Claim #CSB-377515. Only after involving the New York State Insurance Commission did United Health Care overturn the original denial and then pay the relevant claims on 1/7/05.

I believe they had this change of heart because they are intimately familiar with the New York State Insurance Law that states:

**On December 8, 1999, New York State Insurance Commission passed insurance regulation, Section 52.16 (9) of Regulation 62 (11NYCRR52) bringing it into compliance with Articles 42 and 43 of New York State insurance law which states that dental care and treatment be covered under the medial plan due to a congenital anomaly.**

Also, it strikes me as odd that neither Dr. Zucker, nor Dr. Behrman are familiar with Oxford Health Plans' *Summary of Benefits* for our plan, the *Freedom Plan* which states on pg. 15 under subcategory *F. Oral Surgery*:

**"General dental services are not covered. The following limited dental and oral surgical procedures are covered in either an inpatient or outpatient setting:**

***

**2. Oral surgical procedures required for the correction of a non-dental physiological condition which has resulted in a severe functional impairment."**

Clearly if Drs. Zucker and Behrman were familiar with either or both of the above quoted law and Oxford Health Plans' *Summary of Benefits*, they would have not denied my claim, as they would have recognized that doing so clearly contradicts both New York Insurance Law as well as Oxford Health Plans' own stated policy with respect to congenital anomalies. Clearly if Oxford was making a good faith attempt to properly assess claims they would have paid greater attention to these obvious facts and to the evidence I have provided to them on numerous occasions.

As offensive as all of this is, it is not nearly as upsetting as the fact that many families, mine included, cannot afford to pay for these very expensive cleft procedures without the assurance that their insurance will cover their medical expenses. This is, after all, why those of us who can afford health insurance do in fact have it. To be certain, it is for this very reason that the New York State Insurance Commission passed into New York State insurance law a regulation specifically dealing with the fact that a congenital anomaly requiring dental care is to be covered under the medical plan.

Unfortunately this problem has become a cancer within the insurance industry and the experience I have listed above is far too familiar to many New York State citizens. On March 27, 2006 Attorney General Elliot Spitzer distributed a press release detailing the top consumer complaints

Mr. Hill & Mr. Gennaour
New York Insurance Department
7/18/06
Page 7 of 7

concerning health care in New York State. And I quote, "The single most frequently reported complaint involved errors by health plans in processing or paying claims (16.4 percent of all consumer complaints reported between July 2004 and June 2005). Over a third of all consumer complaints (35.5 percent) involved health plan errors in paying claims or approving care, and health plan denials of care or coverage for care." Mr. Spitzer himself is quoted as stating "New Yorkers continue to encounter numerous obstacles when accessing and utilizing health care services" **(Exhibit P)**. As my case indicates, certain insurers continue to feel they have no obligation to act in good faith even in the most serious and clear-cut situations.

Yet, the games continue. How many more times during my cleft palate reconstructive process will I be forced to write a letter to each of you, Mr. Hill and Mr. Gennaour, explaining that I've been denied on another claim relating to my medical treatment? I'm fairly certain that when I receive dental implants, that claim will be denied on the basis that dental procedures are not covered under medical insurance. I'm also fairly certain that when I finally have teeth attached to my implants this expense will be denied, too, on the grounds that it is "cosmetic" and that cosmetic procedures are not covered under medical insurance.

I don't know how to be clearer than this: I am a cleft patient and I must undergo both reconstructive and dental procedures in order to live a normal, healthy life, thereby enabling me to properly eat, drink and speak. This is not elective and it is not so that I look pretty. It is medically necessary. There are laws in place to assure that dental care is covered under medical insurance when related to a congenital anomaly. So why is it that I am fighting so hard and long for something that is a given, protected by state law and stated as a covered benefit in the insurer's contract?

As I stated initially, I ask that you require Oxford to make full reimbursement for the procedures performed to date. Moreover I am requesting declaratory relief whereby your agency will require Oxford to make all future payments associated with any future claims arising from the medically necessary rehabilitation of my cleft palate. Finally, I am seeking any and all damages and/or penalties available associated with the failure of Oxford to reimburse me for medical expenses associated with the rehabilitation of my cleft palate (and for their failure to act in good faith in their assessment of my claims).

Mr. Hill and Mr. Gennaour, I thank you for your time and patience in reviewing this complaint. If I can be of any service to you during your investigatory process, please contact me directly at 914.921.1536.

Sincerely,

Kim Kaufman

cc:    Michael Turpin                          Antonia Coello Novello
       CEO Northeast Region                    Commissioner
       Oxford Health Plans                     New York State Department of Health

       Tim Myers                               Eliot Spitzer
       Vice President Government Relations     Attorney General
       Oxford Health Plans                     State of New York



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ELIOT SPITZER                                                      DIVISION OF PUBLIC ADVOCACY
Attorney General                                                    HEALTH CARE BUREAU

August 8, 2006

Kim Kaufman
74 Fairway Avenue
Rye, NY 10580

                            Re: Oxford
                            Our File No.: 06-570291/JPH

Dear Kim Kaufman:

    I am writing to acknowledge receipt of your correspondence regarding the above named organization. The Health Care Bureau will review the matter and contact you if additional information is required.

    Thank you for bringing your concerns to the attention of the Attorney General's Health Care Bureau. If you have any questions, please feel free to call us at 1-800-771-7755, option #3.

                            Very truly yours,

                            Marianne Moore

                            Marianne Moore
                            Health Care Bureau

# EXHIBIT N

# J. PEAT & ASSOCIATES
## EMPLOYEE BENEFIT SPECIALISTS

September 22, 2006

Grievance Review Board
c/o Oxford Health Plans, Inc.
48 Monroe Turnpike
Trumbull, CT  06611

Re:    Claim Denial: Patient Kim Kaufman Reference #81494407, ID#863508502

To Whom It May Concern:

We request a second level member appeal on Mrs. Kaufman's claim initial denial dated 7/3/06, and subsequent denial,  within the allowed 60 business day window (DOS 5/11/2006, Reference #81494407) (exhibit 1).  An attached letter authorizing our firm to work on behalf of Mrs. Kaufman is enclosed (exhibit 2)

Mrs. Kaufman was born with a severe cleft palate.  This congenital anomaly, and the associated functional impairment is a covered benefit not only under Oxford's contract but also covered by state law (Section 52.16 (9) of Regulation 62-11NYCRR52).  Past work to correct the anomaly has failed and created a further deterioration of the mouth leading to the inability to properly eat, drink and speak without pain and discomfort.

Mrs. Kaufman had bone grafting surgery on July 20, 2006 by a team of highly specialized team of surgeons and dentists that are experts in the field of cleft palate reconstructive medical surgery.  A preliminary surgical procedure took place on May 11, 2006 in anticipation of this upcoming complex surgery.  This surgery on May 11th required the removal of one of the failed implants.  The immediacy of this procedure was required to allow enough time for healing and absence of infection prior to the June 20th surgery.

Elizabeth Britt was the Oxford project manager assigned to review the file of Mrs. Kaufman. In leading to the claim denial we were also informed by Ms. Britt that the Medical Director in the Dental Department of Oxford, Dr. Jonathan Zucker, consulted with an Oxford contracted maxillofacial surgeon, Dr. David Behrman.  Dr. Behrman's office confirmed with us that he has no experience with bone grafting relating to cleft palate deformities.

We find it very disconcerting that Oxford would rely on medical practitioner opinion that admittedly has no experience with the patient's unique circumstance.  We are also very disturbed because we went through a similar process with Mrs. Kaufman in early 2004 when her husband's group coverage was under United Healthcare, group #207394.  Claims were also initially denied procedures related to the cleft palate.  We went through the level one, level two and hearing appeal whereby her claims were also reviewed by medical professionals

20 BLAKE AVENUE • LYNBROOK, NY • 11563-2506
PHONE: (516) 599-2120 • FAX: (516) 599-3135
Macintosh HD:Users:kimkaufman:Documents:Grievance Review Board.doc

not properly qualified to review her unique situation. Not until we filed a complaint with the New York State Insurance Department were her claims properly and correctly paid.

We have attached documents and information about the required procedure, the surgeon's qualifications and letter of appeals directly from these same physicians. In addition the supporting documentation, including a letter summarizing the chronological events, is enclosed (see attached noted July 19, 2006). This supporting information, Oxfords own contract language covering these types of oral surgical procedures and state law governing small group medical plans should be enough information to have the claim of 5/11/2006 reprocessed, the surgery of 7/20/2006 covered, and the subsequent surgeries (not scheduled until the results 7/20 are reviewed) to complete the reconstruction, paid for under the provisions of the certificate of coverage.

We appreciate your prompt response. Please contact either myself or Kim Kaufman with your findings.


Sincerely,


Mark DeRosa
President


cc: Kim Kaufman

# EXHIBIT O

# J. PEAT & ASSOCIATES
### EMPLOYEE BENEFIT SPECIALISTS

October 31, 2006

Grievance Review Board
c/o Oxford Health Plans, Inc.
48 Monroe Turnpike
Trumbull, CT 06611


Re:    Claim Denial: Patient Kim Kaufman
       Reference #81494407, ID#863508502

To Whom It May Concern:

We requested a second level member appeal on Mrs. Kaufman's claim, initially denied on 7/5/06 (DOS 5/11/2006, Reference #81494407). This was sent via UPS overnight and was received on 9/25/06.

Once we confirmed receipt, we called Oxford several times to find out who was assigned to review the appeal. We advised Oxford there was additional information forthcoming from the involved providers and that we did not want the review to begin until this vital information was received. We were advised that the reviewer would be notified of this request (Confirm #84725299).

We called on 10/11 and were told that the appeal was assigned to J. Leninge (Confirm #84739374). We stressed once again that we did not want the review to begin until the additional information was received. When we asked to speak to this person we were told that this was not allowed.

Obviously our requests were completely ignored as J. Leninge made an adverse determination on the appeal on 10/16/06 without giving us the opportunity to send the additional supporting documentation. We find it hard to believe that a fair, complete and thorough review process took all of two business days. Are we to assume that the moment the claim examiner was assigned she reviewed all of the submitted supporting documentation, further investigated the case with Oxford personnel prevousiyl incolved and reviewed all the corresponding system notes that related to Ms. Kaufman's situation. The simple fact the Ms. Leninge did not contact us so we could send her the other materially relevant information tells us this was clearly not the case. In addition the declination letter states that the declination was based on the Medical Director's review. Can we infer that the Medical Director was consulted based on the additional information submitted with this second level appeal or was this decision based on the information that was only reviewed during the initial appeal. The language used in the letter infers that this is the case.

20 BLAKE AVENUE • LYNBROOK, NY • 11563-2506
PHONE: (516) 599-2120 • FAX: (516) 599-3135
C:\Documents and Settings\gkaufman\Local Settings\Temporary Internet Files\OLKC\06KaufmanAppealOxfordFollowup (2).doc

We are very upset by the unprofessional handling of Ms, Kaufman's claims from inception. From the beginning Oxford has imposed unrealistic deadlines on Ms. Kaufman and her providers in response to Oxford's request for information. All deadlines, at great effort, were met. Now once again Oxford has not allowed us to fairly present our case. Oxford made it impossible to talk to J. Leninge and an adverse determination was made without any feedback. We assumed that we would get a fair and proper appeal; however, it appears that this was not the case. Please advise why our request to provide the additional information was ignored and when the Medical Director reviewed this information again to deny this second level appeals.

Sincerely,

Mark DeRosa
President

cc: Kim Kaufman

EXHIBIT P

# OXFORD
HEALTH PLANS

October 16, 2006

J. Peat and Associates
20 Blake Avenue
Lynbrook, New York 11563
Attn: Mark DeRosa

Member Name:        Kim Kaufman
Member Number:      8635085*02
Reference Number:   80835708 and 81894812

Dear Mr. DeRosa:

Oxford's Grievance Review Board has completed its review of the second level appeal you submitted on behalf of Kim Kaufman regarding dental services that were denied as Not a Covered Benefit.

We have thoroughly considered all of the available information submitted in support of your appeal. Based upon the Board's review of that information and the terms of the member's plan, an Oxford Medical Director continues to uphold the denial for the requested dental services because replacement of a crown is covered under the member's dental benefit. Ms. Kaufman has a history of a unilateral cleft repair. The cleft repair remains intact and the dental treatment is due to the failure of the implant and bridgework. The member's current dental problem does not appear to be related to a failure of her cleft repair, as the defect remains well closed. Therefore, the requested services are considered dental in nature and Not a Covered Benefit.

In addition, the services, provided by Dr. Brecht, on July 20, 2006 were not authorized by Oxford. After reviewing claim 6256707985, it has been determined that Oxford has paid the claim in error. The claim will be sent for reprocessing and we will recoup the payment from Dr. Brecht.

The services rendered on May 11, 2006 by Dr. Neal Kurtti were reviewed and it was determined by the Medical Director that the services are dental in nature and therefore remain denied as Not a Covered Benefit.

While the Board regrets that it is not relaying a more favorable decision, this is Oxford's final position on this matter.

## Employee Retirement Income Security Act (ERISA) Rights
If we have not approved the Member's claim after all internal reviews have been completed, the Member may have the right to file a civil action under 502(a) of the Employee Retirement Income Security Act. If the Member (1) has obtained coverage for health benefits through employment with a church or government group or (2) has purchased individual coverage with Oxford, these ERISA rights do not apply to the Member's coverage.

## TDD/TTY Notice
For a hearing impaired interpreter, you may contact Oxford's TTY TDD line at 1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for assistance in Korean, 1-800-449-4390 para ayuda en espanol, or the number on your ID card for assistance in other languages.

**ERISA Disclosure Requirements**

We denied this appeal because the claim does not meet criteria established by the Member's plan. If the Member would like a copy of the criteria used or any documents, records, and other information relevant to this claim, the Member must send a written request to ERISA Disclosure Requests, c/o Oxford Health Plans, Inc., 48 Monroe Turnpike, Trumbull, CT 06611. This information will be provided to the Member free of charge.

Sincerely,

*Judith m. Leninger*

Judith M. Leninger
Grievance Associate

Cc: Kim Kaufman

# EXHIBIT Q



**OXFORD**
HEALTH PLANS

June 20, 2006


Kim Kaufman
74 Fairway Ave
Rye, NY 10580



United HealthCare Services, Inc. on behalf of Oxford has received a request to approve the following services. This approval is based upon the information supplied by the healthcare provider and applies to the following services only:

**Requested Services Summary**
Member Name: Kim Kaufman          Oxford ID #: 863508502
Service Code(s): 42210
Description of Service Code(s): Reconstruct cleft palate
Service Provider: Court Cutting, MD
Date of Service: 07/20/06     **Number of Visit(s) (If applicable): 1**
Additional information about the request:
**Reference #: 81777358**

This reference number is valid from 07/20/06 through 10/18/06 with the requirement that the Member is enrolled and eligible at the time the services are rendered. If treatment is not initiated and completed within these time frames, this approval will no longer be valid and a new request must be submitted.

The above listed services will be reimbursed according to the Member's out-of-network deductible and coinsurance. (If the plan does not require referrals, services from participating providers will be subject to the Member's in-network benefits, including the Member's in-network copayment, deductible and/or coinsurance.) If non-participating providers are being utilized, those charges for covered services that exceed the out-of-network fee schedule established by the plan are not covered and will not be counted toward the Member's deductible or out-of-pocket maximum. Payment for approved services will be consistent with the terms, conditions and limitations of the Member's health benefits plan, as well as with Oxford's administrative and payment policies. No assessment has been made concerning whether the requested service codes listed above are payable when billed together. Participating providers are subject to Oxford's balance billing policy and may not bill Members for the difference between the contracted rate and billed charges.

We have approved the request according to the Member's out-of-network benefits. Oxford makes efforts to maintain a broad network to meet our Member's needs. Accessing care from physicians and facilities that are outside of Oxford's network frequently increases costs for Members. Out-of-network benefits also apply in instances when providers participate in Oxford's network but a required referral was not obtained. If the Member has questions about receiving the services listed below on an out-of-network basis, or would like information on in-network physicians and facilities, please call Oxford Customer Service at the number on the back of the Member's Oxford ID card or 1-800-444-6222. This information may also be accessed online at *www.oxfordhealth.com*.

Upon receipt of a claim, we will make claim payments directly to providers who participate with Oxford. Oxford may pay the Member directly if services are rendered by a provider who does not

participate with Oxford. In these instances, we recommend that the non-participating provider bill the Member after the provider has received the Remittance Letter from Oxford indicating that the Member was paid directly. The Member will be responsible for paying the non-participating provider the full amount of the reimbursement check issued by Oxford, in addition to any applicable copayment, deductible, coinsurance or other cost share amount required by the Member's benefit plan. *Exception: Non-participating providers will continue to be reimbursed directly for services rendered to New Jersey small group Members and New Jersey individual product Members.*

**Please note:** To obtain these services, the Member must be enrolled and eligible under his or her health benefits plan at the time the services are rendered. Eligibility for coverage is determined as of the date the services are rendered in accordance with the Member's health benefits plan. It is recommended that the provider confirm the continued enrollment and eligibility of the Member.

Oxford is not responsible or liable for services provided to disenrolled or non-eligible Members under any circumstances. Please understand that the purpose of this review was to evaluate the requested services based on medical necessity, appropriate site of service and the Member's benefit plan, but not whether the services are part of a pattern of abusive billing. No assessment has been made concerning whether the requested service codes are payable when billed together. Additionally, Oxford's Medical Management Department does not assess whether the Member has reached his or her maximum dollar or visit limit for a service. Certain services, such as durable medical equipment, infertility, physical therapy, skilled nursing facility care, or behavioral healthcare may have a dollar or visit limit under the Member's plan. Should other claims reduce or exhaust the Member's benefit before the claim(s) for the item(s) or service(s) precertified by this letter is submitted, Oxford will reimburse only to the extent any benefit remains available.

As always, treatment decisions are the responsibility of the patient and the attending physician, not Oxford.

Patient safety is an important issue in healthcare today. Members may log on to *www.oxfordhealth.com* to learn more about patient safety.

Your satisfaction is important to us. As part of our continuing efforts to increase Member satisfaction, it is our goal to thoroughly review your request and provide you with a prompt response. If you have any additional questions, please call Customer Service at the number on your Oxford Member ID card. As an added service to you, you may review claims, check referrals, change your primary care physician (PCP), and obtain other helpful Member information through our web site at *www.oxfordhealth.com.* If you have a suggestion about how we can improve your satisfaction with Oxford, please contact us via e-mail at *membersatisfaction@oxfordhealth.com.*

If you are hearing impaired and require assistance, please call our TTY/TDD line at 1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for assistance in Korean, 1-800-449-4390 *para ayuda en espanol,* or the number on your Oxford ID card for assistance in other languages. Interpreters are available Monday through Friday between 8:00 AM and 6:00 PM.

Sincerely,
Beth Goldenberg, Case Manager II

cc:  Court Cutting MD   , Kim Kaufman

MGR00-05  MS-06-535                          06/20/2006

EXHIBIT R

COURT B. CUTTING, M.D., P.C.
PLASTIC AND RECONSTRUCTIVE SURGERY
333 EAST 34TH STREET, SUITE 1K
NEW YORK, NY 10016

TELEPHONE: (212) 447-6229                                   FACSIMILE: (212) 447-6228

August 28, 2006

Oxford Health Plans
Attn: Appeals Department
PO Box 7082
Bridgeport, CT 06601

RE:    PATIENT: KIM KAUFMAN          DOB: 02/21/69       ID #: 8635085*02
       INSURED: GLENN KAUFMAN        DOS: 07/28/06       CLAIM #: 6215U03876

Dear Director of Claims:

We are in receipt of the benefit payment for the above referenced claim.

It is our understanding that benefits were significantly reduced due to your determination that the billed charges are more than the usual and customary rate for certain procedures or items.

We do not believe the reduction is justified.  As you are likely aware, such provider reimbursement rates are typically adjusted based on the usual and customary treatment charges for that specialty and the geographical region where treatment was provided. Further, many insurance policies specifically state that the benefit determination must be based on the billed charges of that provider rather than a statistically derived reimbursement rate.  Please see *Desai v. Blue Shield of NW New York*, 178 AD 2d 894, 577 NYS 2d 932.

Based on this information, we request that the reductions be reversed and an additional payment be made.  If your company does not release additional benefits, please submit the applicable policy language which justified the reduction so that we may determine your company's and the patient's liability in regards to the unpaid balance.

We appreciate your prompt attention to this matter.

Sincerely,

Dawn Pine
Claims Analyst

cc:    Mr. & Mrs. Glenn Kaufman

## Court B. Cutting, MD, PC

333 East 34th Street, Suite 1K
New York, NY 10016
(212)447-6229

Glenn Kaufman                                    August 29, 2006                                    Page 1
74 Fairway Ave
Rye, NY 10580                                                                     Account Number: KAUF010002

| Date | Patient | Bill No. | Description | Amount |
|------|---------|----------|-------------|--------|
| 2/1/2006 | Kim | 10000392 | Follow Up / Pre-Op | $250.00 |
| 4/26/2006 | Kim | 10000508 | Follow Up / Pre-Op | $250.00 |
| 6/6/2006 | Kim | 10000508 | Check - Personal | ($250.00) |
| 6/6/2006 | Kim | 10000584 | Deposit for Surgery | ($2,500.00) |
| 7/12/2006 | Kim | 10000623 | Follow Up / Pre-Op | $250.00 |
| 7/28/2006 | Kim | 10000584 | Cleft Palate w/Alveolar Bone Graft | $14,500.00 |
| 8/28/2006 | Kim | 10000584 | Insurance Payment | ($4,632.60) |
| 8/29/2006 | Kim | 10000392 | Check - Personal | ($250.00) |
| 8/29/2006 | Kim | 10000584 | Insurance Adjustment | ($2,900.40) |

Total for Kim    $4,717.00

COURT B. CUTTING, M.D., P.C.
PLASTIC AND RECONSTRUCTIVE SURGERY
333 EAST 34TH STREET, SUITE 1K
NEW YORK, NY 10016

TELEPHONE: (212) 447-6229                                  FACSIMILE: (212) 447-6228

October 6, 2006

Grievance Review Board
c/o Oxford Health Plans
48 Monroe Turnpike
Trumbull CT 06611

**RE:    PATIENT: KIM KAUFMAN          DOB: 02/21/69      ID #: 8635085*02**
**        INSURED: GLENN KAUFMAN       DOS: 05/11/06      REF#: 81494407**

To Whom It May Concern:

We have recently received notification that you have denied payment for this claim, as it was not medically necessary. This conclusion is certainly not true. The patient currently has no bony connection between the two sides of her palate. This causes maxillary instability that cannot be corrected by simple dental means. It also produces a skeletal depression under the base of the nose which similarly cannot be corrected by dental means. These are medical considerations and not dental ones.

It is true that bone grafting this region makes it possible for the placement of dental implants, but this is certainly not the only reason for performing this procedure.

I hope this letter clarifies the issues involved. I urge you to pay this claim promptly.

Sincerely,

Court Cutting, M.D.

/dp
cc:    Mr. & Mrs. Glenn Kaufman

# Court B. Cutting, MD, PC

333 East 34th Street, Suite 1K
New York, NY 10016
(212)447-6229

Glenn Kaufman
74 Fairway Ave
Rye, NY 10580

October 5, 2006

Page 1

Account Number: KAUF010002

| Date | Patient | Bill No. | Description | Amount |
|------|---------|----------|-------------|--------|
| 2/1/2006 | Kim | 10000392 | Follow Up / Pre-Op | |
| 4/26/2006 | Kim | 10000508 | Follow Up / Pre-Op | $250.00 |
| 6/6/2006 | Kim | 10000508 | Check - Personal | $250.00 |
| 6/6/2006 | Kim | 10000584 | Deposit for Surgery | ($250.00) |
| 7/12/2006 | Kim | 10000623 | Follow Up / Pre-Op | ($2,500.00) |
| 7/28/2006 | Kim | 10000584 | Cleft Palate w/Alveolar Bone Graft | $250.00 |
| 8/28/2006 | Kim | 10000584 | Insurance Payment | $14,500.00 |
| 8/29/2006 | Kim | 10000392 | Check - Personal | ($4,632.60) |
| 8/29/2006 | Kim | 10000584 | Insurance Adjustment | ($250.00) |
| 9/18/2006 | Kim | 10000623 | Insurance Payment | ($2,900.40) |
| | | | | ($136.50) |

Total for Kim     $4,580.50

Your insurance has paid on these charges.  Please remit the balance at this time.

# EXHIBIT S

*Kim Kaufman*
*74 Fairway Avenue*
*Rye, NY 10580*
*914.921.1586*

October 20, 2006

Appeals Division
Oxford Health Plans
P.O. Box 7073
Bridgeport, CT  06601

**RE: Kim Kaufman, Member # 8635085\*02, Dr. Court Cutting Procedure, 7/20/06**

Dear Sir or Madam,

I am writing this letter to officially appeal Oxford Health Plan's decision to pay $6,618 of a cleft reconstructive procedure with Dr. Cutting on 7/20/06 (billed 7/28/06 to Oxford) that cost $14,500.

I would like "usual and customary" to be specifically defined so that I may come to understand how Oxford has chosen to pay less than 50% of the cost of my very necessary and medically valid cleft reconstructive procedure.  What exactly is "usual and customary" about a cleft palate?  This is a procedure without which I would be unable to masticate or function normally.

Please note that this is a formal grievance and I expect this matter to be reviewed in a timely manner.  Should any additional letters from Dr. Cutting be necessary, please contact me directly so that I can have them provided.

Sincerely,


Kim Kaufman

cc:  Dr. Court Cutting, Mark DeRosa

EXHIBIT T



**LAWRENCE E. BRECHT, D.D.S., P.C.**
PROSTHODONTICS & MAXILLOFACIAL PROSTHETICS
ESTHETIC AND RECONSTRUCTIVE DENTISTRY

22 October 2006

Oxford Health Plans
Attn: Clinical Appeals
PO Box 7078
Bridgeport, CT 06601

**RE: MRS. KIM KAUFMAN-reference # 81494407, 80835708 & 81894812**

To Whom This May Concern:

It is my understanding that despite meticulous documentation by the patient as well as her multiple doctors to the contrary, Oxford Health Plans has continued to deny the care provided to Mrs. Kim Kaufman claiming that her care is "dental" in nature. The facts of Mrs. Kaufman's condition are clear:

1) The patient was born with a unilateral cleft defect of the lip, alveolus and palate.
2) As a result of her congenital condition, she was born missing adult teeth as well.
3) Previously the congenitally missing teeth were replaced with a tooth-borne fixed dental prosthesis and an osseointegrated implant-supported restoration.
4) Her existing prostheses were failing and in need of replacement.
5) Her recent procedures were undertaken to provide a successful treatment of her *current cleft condition.*
6) Mrs. Kaufman is a resident of the state of New York
7) By *New York State law,* care for a cleft palate that might include a dental restoration must be covered under the patient's major medical insurance.

The denial of coverage of Mrs. Kaufman's procedures simply is not logical when the law is considered. The replacement of a prosthetic heart valve in a patient requiring such a procedure would not be denied. So the question is why would a patient who is in need of a replacement prosthesis *as part of her overall congenital cleft palate care be denied equal coverage as provided by the law?*

I sincerely hope that Oxford Health Plans would fully understand the complex nature of the cleft condition requires the services of several different health care disciplines in order to complete treatment. This treatment includes care by

surgeons as well as dental specialists in making a patient whole and functional
again. I hope Oxford will reconsider its denial and provide this and other cleft
palate patients with the care they are entitled to under New York State law.

Sincerely,

Lawrence E. Brecht, DDS

cc:     Mrs. Kim Kaufman
        Court B. Cutting, MD
        Burton Langer, DMD
        Patient file

LEB/mqm

EXHIBIT U

**OXFORD**

**HEALTH PLANS®**

A UnitedHealthcare Company

November 6, 2006


Ms. Kim Kaufman
74 Fairway Avenue
Rye, NY 10580


| | |
|---|---|
| Member Name: | Kim Kaufman |
| Member ID: | 863508502 |
| Provider Name: | Dr. Court Cutting |
| Provider ID: | NS634 |
| Claim Number: | 6215U03876 |
| Date of Service: | 7/28/06 |
| Document #: | 6296611195 |

Dear Ms. Kaufman,

This letter is in response to the correspondence you submitted regarding the referenced claim.

While it is unfortunate that we cannot provide a more positive response to your appeal, claim 6215U03876 has been reviewed. It has been determined that this claim was processed correctly out-of-network, subject to your health benefits plan. Therefore, no additional payment will be made on this claim.

When a Member uses an out-of-network provider through their out-of-network option, Oxford will reimburse the member based on the appropriate out-of-network fee schedule determined by their product. While the Member's plan includes the option benefit to seek treatment from non-participating providers, such treatment is subject to any applicable deductible, coinsurance and "UCR" schedule. Oxford's UCR Schedule is determined based upon HIAA data from Ingenix, which purchased and maintains the Health Insurance Association of America (HIAA) databases and which is still referred to as HIAA. HIAA data is based upon the amount commonly charged and/ or accepted for a particular medical service by physicians in a particular region.

Please note that when you choose to go outside Oxford's provider network, you are responsible for paying a higher portion of your medical expenses. This includes an annual deductible and a percentage (coinsurance) of eligible expenses.

A Member may designate a person to act on his or her behalf, including the Member's provider, to appeal this decision ("Designee"). To do so, the Member must provide Oxford with written consent, at the time of the appeal, for the designee to act on his or her behalf. The consent must be signed by the Member, or by the Member's guardian, if the Member is a minor.

A claim is any request by a covered Member for certification of a benefit or payment for a service, as required under the terms of the Member's health plan.

If you the Member remain dissatisfied with the First-Level Appeal determination, you or your Designee may appeal this determination to Oxford's Grievance Review Board (GRB) for further

MS-03-1297



**OXFORD**
H E A L T H   P L A N S®
A UnitedHealthcare Company

Page Two
Kaufman, Kim

consideration. Requests for a Second-Level Appeal must be made within **60 business days** of receipt of this First-Level Appeal determination letter.

The request for appeal and any additional information must be submitted to: **Grievance Review Board, c/o Oxford Health Plans, Inc., 48 Monroe Turnpike, Trumbull, CT 06611**. The Member or Designee will need to include all information requested previously by Oxford (if not previously submitted), and include any additional facts or information that the Member believes to be relevant to the issue. The Member or Designee may send us written comments, documents, records or other information regarding the claim. The GRB will consider all available information relevant to the Member's appeal when making its review. The appeal will be resolved no later than 30 days from the GRB's receipt of the Member's request for a Second-Level Appeal.

### Employee Retirement Income Security Act (ERISA) Rights

If we have not approved the Member's claim after all mandatory internal reviews have been completed, the Member may have the right to file a civil action under 502(a) of the Employee Retirement Income Security Act. ERISA rights do not apply if the Member's coverage for health benefits was (1) obtained through employment with a church or government group or (2) purchased as an individual plan from Oxford.

### ERISA Disclosure

We denied the Member's appeal because the Member's claim does not meet criteria established by the Member's health plan. If the Member would like a copy of the criteria used or any documents, records, and other information relevant to the claim, the Member must send a written request to: **ERISA Disclosure Requests, c/o Oxford Health Plans, Inc., 48 Monroe Turnpike, Trumbull, CT 06611**. This information will be provided to the Member free of charge.

We look forward to your continued membership with Oxford. If you have any additional questions, please contact Customer Service at 1-800-444-6222 or the number on the back of your identification (ID) card.

For a hearing impaired interpreter, you may contact Oxford's TTY/TDD line at 1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for assistance in Korean, 1-800-449-4390 *para ayuda en Español*, or the number on your Member ID card for assistance in other languages.

Sincerely,


Candice Davies
Resolution Analyst
Member Appeals Unit

MS-03-1297

EXHIBIT V



**OXFORD**
HEALTH PLANS
A UnitedHealthcare Company

August 15, 2006


Kim Kaufman
74 Fairway Ave
Rye, NY 10580


Dear Kim Kaufman,

United HealthCare Services, Inc. on behalf of Oxford has received and reviewed a request from your provider, Burton Langer, DMD. Your provider has requested the following services:

**Service Request Summary**
Member Name: Kim Kaufman -- Oxford ID#: 863508502
Service Code(s): D6010
Description of Service Code(s): Surg plcmt impl body: endosteal
Date of Service: 09/04/06 -- **Reference #: 81894812**

Our Medical Director has determined that the request is: Denied - Not Covered Benefit.

After consideration of all available information, our Medical Director has determined that the requested procedure will not be covered for the following reason(s): Dental treatment including replacement of teeth is not a covered benefit.

If your provider has any questions regarding this decision, he or she may contact the clinical staff under the direction of Jonathan Zucker at 800-889-7658 Extension 6156.

Your satisfaction is important to us. As part of our continuing efforts to increase Member satisfaction, it is our goal to thoroughly review your request and provide you with a prompt response. If you have any additional questions, please contact Customer Service at the number on your Oxford Member ID card. As an added service to you, you may review claims, check referrals, change your primary care physician (PCP), and obtain other helpful Member information through our web site, *www.oxfordhealth.com.*

We have enclosed a detailed explanation of the Member's Appeal Rights. A Member has the right to request a review of a denial of services. If the Member would like to appeal, the Member should follow the First-Level Member Appeal Rights process described in the enclosure in response to the question, *"How do I submit a First-Level Appeal request?".*

If you are hearing impaired and require assistance, please call our TTY/TDD line at 1-800-201-4875. Please call 1-800-303-6719 for assistance in Chinese, 1-888-201-4746 for assistance in Korean, 1-800-449-4390 *para ayuda en espanol,* or the number on your Oxford ID card for assistance in other languages. Interpreters are available Monday through Friday between 8:00 AM and 6:00 PM.

Sincerely,
Nicole Lopes, Dental Administrator

Enclosure: Explanation of Your Appeal Rights

EXHIBIT W

## GLENN KAUFMAN

| From: | Kim Kaufman [kimkaufman@mac.com] |
|---|---|
| Sent: | Tuesday, August 22, 2006 9:18 PM |
| To: | ebritt@oxhp.com; Nicole M. Lopes; jzucker@oxhp.com |
| Cc: | jsaia@oxhp.com; Mark DeRosa; GLENN KAUFMAN; Linda Lao; mturpin@oxhp.com; tmyers@oxhp.com |
| Subject: | Appeal for Ref #s 81835708, 81894812 |

**Importance:** High

Dear Ms. Britt, Ms. Lopes and Dr. Zucker,

This email serves as a formal appeal to the denials issued to me by Oxford Health Plans for the following pre-certifications related to the continuing medically necessary treatment of my cleft palate:

1) Reference Number 81894812 for work to be performed by Dr. Burton Langer, Service Code: D6010, Description of Service Code: Surg plcmt impl body: endosteal; the denial letter is dated August 15, 2006

2) Reference Number 81835708 for work to be performed by Dr. Lawrence Brecht, Service Codes: D2740, D2952, D6066, D6240, Description of Service Codes: Cast & post&core in addition to crown, Crown - porcelain/ceramic substrate, Impl supp porceln fused metal crown, Pontic-porceln fused hi nobel metl; the denial letter is dated August 10, 2006

I have been unable to respond to these denials until now because I underwent an alveolar bone graft with Dr. Cutting on July 20, 2006 and I have been recovering.

I continue to request that a medical doctor who actively treats cleft patients review my file, as my treatment is within the context of rehabilitating my cleft palate and is directly related to resolving the medical problems and functional impairment I have been experiencing as a result of a congenital anomaly. Please note that a maxillofacial surgeon who has no cleft experience is not qualified to opine on my case. Moreover, although highly specialized dentists do treat clefts, they only do so as part of a cleft team which is overseen by a medical doctor. This is because the treatment of a cleft palate is actually medical in nature, not dental.

Also, I will continue to remind you of the following New York State Insurance Law as well as Oxford Health Plans' own stated policy:

**On December 8, 1999, New York State Insurance Commission passed insurance regulation, Section 52.16 (9) of Regulation 62 (11NYCRR52) bringing it into compliance with Articles 42 and 43 of New York State insurance law which states that dental care and treatment be covered under the medial plan due to a congenital anomaly.**

**"General dental services are not covered. The following limited dental and oral surgical procedures are covered in either an inpatient or outpatient setting:**

**\*\*\***

**2. Oral surgical procedures required for the correction of a non-dental physiological condition which has resulted in a severe functional impairment."**

I believe that I have already supplied your team with ample background information and letters from my doctors explaining the procedures necessary to treat my cleft palate. However, I will be more than happy to provide you with any additional materials you will need for the appeals. Should there be anything you feel is missing or that you will need, please let me know as soon as possible so that I can attempt to provide you with what you request.

It may be of interest to note that we have submitted a formal complaint against Oxford Health Plans with the New York State Insurance Department with respect to the continued denials of my cleft claims. The complaint is currently under review and we expect to hear a ruling shortly. We have also informed the New York State Attorney General's office and the New York State Department of Health of our complaint.

Thank you for your time.

Best regards,


Kim Kaufman

Oxford ID# 863508502

914.921.1536

# EXHIBIT X



**OXFORD**
HEALTH PLANS®
A UnitedHealthcare Company

September 5, 2006

Kim Kaufman
74 Fairway Ave
Rye, NY 10580

Dear Kim Kaufman,

United HealthCare Services, Inc. on behalf of Oxford has completed its review of the request to appeal the decision to deny D6010 - surg plcmt impl body: endosteal.

**Medical Service Summary**
Member Name: Kim Kaufman -- Oxford ID Number: 863508502
Contract Type: NY SMALL FREEDOM PLAN DIRECT (2-50)
Service Date(s): 9/4/06 through 12/3/06 -- Service Provider: Burton Langer, DMD
Type of Appeal: Precertification
**Reference Number: 81894812**

We have considered the information submitted in support of your appeal. Based upon the review of all available information and the terms of your plan, our Medical Director has decided to uphold the initial adverse determination because the request for management of a failing dental implant is no different from any other failing dental implant. The member's current dental problem does not appear to be related to a failure of her cleft repair, as the defect remains well closed. Therefore, medical necessity has not been demonstrated and services are not certified.

We have enclosed a detailed explanation of the Member's Appeal rights. A Member has a right to request a review of a denial of services. If the Member would like to appeal the services denied in this notice, the Member should follow the Second-Level appeal procedure described in the enclosure in response to the question *"How do I appeal this determination?"*

Your satisfaction is important to us. As part of our continuing efforts to increase Member satisfaction, it is our goal to thoroughly review your appeal and provide you with a prompt response. If you have any additional questions, please contact Customer Service at the number on your Oxford Member ID card. As an added service to you, you may review claims, check referrals, change your primary care physician (PCP), and obtain other helpful Member information through our web site, *www.oxfordhealth.com*. If you have a suggestion about how we can improve your satisfaction with Oxford, please contact us via e-mail at *membersatisfaction@oxfordhealth.com*.

Sincerely,
Pamela Trotto, Sr Coordinator- Hcs

Enclosure: Explanation of your Second-Level Appeal Rights

cc:  Burton Langer DMD , Kim Kaufman
MSM118-06345-06497                              09/05/2006

EXHIBIT Y

 Experts in Defining and Improving the Quality of Health Care

December 6, 2006

Mark DeRosa
J. Peat & Associates
20 Blake Avenue
Lynbrook, NY 11563

Re:      External Appeal Application – Kim Kaufman
Reference #:  200610-14241

Dear Mr. DeRosa:

IPRO has completed review of all documentation submitted relative to your request for external appeal on behalf of Kim Kaufman and has determined that the decision of Oxford Health Plans of New York to deny authorization for removal of supportive implant, denial of crowns, denial of surgical placement implant body: endosteal, denial of reconstruction of cleft palate should be modified to approve requested procedures with exception of replacement for numbers five and six, as they were not part of the original congenital anomaly.

Review of this appeal was conducted by a clinical reviewer who is a Doctor of Dental Surgery and Specialist in Adult and Child Orthodontics and Dentofacial Orthopedics. IPRO has screened this clinical reviewer for any prohibited material affiliation and has determined that none exists.

Documentation submitted for review included:

- Letter from S. Swift, New York State Insurance Department to T. Giorgio, RN, IPRO dated 11/7/06
- New York State External Appeal Application signed K. Kaufman dated 10/19/06
- Letters from P. Trotta, Oxford to K. Kaufman dated 9/5/06 (2), 9/5/06
- Letter from J. Leninger, Oxford to M. DeRosa, J. Peat and Associates dated 10/16/06
- Letter from C. Linen, New York State Insurance Department to K. Kaufman dated 9/29/06
- Letter from A. Cogan, Oxford to C. Linen dated 9/15/06
- Letters from B. Goldenberg, Oxford to K. Kaufman dated 6/20/06 (2)
- Letters from N. Lopes, Oxford to K. Kaufman dated 6/7/06, 6/23/06, 8/15/06, 8/10/06
- Letter from E. Britt, Oxford to K. Kaufman dated 6/30/06
- Letters from M. DeRosa To Whom It May Concern, Oxford dated 9/22/06, 6/19/06
- Letters from C. Cutting, MD To Whom It May Concern, Oxford dated 10/6/06. 6/6/06
- Letter from K. Kaufman to H. Mills and M. Gennaour. New York State Insurance Department dated 7/19/06
- Biograph and Personal Archive re: D.R. Millard, MD
- Information from Miami Children's Hospital re: S.A. Wolfe, MD
- Vitae re: C. Cutting, MD
- Viate re: L. Brecht, DDS
- Consultation Notes from C. Cutting, MD re: K. Kaufman
- Letter from B. Langer, DMD to N. Lopes dated 5/18/06

ISO
9001:2000
CERTIFIED

Mark DeRosa
December 6, 2006
Page 2

- Single Family Ledger re: K. Kaufman dated 5/18/06
- E-mails between K. Kaufman to E. Britt and N. Lopes
- Letter from K. Kaufman to J. Zucker, MD, Oxford dated 5/26/06
- Medical Records including progress notes, dental notes, operative reports, lab reports, treatment records, pictures, x-rays and correspondence re: K. Kaufman
- Vitae re: D. Behrman, DMD
- E-mails between K. Kaufman and V. Scott, oxford
- Letters from L. Brecht, DDS To Whom This May Concern, Oxford dated 6/15/06, 10/22/06
- Press Release from Office of New York State Attorney General Eliot Spitzer re: Report Cites Health Plan Errors and Denial as Top Consumer Complaints dated 3/27/06
- Letter from C. Cutting, MD to S. Swift dated 11/6/06
- Additional Correspondence Summary re: K. Kaufman
- Letter from V. Scott, Oxford to K. Kaufmandated7/3/06
- Letter from M. Moore, New York State Office of the Attorney General to K. Kaufman dated 8/8/06
- Letter from P. Trotto to B. Langer, DMD dated 9/5/06
- Letter from J. Neverson, New York State Insurance Department to K. Kaufman dated 8/24/06
- Letter from K. Powell, Oxford to K. Kaufman dated 8/24/06
- Letter from C. Misorek, Oxford to J. Heffner, New York State Office of the Attorney General dated 8/30/06
- Letter from V. Maiolo, Oxford to New York State Insurance Department dated 8/21/06
- Letter from J. Heffner to K. Kaufman dated 9/11/06
- Letter from R. Lucus to K. Kaufman dated 8/29/06
- Statement of Account from C. Cutting, MD re: K. Kaufman dated 8/29/06
- Letters from D. Pine to Oxford dated 8/28/06, 6/2/06
- Letter from D. Pine to New York State Insurance Department dated 8/28/06
- Letter from K. Kaufman to T. Giorgio, RN dated 11/10/06
- Letter from V. Torres, Oxford to K. Kaufman dated 11/8/06
- Letter from K. Kaufman to J. Leninger dated 10/18/06
- Letter from J. Leninger to K. Kaufman dated 10/24/06
- Case Review from D. Behrman to E. Britt, N. Lopes dated 8/27/06
- Oxford Individual Authorization Reports re: K. Kaufman
- Letter from N. Lopes to L. Brecht, DDS dated 8/10/06
- Letter from K. Powell, Oxford to K. Kaufman dated 8/24/06
- Letter from K. Powell to B. Langer, DMD dated 8/24/06
- Oxford Clinical Appeals CAG printout re: K. Kaufman
- Oxford Dental Department Review of Clinical Cases re: K. Kaufman dated 9/5/06
- Letter from N. Lopes to B. Langer, DMD dated 8/15/06
- Progress Notes from C. Cutting, MD re: K. Kaufman
- Medical Records from B. Langer, MD re: K. Kaufman

December 6, 2006
Page 3

      Dental Records and x-rays from L. Brecht, DDS re: K. Kaufman
      Letter from F. Steeger, Oxford to T. Giorgio, RN dated 11/14/06
      Letter from S. Swift to F. Steeger dated 11/7/06
      Oxford Policy re: Covered Services and Exclusions & Limitations
      Oxford Coverage Statement re: Dental and Oral Surgical Procedures
      Oxford Grievance Review re: K. Kaufman
      Letter from L. Brecht, DDS to N. Lopes date d8/1/06

The basis for this determination is as follows:

Issue:

According to the documentation submitted, more specifically a letter dated 5/18/06 from Dr. Langer, the patient has a previous cleft palate and lip which was partially repaired. He notes that the patient was seen 5/11/06 for removal of an implant in the # 6 position which had dehisced on the buccal and was inflamed. In addition, he indicates that there was a "major deficiency in the amount of keratinized tissue surrounding the implant and bordering position of tooth #7 deeming the need for a subepithelial connective tissue graft." Dr. Langer also notes that a bone graft to re-establish normal integrity to the area between #'s 6 and 7 is being planned in order to provide osseointegrated implants. He states that this procedure would not be possible with the prior inflamed implant and the lack of adequate tissue and refers to a New York State Insurance Commission regulation that states that dental care and treatment be covered under the insurance plan for congenital anomalies. In a letter dated 6/6/06 from Dr. Cutting, he outlines the timeline and rationale for each step. He notes that the patient must first have a removal of the failed dental implant followed by an iliac bone graft to the alveolar cleft to make a repeat placement of a dental implant feasible. Prior to this, he notes, palatal mucosal grafts to the alveolar cleft must be done to prepare the area for the bone graft and notes that this is crucial that the placement of the bone graft be done in a pocket that is not buckled mucosa. Another letter from Dr. Cutting dated 10/6/06 refers to the denial of the implant and connective tissue grafting and notes that the procedures were medically necessary based on the fact that "the patient currently has no bony connection between the two sides of her palate. This causes maxillary instability that cannot be corrected by simple dental means." He further notes that the concerns are of a medical nature rather than a dental.

The insurer has denied the removal of supportive implant, denial of crowns, denial of surgical placement implant body: endosteal, denial of reconstruction of cleft palate and indicates in an final determination letter dated 10/16/06 that the patient has a history of a unilateral cleft repair. They further note that the cleft palate remains intact and the dental treatment was related to a failed bridgework and implant. In addition, the insurer notes that the current dental problems do not appear to be related to a failed cleft palate repair,

12/12/2006

December 6, 2006
Page 4

is the defect continues to remain well closed and that the services are dental in nature and not a covered benefit.

The patient is appealing and supplies extensive summaries and exhibits relating to her case, the most inclusive one being the one dated 7/19/06. She indicates in that letter that she has a cleft palate and "must undergo both reconstructive and dental procedures in order to live a normal, healthy life, thereby enabling me to eat, drink and speak." She further notes that "there are laws in place to assure that dental care is covered under medical insurance when related to a congenital anomaly." The patient also brings up the issue that the physicians utilized by the insurers to review her case lacked experience in cleft palate issues.

Reviewer Findings:

Based on the review of all information submitted, modification of the previous consultant's decision to deny coverage is recommended. In order to reach this determination a couple of questions must be answered: 1) Was the cleft still present and if so, was it necessary to close for long term stability? 2) Which teeth were aplastic (congenitally absent) and how should they be restored?

The answer to question number one can only be given by Dr. Cutting, who physically opened and explored the cleft. Review of the correspondence and medical record clearly shows that the cleft was present with "...no bony connection..." For stability of the dental arch, foundation is most important. The analogy can be made to building a house. A house built on a solid foundation will remain intact; whereas, a house built on uneven or unstable foundation will deteriorate. For long term stability and medical/dental health of the site and adjacent areas, bony closure of the cleft is necessary. The fact that Oxford covered a portion of the graft suggests they deemed the procedure medically necessary.

Question number two must be answered from the dental record and history. Information obtained by Ms. Kaufman from Dr. Wolfe, revealed information about the grafting of the cleft, but did not specify which teeth were or were not present. At the present time, only teeth #'s 5, 6 and 7 are missing. Dr. Brecht stated that these were congenitally absent. According to the record of Dr. Blum, tooth number five was extracted and implanted in 2003; in 2005 Dr. Weber performed an apicoectomy of tooth number five. Dr.'s Brecht and Langer both refer to the implant as in position of tooth number six. Panoral radiographs show tooth number five present next to the implant in place of tooth number six. The only logical resolution of these discrepancies is that the record of Dr. Blum is incorrectly written and the cuspid (tooth number six) was extracted and then implanted. Only tooth number seven is aplastic. Most cleft patients have aplasia of primary and permanent teeth, the usual suspects are those adjacent to the cleft. The most common

12/13/2006

December 6, 2006
Page 5

plastic anterior tooth is the maxillary lateral incisor (teeth numbers seven and ten). It is safe to assume that number seven is the only congenitally absent tooth.

With these questions answered, reconstruction of the cleft and restoration of those congenitally absent teeth are under the umbrella of New York State regulation. It does not matter if this is a child or an adult; the age at the time of diagnosis and reconstruction is immaterial. Correction of the congenital malformation is medically necessary. Even in this situation where grafting was done prior, the malformation was never corrected. There are some procedures that were done in preparation of the site of surgery. Since these procedures were done to enhance the likelihood of the success of the surgical graft, they should be covered as well.

In order to ensure success of the graft, the tissues covering the area needed to be prepared and healthy. To achieve this, the failing implant required removal so that the soft tissue would be healthy enough to withstand surgery and promote good healing. Remember, the oral tissue will act as a bandage and provide nutrition (blood supply) after the graft is in place. If the tissue is diseased or inadequate in size, quality, or blood supply, the graft would be sure to fail.

Removal of the implant was the first step in preparing the cleft for grafting. The second step is to ensure that the tissue covering the graft be of the right quality. Dr. Langer performed a subepithelial connective tissue graft in the area of the cleft to build the tissue. Prior to the connective tissue graft, mucosa was covering the area; this tissue is not suitable for covering the graft, it lacks size (quantity) and blood supply (quality). Grafting under mucosa would result in retraction of the iliac crest graft; in other words, the graft would resorb (be digested by the body). Now the site, provided oral home care is adequate, would be ready to accept the graft.

Restoration of the region is also necessary for stabilization of the occlusion and maintenance of the graft. Replacement of tooth number seven by means of dental implant and implant crown should be covered as it is part of the final reconstruction of the cleft. Replacement of teeth numbers five and six are the responsibility of Ms. Kaufman as they were not part of the original congenital anomaly.

12/12/2006

Mark DeRosa
December 6, 2006
Page 6

In summary, reversal of the denial of coverage for the following is recommended:

1. **Removal of implant.**
2. **Subepithelial connective tissue graft.**
3. **Reconstruction of cleft palate.**
4. **Temporization after surgical reconstruction.**
5. **Placement of dental implant tooth number seven.**
6. **Fixed prosthetics tooth number seven.**

**However, coverage for replacement of teeth numbers five and six should not be approved as they were not part of the original congenital anomaly.**

**The carrier's denial should be modified as detailed above.**

Should you have any questions in regard to this review determination, please do not hesitate to contact me or Terese Giorgio at (516) 326-7767, ext. 411.

Sincerely,

Monty M. Bodenheimer, MD
Medical Director, Health Care Assessment

MMB:jg

cc:    Susan Swift, New York State Insurance Department
       Francine Steeger, Oxford Health Plans of New York
       Kim Kaufman

EXHIBIT Z

On Jan 2, 2007, at 3:15 PM, Steeger, Francine A. wrote:

January 2, 2007

Dear Ms. Kaufman,

Thank you for taking the time to contact me regarding your December 6,
2006 letter from Dr. Bodenheimer at IPRO.
Oxford received the final decision and will abide by the determination

made by IPRO.
It was necessary to contact IPRO to clarify and properly code the
approved procedures for reimbursement.

I regret that Oxford has been unable to send to you a prompt
notification letter and guidance for your reimbursement.  Oxford
wanted accurate information to be able to correctly process your
health claim in accordance with the IPRO determination.  We are
waiting for IPRO's reply and will contact you as soon as possible.

Sincerely,

Francine A. Steeger, RN, CCM, CPC
UnitedHealthcare

4

-----Original Message-----
From: Kim Kaufman [mailto:kimkaufman@mac.com]
Sent: Friday, December 29, 2006 11:38 AM
To: Steeger, Francine A.
Cc: tgiorio@ipro.org; Mark DeRosa; Kevin Westley; Glenn Kaufman; Linda

Lao; Dr. Court Cutting, M.D., P.C.; Dr. Lawrence Brecht
Subject: External Appeal Ruling, Reference # 200610-14241

Dear Ms. Steeger,

I am writing to find out why it is that despite an External Appeal
ruling by Dr. Monty M. Bodenheimer on December 6, 2006 I have yet to
receive any letter from Oxford Health Plans indicating receipt of the
ruling and next steps for me to obtain all medical reimbursement due
to me as per the ruling.

If there is a letter that has already been sent by Oxford Health Plans
please let me know as we cannot move forward without this letter.
If a
letter has not been sent, I would also like to know when to expect it
so that I can inform all the appropriate people.

Thank you for your assistance in this matter.

Sincerely,

Kim Kaufman
914.921.1536

)

# EXHIBIT AA



**OXFORD**

HEALTH PLANS'

A UnitedHealthcare Company

March 7, 2007

Ms. Kim Kaufman
74 Fairway Avenue
Rye, NY 10580

Re: External Appeal Determination: Kim Kaufman Reference # 200610-14241

Dear Ms. Kaufman:

Oxford received a letter from Dr. Monty M. Bodenheimer, MD dated December 6, 2006,
with the external appeal opinion from IPRO partially reversing Oxford's earlier determination.

IPRO determined Oxford should provide coverage for Dr. Burt Langer DMD for the following
services:  Coverage will be provided for: CPT 20680  Removal of Supportive Implant, CPT
41870   Subepithelial connective tissue graft, CPT 42210   Reconstruction /bone graft of cleft
palate.

IPRO also determined in the external reviewer's recommendation that Oxford should provide
coverage for Dr. Lawrence Brecht, DDS for the following services.
Coverage will be provided for:  Temporization after surgical reconstruction
CPT 41899 (D6240) Pontic –porcelain fused to high noble metal – tooth # 8,
Placement of dental implant tooth # 7 CPT 21248 (D6010) endosteal implant
and fixed prosthetics tooth # 7 CPT 41899 (D6066).

IPRO partially upheld Oxford's earlier denial of coverage for replacement of tooth # 5
and tooth #6.  These teeth were not part of the original congenital anomaly.

Although Oxford feels that its original denial in this case was correct, Oxford will modify its
earlier decision and provide coverage in accordance with IPRO's determination. We have
updated Oxford authorization # 81835708 and Oxford's Claims Department will reprocess the
submitted claims from Dr. Langer and Dr. Brecht.  Your providers should submit completed
claims forms for any services not previously billed for services.  Please note all claims will be
processed in accordance with your contract benefits.

Please contact me if you require any further assistance in this matter.

Sincerely,

*Francine A. Steeger*

Francine A. Steeger RN, CPC, CCM
UnitedHealthcare External Reviews

cc: Dr. Lawrence Brecht, Dr. Burt Langer, Susan Swift, NY State Dept of Insurance

203 459 6000
48 Monroe Turnpike, Trumbull, CT 06611
WWW.OXFORDHEALTH.COM

EXHIBIT BB

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1890

October 5, 2007

<u>Oxford Health Plans - Kim Kaufman Benefits</u>

Dear Ms. Steeger:

I have been retained by Glenn and Kim Kaufman to assist in Ms. Kaufman's continuing efforts to be reimbursed by Oxford Health Plans for covered benefits (Member ID: ███████, SSN ███████105). As you are aware, Ms. Kaufman has undergone significant, necessary medical procedures related to her cleft palate. She has been seeking reimbursement for costs associated with those procedures since shortly after they were performed.

For an extended period, Oxford has improperly refused to provide coverage that is mandated by its policy. It has based its improper denials upon the patently false grounds that the procedures were unrelated to Ms. Kaufman's cleft palate and are "dental" in nature. Not only is that factually unsupportable, but it is also contradicted by the professional opinions of Ms. Kaufman's medical team and violative of applicable New York law. <u>First</u>, Ms. Kaufman's doctors (Dr. Langer and Dr. Cutting) have provided Oxford with extensive explanations of why the procedures were medical in nature (rather than dental), were medically necessary and were related to a congenital anomaly. Those submissions provided detailed timelines and rationales for all the treatment in question. <u>Second</u>, section 52.16(c)(9) of the New York Administrative Code (11 NYCRR 52.16, attached) prohibits a policy from limiting or excluding coverage for "dental care or treatment necessary due to congenital disease or anomaly". That is the case here.

The lack of merit in Oxford's position was underscored on December 6, 2006, when IPRO concluded that the great bulk of Oxford's denials should be reversed and that Oxford should provide coverage for almost all costs associated with procedures related to Ms. Kaufman's cleft palate (attached). Although we disagree with IPRO's decision related to teeth numbers five and six--and we seek full reimbursement for <u>all</u> of

2

Ms. Kaufman's procedures--the IPRO decision was nonetheless a stunning rebuke of Oxford's previous course of conduct. Despite that fact, Oxford then proceeded to delay until March 7, 2007--fully three months later--before finally agreeing to provide coverage in accordance with IPRO's determination (attached). And to date, despite extraordinary efforts by Ms. Kaufman to submit paperwork (including appropriate forms, receipts, bills and letters), not a dollar of the approved coverage has been paid.

Oxford's long history of obfuscation, avoidance and delay--in light of overwhelming evidence undermining its position--is completely unacceptable, is clearly the product of bad faith and has caused needless suffering. Accordingly, we are asking one last time that Oxford provide prompt reimbursement for all procedures for which Ms. Kaufman has requested coverage. Further, we are now asking that Oxford make resulting additional payments associated with proper reimbursement to Mrs. Kaufman and her family--the impact of such payments bringing individual and family covered benefits to and above annual deductibles. If we do not receive full payment (with documentation supporting calculation of such payments) by October 22, 2007, we will commence legal proceedings.

Very truly yours,

Max R. Shulman

Francine A. Steeger, RN, CPC, CCM
    Oxford Health Plans
        48 Monroe Turnpike
            Trumbull, CT 06611

Encls.

335A

FEDEX AND E-MAIL

Copies w/encls. to:

Michael Turpin
Jennifer Saia
Elizabeth J. Britt
    Oxford Health Plans
        48 Monroe Turnpike
            Trumbull, CT 06611

FEDEX AND E-MAIL

Oxford Health Plans--Clinical Appeals
Attention of Claims Manager
P.O. Box 7078
Bridgeport, CT 06601

UnitedHealthcare Corporate Headquarters
Attention of Legal Department
P.O. Box 1459
Minneapolis, MN 55440

UnitedHealthcare
Attention of Claims Resolution
2 Penn Plaza, 7th Floor
New York, NY 10121

FEDEX

Westlaw.

11 NY ADC 52.16                                                        Page 1

 11 NYCRR 52.16
 N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

C

Use Δ RegChange to view changes.
NEW YORK ADMINISTRATIVE CODE
TITLE 11. INSURANCE DEPARTMENT
CHAPTER III. POLICY AND CERTIFICATE PROVISIONS
SUBCHAPTER A. LIFE, ACCIDENT AND HEALTH INSURANCE
PART 52. MINIMUM STANDARDS FOR FORM, CONTENT AND SALE OF HEALTH INSURANCE,
INCLUDING STANDARDS OF FULL AND FAIR DISCLOSURE
REGULATION NO. 62

Current with amendments included in the New York State Register, Volume XXIX,
Issue 16, dated April 18, 2007, and updates received from the New York
Department of Insurance.

Section 52.16. Prohibited provisions and coverages

EMERGENCY RULE

  (a) No policy or certificate shall provide benefits for specified diseases, or
for procedures or treatments unique to specified diseases, and no policy or
certificate shall provide additional benefits for such specified diseases or
procedures, unless the policy or certificate meets the standards set forth in
section 52.15 of this Part.

  (b) No policy shall provide a return of premium or cash value benefit, except
return of unearned premium upon termination or suspension of coverage, retroactive
waiver of premium paid during disability, payment of dividends on participating
policies, experience rating refunds, nonforfeiture values permitted for long-term
care insurance, nursing home and home care insurance or nursing home insurance
only, or a return of premium benefit upon death permitted for long-term care
insurance, nursing home insurance only, home care insurance only, or nursing home
and home care insurance. This prohibition applies to an accidental death benefit
where the amount of the benefit equals the total premium paid to date of death.

  (c) No policy shall limit or exclude coverage by type of illness, accident,
treatment or medical condition, except as follows:

  (1) preexisting conditions or diseases, as defined in section 52.2(u) of this
Part or section 3232 or 4318 of the Insurance Law, except for congenital anomalies
of a covered dependent child; subject to limitations set forth in subdivision (f)
of this section, sections 52.17(a)(27)-(28), 52.18(a)(5) and 52.20 of this Part;

  (2) mental or emotional disorders, alcoholism and drug addiction, except that
coverage must be made available or provided pursuant to section 52.7 of this Part

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

and sections 3221, and 4303 of the Insurance Law. Medicare supplement insurance issued pursuant to sections 52.11 and 52.22 of this Part shall not include limitations or exclusions which are more restrictive than those of Medicare for this type of benefit;

(3) pregnancy, except to the extent coverage is required pursuant to  sections 3216, 3221, 3232, 4303, and 4318 of the Insurance Law, and except for complications of pregnancy as defined in section 52.2(e) of this Part, other than for policies defined in section 52.8 of this Part;

(4) illness, accident, treatment or medical condition arising out of:

(i) war or act of war (whether declared or undeclared); participation in a felony, riot or insurrection; service in the Armed Forces or units auxiliary thereto;

(ii) suicide, attempted suicide or intentionally self-inflicted injury;

(iii) aviation, other than as a fare-paying passenger on a scheduled or charter flight operated by a scheduled airline; and

(iv) with respect to blanket insurance, interscholastic sports;

(5) cosmetic surgery, except that *cosmetic surgery* shall not include reconstructive surgery when such service is incidental to or follows surgery resulting from trauma, infection or other diseases of the involved part, and reconstructive surgery because of congenital disease or anomaly of a covered dependent child which has resulted in a functional defect. However, if the policy provides hospital, surgical or medical expense coverage, including a policy issued by a health maintenance organization, then coverage and determinations with respect to cosmetic surgery must be provided pursuant to Part 56 of this Title (Regulation 183);

(6) foot care, in connection with corns, calluses, flat feet, fallen arches, weak feet, chronic foot strain or symptomatic complaints of the feet; unless the policy is issued as Medicare supplement insurance pursuant to sections 52.11 and 52.22 of this Part, in which case the policy shall not include limitations or exclusions more restrictive than those of Medicare for this type of benefit;

(7) care in connection with the detection and correction by manual or mechanical means of structural imbalance, distortion or subluxation in the human body for purposes of removing nerve interference and the effects thereof, where such interference is the result of or related to distortion, misalignment or subluxation of or in the vertebral column; unless the policy is issued as Medicare supplement insurance pursuant to sections 52.11 and 52.22 of this Part, in which case the policy shall not include limitations or exclusions more restrictive than those of Medicare for this type of benefit;

(8) treatment provided in a government hospital; benefits provided under Medicare

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NY ADC 52.16                                                          Page 3

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

or other governmental program (except Medicaid), any State or Federal workers'
compensation, employers' liability or occupational disease law; benefits to the
extent provided for any loss or portion thereof for which mandatory automobile
no-fault benefits are recovered or recoverable; services rendered and separately
billed by employees of hospitals, laboratories or other institutions; services
performed by a member of the covered person's immediate family; and services for
which no charge is normally made;

   (9) dental care or treatment, except for such care or treatment due to accidental
injury to sound natural teeth within 12 months of the accident and except for
dental care or treatment **necessary due** to **congenital disease** or anomaly;

   (10) eyeglasses, hearing aids, and examination for the prescription or fitting
thereof;

   (11) rest cures, custodial care and transportation, unless the policy is issued
as Medicare supplement insurance pursuant to sections 52.11 and 52.22 of this
Part, in which case the policy shall not include limitations or exclusions more
restrictive than those of Medicare for this type of benefit; and

   (12) coverage while the insured is outside the United States, its possessions or
the countries of Canada and Mexico.

   (d) No policy shall contain provisions establishing a probationary or similar
period longer than the following:

   (1) for all specified conditions: 30 days;

   (2) for inception of pregnancy, except where otherwise specifically prescribed by
statute: 30 days; and

   (3) for accidents: none.

  This subdivision shall not apply to benefits for dental, hearing or vision care.

   (e) Except with respect to Medicare supplement insurance, as defined in sections
52.11 and 52.22 of this Part, nothing contained in subdivisions (c) and (d) of
this section shall preclude:

   (1) the use of a nonduplication of coverage or coordination of benefit provision;
or

   (2) unless otherwise provided by law, waivers to exclude, limit or reduce
coverage or benefits for specifically named or described disease, physical
condition or extra-hazardous activity, as defined in section 52.2(i) of this Part,
as an alternative to refusal to issue, renew or reinstate coverage.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NY ADC 52.16                                                            Page 4

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

   Where waivers are required as a condition of issuance, renewal or reinstatement,
signed acceptance by the insured is required unless on initial issuance the full
text of the exclusion is contained either on the first page or specification page
of the policy. Waivers to exclude, limit or reduce coverage or benefits for
specifically named or described preexisting diseases or physical conditions shall
not be used in Medicare supplement insurance.

   (f) No group or blanket medical expense insurance policy insuring 300 or more
persons, excluding dependents, shall contain a provision which excludes or limits
coverage for preexisting conditions for any person who elects coverage during the
first 30 days of eligibility. This provision shall not apply to blanket insurance
where enrollment for the coverage is voluntary, to dental insurance, to insurance
written under section 4235(c)(1)(H), (K), (L) and (M) of the Insurance Law or to
the extent that insurance written under section 4235(c)(1)(B) and (D) of the
Insurance Law insures employees of an employer with less than 300 employees.

   (g) Except as provided for in subdivision (c) of this section, and coverages in
effect after eligibility for Medicare, no policy shall set more than a single
maximum benefit limit for any class of covered persons in each of the following
categories of services provided by a hospital:

   (1) hospital services other than room and board; and

   (2) outpatient services.

   (h) No community-rated policy issued by an article 43 corporation, other than a
policy providing benefits through a health maintenance organization or its
equivalent, and no individual policy, as defined in section 52.2(n) of this Part,
shall provide benefits which duplicate benefits recoverable under mandatory
automobile no-fault insurance policies unless such benefits are contained in a
rider purchased at the option of the contract holder at an appropriate premium.

   (i) The terms Medicare supplement, Medigap, Medicare Wrap-Around and words of
similar import shall not be used unless the policy is issued or amended to comply
with sections 52.11 and 52.22 of this Part.

   (j) The terms long term care and custodial care and words of similar import shall
not be used in describing benefits unless the policy is issued or amended to
comply with section 52.12 or 52.13 of this Part.

   (k) Any application for a policy of limited benefits health insurance as defined
in section 52.10 of this Part and any such policy, when offered to persons who are
65 years of age or older, must include the following notice:

   (1) The application form shall incorporate immediately above the applicant's
signature in bold print at least four points greater than the largest print used
in the application, excluding the company name, logo and address, the following
statement only:

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NY ADC 52.16                                                              Page 5

11 NYCRR 52.16
N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16

The coverage applied for provides limited benefits health insurance only. This
coverage does not meet the minimum requirements for Medicare supplement, long term
care insurance, nursing home insurance only, home care insurance only, or nursing
home and home care insurance in the state of New York. Purchase of this coverage
may be unnecessary if you already have or intend to purchase Medicare supplement
insurance or long term care insurance.

(2) The policy shall incorporate into the top quarter of the first page in bold
print at least four points greater than the largest print used in the policy,
excluding the company name, logo and address, the following statement only:

This policy provides limited benefits health insurance only. This coverage does
not meet the minimum requirements for Medicare supplement, long-term care
insurance, nursing home insurance only, home care insurance only, or nursing home
and home care insurance in the state of New York. Purchase of this coverage may be
unnecessary if you already have or intend to purchase Medicare supplement
insurance or long term care insurance.

(1) No policy or certificate shall provide benefits for custodial care services
unless that policy or certificate also provides insurance which meets the
definition contained in section 52.11, 52.12 or 52.13 of this Part. For purposes
of this section custodial care services means help in transferring, eating,
dressing, bathing, toileting, and other such related activities.

CREDIT(S)


Sec. filed April 21, 1972; amds. filed: Nov. 17, 1972; Nov. 28, 1973; Aug. 26,
1974; June 16, 1975; Dec. 23, 1980; repealed, new filed April 2, 1982; amds.
filed: Aug. 17, 1984; Dec. 24, 1985 as emergency measure; Feb. 19, 1986; Sept. 1,
1989; June 19, 1990; July 2, 1991; March 12, 1992; Feb. 10, 1998 as emergency
measure; March 31, 1998; May 11, 1998 as emergency measure; July 14, 1998; Nov.
18, 1999 eff. Dec. 8, 1999. Amended (c)(9); amd. filed Aug. 1, 2002 eff. Aug. 21,
2002; emergency rulemaking eff. Aug. 2, 2006, expired Oct. 30, 2006; emergency
rulemaking eff. Oct. 31, 2006; expired Jan. 28, 2007; emergency rulemaking eff.
Jan. 30, 2007; expires Apr. 29, 2007.

REGULATION NO. 62 -- General Materials

Insurance Product Line: General, Health

A-to-Z Index Terms:

      ACCIDENT AND HEALTH INSURANCE

      POLICY

      POLICY - Filing requirements


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 NY ADC 52.16                                                          Page 6

 11 NYCRR 52.16
 N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16


        11 NY ADC 52.16
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IPRO**    Experts in Defining and Improving the Quality of Health Care

December 6, 2006

Mark DeRosa
J. Peat & Associates
20 Blake Avenue
Lynbrook, NY 11563

Re:         External Appeal Application – Kim Kaufman
Reference #:  200610-14241

Dear Mr. DeRosa:

IPRO has completed review of all documentation submitted relative to your request for external
appeal on behalf of Kim Kaufman and has determined that the decision of Oxford Health Plans
of New York to deny authorization for removal of supportive implant, denial of crowns, denial of
surgical placement implant body: endosteal, denial of reconstruction of cleft palate should be
modified to approve requested procedures with exception of replacement for numbers five and
six, as they were not part of the original congenital anomaly.

Review of this appeal was conducted by a clinical reviewer who is a Doctor of Dental Surgery
and Specialist in Adult and Child Orthodontics and Dentofacial Orthopedics. IPRO has screened
this clinical reviewer for any prohibited material affiliation and has determined that none exists.

Documentation submitted for review included:

- Letter from S. Swift, New York State Insurance Department to T. Giorgio, RN, IPRO dated
  11/7/06
- New York State External Appeal Application signed K. Kaufman dated 10/19/06
- Letters from P. Trotto, Oxford to K. Kaufman dated 9/5/06 (2), 9/5/06
- Letter from J. Leninger, Oxford to M. DeRosa, J. Peat and Associates dated 10/16/06
- Letter from C. Linen, New York State Insurance Department to K. Kaufman dated 9/29/06
- Letter from A. Cogan, Oxford to C. Linen dated 9/15/06
- Letters from B. Goldenberg, Oxford to K. Kaufman dated 6/20/06 (2)
- Letters from N. Lopes, Oxford to K. Kaufman dated 6/7/06, 6/23/06, 8/15/06, 8/10/06
- Letter from E. Britt, Oxford to K. Kaufman dated 6/30/06
- Letters from M. DeRosa To Whom It May Concern, Oxford dated 9/22/06, 6/19/06
- Letters from C. Cutting, MD To Whom It May Concern, Oxford dated 10/6/06. 6/6/06
- Letter from K. Kaufman to H. Mills and M. Gennaour, New York State Insurance Department
  dated 7/19/06
- Biograph and Personal Archive re: D.R. Millard, MD
- Information from Miami Children's Hospital re: S.A. Wolfe, MD
- Vitae re: C. Cutting, MD
- Viate re: L. Brecht, DDS
- Consultation Notes from C. Cutting, MD re: K. Kaufman
- Letter from B. Langer, DMD to N. Loees dated 5/18/06

SO
ORDERED
CERTIFIED

Mark DeRosa
December 6, 2006
Page 2

- Single Family Ledger re: K. Kaufman dated 5/18/06
- E-mails between K. Kaufman to E. Britt and N. Lopes
- Letter from K. Kaufman to J. Zucker, MD, Oxford dated 5/26/06
- Medical Records including progress notes, dental notes, operative reports, lab reports, treatment records, pictures, x-rays and correspondence re: K. Kaufman
- Vitae re: D. Behrman, DMD
- E-mails between K. Kaufman and V. Scott, oxford
- Letters from L. Brecht, DDS To Whom This May Concern, Oxford dated 6/15/06, 10/22/06
- Press Release from Office of New York State Attorney General Eliot Spitzer re: Report Cites Health Plan Errors and Denial as Top Consumer Complaints dated 3/27/06
- Letter from C. Cutting, MD to S. Swift dated 11/6/06
- Additional Correspondence Summary re: K. Kaufman
- Letter from V. Scott, Oxford to K. Kaufman dated 7/3/06
- Letter from M. Moore, New York State Office of the Attorney General to K. Kaufman dated 8/8/06
- Letter from P. Trotto to S. Langer, DMD dated 9/5/06
- Letter from J. Neverson, New York State Insurance Department to K. Kaufman dated 8/24/06
- Letter from K. Powell, Oxford to K. Kaufman dated 8/24/06
- Letter from C. Misorek, Oxford to J. Heffner, New York State Office of the Attorney General dated 8/30/06
- Letter from V. Maiolo, Oxford to New York State Insurance Department dated 8/21/06
- Letter from J. Heffner to K. Kaufman dated 9/11/06
- Letter from R. Lucus to K. Kaufman dated 8/29/06
- Statement of Account from C. Cutting, MD re: K. Kaufman dated 8/29/06
- Letters from D. Pine to Oxford dated 8/28/06, 6/2/06
- Letter from D. Pine to New York State Insurance Department dated 8/28/06
- Letter from K. Kaufman to T. Giorgio, RN dated 11/10/06
- Letter from V. Torres, Oxford to K. Kaufman dated 11/8/06
- Letter from K. Kaufman to J. Leninger dated 10/18/06
- Letter from J. Leninger to K. Kaufman dated 10/24/06
- Case Review from D. Behrman to E. Britt, N. Lopes dated 8/27/06
- Oxford Individual Authorization Reports re: K. Kaufman
- Letter from N. Lopes to L. Brecht, DDS dated 8/10/06
- Letter from K. Powell, Oxford to K. Kaufman dated 8/24/06
- Letter from K. Powell to B. Langer, DMD dated 8/24/06
- Oxford Clinical Appeals CAG printout re: K. Kaufman
- Oxford Dental Department Review of Clinical Cases re: K. Kaufman dated 9/5/06
- Letter from N. Lopes to B. Langer, DMD dated 8/15/06
- Progress Notes from C. Cutting, MD re: K. Kaufman
- Medical Records from B. Langer, MD re: K. Kaufman

December 6, 2006
Page 3

      Dental Records and x-rays from L. Brecht, DDS re: K. Kaufman
      Letter from F. Steeger, Oxford to T. Giorgio, RN dated 11/14/06
      Letter from S. Swift to F. Steeger dated 11/7/06
      Oxford Policy re: Covered Services and Exclusions & Limitations
      Oxford Coverage Statement re: Dental and Oral Surgical Procedures
      Oxford Grievance Review re: K. Kaufman
      Letter from L. Brecht, DDS to N. Lopes date d8/1/06

The basis for this determination is as follows:

Issue:

According to the documentation submitted, more specifically a letter dated 5/18/06 from Dr. Langer, the patient has a previous cleft palate and lip which was partially repaired. He notes that the patient was seen 5/11/06 for removal of an implant in the # 6 position which had dehisced on the buccal and was inflamed. In addition, he indicates that there was a "major deficiency in the amount of keratinized tissue surrounding the implant and bordering position of tooth #7 deeming the need for a subepithelial connective tissue graft." Dr. Langer also notes that a bone graft to re-establish normal integrity to the area between #'s 6 and 7 is being planned in order to provide osseointegrated implants. He states that this procedure would not be possible with the prior inflamed implant and the lack of adequate tissue and refers to a New York State Insurance Commission regulation that states that dental care and treatment be covered under the insurance plan for congential anomalies. In a letter dated 6/6/06 from Dr. Cutting, he outlines the timeline and rationale for each step. He notes that the patient must first have a removal of the failed dental implant followed by an iliac bone graft to the alveolar cleft to make a repeat placement of a dental implant feasible. Prior to this, he notes, palatal mucosal grafts to the alveolar cleft must be done to prepare the area for the bone graft and notes that this is crucial that the placement of the bone graft be done in a pocket that is not buckled mucosa. Another letter from Dr. Cutting dated 10/6/06 refers to the denial of the implant and connective tissue grafting and notes that the procedures were medically necessary based on the fact that "the patient currently has no bony connection between the two sides of her palate. This causes maxillary instability that cannot be corrected by simple dental means." He further notes that the concerns are of a medical nature rather than a dental.

The insurer has denied the removal of supportive implant, denial of crowns, denial of surgical placement implant body: endosteal, denial of reconstruction of cleft palate and indicates in an final determination letter dated 10/16/06 that the patient has a history of a unilateral cleft repair. They further note that the cleft palate remains intact and the dental treatment was related to a failed bridgework and implant. In addition, the insurer notes that the current dental problems do not appear to be related to a failed cleft palate repair,

December 6, 2006
Page 4

...s the defect continues to remain well closed and that the services are dental in nature
.nd not a covered benefit.

The patient is appealing and supplies extensive summaries and exhibits relating to her
:ase, the most inclusive one being the one dated 7/19/06. She indicates in that letter that
.he has a cleft palate and "must undergo both reconstructive and dental procedures in
order to live a normal, healthy life, thereby enabling me to eat, drink and speak." She
further notes that "there are laws in place to assure that dental care is covered under
medical insurance when related to a congenital anomaly." The patient also brings up the
issue that the physicians utilized by the insurers to review her case lacked experience in
:left palate issues.

Reviewer Findings:

Based on the review of all information submitted, modification of the previous
consultant's decision to deny coverage is recommended. In order to reach this
determination a couple of questions must be answered: 1) Was the cleft still present and
f so, was it necessary to close for long term stability? 2) Which teeth were aplastic
congenitally absent) and how should they be restored?

The answer to question number one can only be given by Dr. Cutting, who physically
opened and explored the cleft. Review of the correspondence and medical record clearly
shows that the cleft was present with "...no bony connection..." For stability of the
dental arch, foundation is most important. The analogy can be made to building a house.
A house built on a solid foundation will remain intact; whereas, a house built on uneven
or unstable foundation will deteriorate. For long term stability and medical/dental health
of the site and adjacent areas, bony closure of the cleft is necessary. The fact that
Oxford covered a portion of the graft suggests they deemed the procedure medically
necessary.

Question number two must be answered from the dental record and history. Information
obtained by Ms. Kaufman from Dr. Wolfe, revealed information about the grafting of the
cleft, but did not specify which teeth were or were not present. At the present time, only
teeth #'s 5, 6 and 7 are missing. Dr. Brecht stated that these were congenitally absent.
According to the record of Dr. Blum, tooth number five was extracted and implanted in
2003; in 2005 Dr. Weber performed an apicoectomy of tooth number five. Dr.'s Brecht
and Langer both refer to the implant as in position of tooth number six. Panoral
radiographs show tooth number five present next to the implant in place of tooth number
six. The only logical resolution of these discrepancies is that the record of Dr. Blum is
incorrectly written and the cuspid (tooth number six) was extracted and then implanted.
Only tooth number seven is aplastic. Most cleft patients have aplasia of primary and
permanent teeth, the usual suspects are those adjacent to the cleft. The most common

December 6, 2006
Page 5

plastic anterior tooth is the maxillary lateral incisor (teeth numbers seven and ten). It is safe to assume that number seven is the only congenitally absent tooth.

With these questions answered, reconstruction of the cleft and restoration of those congenitally absent teeth are under the umbrella of New York State regulation. It does not matter if this is a child or an adult; the age at the time of diagnosis and reconstruction is immaterial. Correction of the congenital malformation is medically necessary. Even in this situation where grafting was done prior, the malformation was never corrected. There are some procedures that were done in preparation of the site of surgery. Since these procedures were done to enhance the likelihood of the success of the surgical graft, they should be covered as well.

In order to ensure success of the graft, the tissues covering the area needed to be prepared and healthy. To achieve this, the failing implant required removal so that the soft tissue would be healthy enough to withstand surgery and promote good healing. Remember, the oral tissue will act as a bandage and provide nutrition (blood supply) after the graft is in place. If the tissue is diseased or inadequate in size, quality, or blood supply, the graft would be sure to fail.

Removal of the implant was the first step in preparing the cleft for grafting. The second step is to ensure that the tissue covering the graft be of the right quality. Dr. Langer performed a subepithelial connective tissue graft in the area of the cleft to build the tissue. Prior to the connective tissue graft, mucosa was covering the area; this tissue is not suitable for covering the graft, it lacks size (quantity) and blood supply (quality). Grafting under mucosa would result in retraction of the iliac crest graft; in other words, the graft would resorb (be digested by the body). Now the site, provided oral home care is adequate, would be ready to accept the graft.

Restoration of the region is also necessary for stabilization of the occlusion and maintenance of the graft. Replacement of tooth number seven by means of dental implant and implant crown should be covered as it is part of the final reconstruction of the cleft. Replacement of teeth numbers five and six are the responsibility of Ms. Kaufman as they were not part of the original congenital anomaly.

Mark DeRosa
December 6, 2006
Page 6

In summary, reversal of the denial of coverage for the following is recommended:

1. Removal of implant.
2. Subepithelial connective tissue graft.
3. Reconstruction of cleft palate.
4. Temporization after surgical reconstruction.
5. Placement of dental implant tooth number seven.
6. Fixed prosthetics tooth number seven.

However, coverage for replacement of teeth numbers five and six should not be approved as they were not part of the original congenital anomaly.

The carrier's denial should be modified as detailed above.

Should you have any questions in regard to this review determination, please do not hesitate to contact me or Terese Giorgio at (516) 326-7767, ext. 411.

Sincerely,

Monty M. Bodenheimer, MD
Medical Director, Health Care Assessment

MMB:jg

cc:    Susan Swift, New York State Insurance Department
       Francine Steeger, Oxford Health Plans of New York
       Kim Kaufman



**OXFORD**
HEALTH PLANS'
A UnitedHealthcare Company

March 7, 2007

Ms. Kim Kaufman
74 Fairway Avenue
Rye, NY 10580

Re: External Appeal Determination: Kim Kaufman Reference # 200610-14241

Dear Ms. Kaufman:

Oxford received a letter from Dr. Monty M. Bodenheimer, MD dated December 6, 2006,
with the external appeal opinion from IPRO partially reversing Oxford's earlier determination.

IPRO determined Oxford should provide coverage for Dr. Burt Langer DMD for the following
services:  Coverage will be provided for: CPT 20680  Removal of Supportive Implant, CPT
41870   Subepithelial connective tissue graft, CPT 42210   Reconstruction /bone graft of cleft
palate.

IPRO also determined in the external reviewer's recommendation that Oxford should provide
coverage for Dr. Lawrence Brecht, DDS for the following services.
Coverage will be provided for:  Temporization after surgical reconstruction
CPT 41899 (D6240) Pontic –porcelain fused to high noble metal – tooth # 8,
Placement of dental implant tooth # 7 CPT 21248 (D6010) endosteal implant
and fixed prosthetics tooth # 7 CPT 41899 (D6066).

IPRO partially upheld Oxford's earlier denial of coverage for replacement of tooth # 5
and tooth #6.  These teeth were not part of the original congenital anomaly.

Although Oxford feels that its original denial in this case was correct, Oxford will modify its
earlier decision and provide coverage in accordance with IPRO's determination. We have
updated Oxford authorization # 81835708 and Oxford's Claims Department will reprocess the
submitted claims from Dr. Langer and Dr. Brecht.  Your providers should submit completed
claims forms for any services not previously billed for services.  Please note all claims will be
processed in accordance with your contract benefits.

Please contact me if you require any further assistance in this matter.

Sincerely,

*Francine A. Steeger*

Francine A. Steeger RN, CPC, CCM
UnitedHealthcare External Reviews

cc: Dr. Lawrence Brecht, Dr. Burt Langer, Susan Swift, NY State Dept of Insurance

**203 459 6000**
48 Monroe Turnpike, Trumbull, CT 06611

EXHIBIT CC

Receivable Strategies, LLC
335-365 New Commerce Blvd
Hanover Industrial Estates
Wilkes-Barre, PA 18706



02/07/08

| | |
|---|---|
| Phone #: | 1-800-967-2894 |
| | |
| Tax ID #: | 133797774-0000 |
| Control #: | UHC-2008037-1-133797774-0000-UHY |
| RE: | Oxford |

ATTN: REFUND DEPARTMENT        64-16
LAWRENCE BRECHT
560 FIRST AVENUE
NEW YORK NY  10016-6402

Dear Sir or Madam:

Oxford has recently performed a review of claims paid. During this
review, Oxford determined that the claim(s) on the enclosed remittance advice was/were
paid incorrectly. Oxford has retained Receivable Strategies, LLC (under a contract,
which includes a Business Associate Agreement compliant with "HIPAA" regulations), to recover
this/these incorrect payment(s) from you.

According to our records, you have not reimbursed Oxford for the claim(s) on the
enclosed remittance advice. If your records show that you have reimbursed these funds, please
forward a copy of the front and back of your cancelled check with the enclosed remittance advice
so that we may update our records.

If no reimbursement has been made, make your check payable to Oxford
for the full refund amount indicated on the enclosed remittance advice. On your check, please include
your tax ID number and the control number provided above. Send your payment with the enclosed
remittance advice to: Receivable Strategies, LLC, P.O. Box 36260, Newark, NJ 07188-6260.

Pay by phone information and assistance is available by contacting us at 1-800-967-2894.

If a response is not received within forty-five (45) days, Oxford may offset future
payments by the refund amount requested.

If you feel these findings are in error, please forward written notification and supporting
documentation to: Receivable Strategies, LLC, 335-365 New Commerce Blvd., Hanover Industrial Estates,
Wilkes-Barre, PA 18706.

We appreciate your prompt attention to this important matter. Please contact us immediately at the
number provided above if you require additional information.

Portal address  www.unitedhealthcareonline.com can be utilized for patient eligibility, claims
submission and reimbursement information.

Sincerely,

Receivable Strategies, LLC

Enclosures (1)                                                                 83

Tax ID #        133797774-0000  1-133797774-0000-UHY    Payable To: Oxford
Provider:       LAWRENCE BRECHT                          PO Box 36260
Date :          02/07/08                                 Newark, NJ  07188-6260
                                                         (800) 967-2894

| Patient Acct#<br>Claim UID | Member ID<br>Member Name | Audit Number<br>Proc Code | Date of Srvc<br>Provider | Overpaid Amt | Date Paid | Refun |
|---|---|---|---|---|---|---|
| 6256707985<br>UNC11597971 | AB2824886350850102S<br>Kaufman, Kim | 6256707985 | 07-20-06<br>LAWRENCE BRECHT | 1,422.90 | 10-19-06 | |
| Reason : CLAIM PAID FOR SERVICES NOT AUTHORIZED<br>Not authorized by Oxford. | | | | | | |

-------------------------------------------------------------------------------------------------------------

TOTAL REFUND DUE
#3                                                                              1,422.90

Docket No.   08 Civil        (        )

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

KIM KAUFMAN and GLENN KAUFMAN,

Plaintiffs,

-against-

UNITEDHEALTH GROUP, INC.,
UNITEDHEALTHCARE, UNITED
HEALTHCARE INSURANCE COMPANY
OF NEW YORK, UNITEDHEALTHCARE
OF NEW YORK, INC., OXFORD HEALTH
PLANS LLC and OXFORD HEALTH
PLANS (NY), INC.,

Defendants.

## COMPLAINT

**CRAVATH, SWAINE & MOORE LLP**
*Attorneys for Plaintifffs*
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000